**No. 24-6151**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

**FIONA HARVEY,**

*Plaintiff-Appellee*,

v.

**NETFLIX, INC. and NETFLIX WORLDWIDE ENTERTAINMENT, LLC,**

*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the Central District of California, Case No. 2:24-cv-04744-RGK-AJR
The Honorable R. Gary Klausner

_____

## OPENING BRIEF OF DEFENDANTS-APPELLANTS
## NETFLIX, INC. AND NETFLIX WORLDWIDE ENTERTAINMENT, LLC

_____

Marvin S. Putnam
Laura R. Washington
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
(424) 653-5500

Gregory G. Garre
  *Counsel of Record*
Peter E. Davis
Christina R. Gay
Sakina Haji*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

February 26, 2025

*Admitted in New York; all work
supervised by a member of the DC Bar.

*Counsel for Defendants-Appellants*
*Netflix, Inc. and Netflix Worldwide Entertainment, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Netflix, Inc. is a publicly traded company that has no parent company, and no publicly held corporation owns 10% or more of Netflix, Inc.'s stock. Appellant Netflix Worldwide Entertainment, LLC is a wholly owned subsidiary of Netflix, Inc.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION...................................................................4

STATEMENT OF THE ISSUES.......................................................................5

STATEMENT OF THE CASE.........................................................................5

     A.    Legal Background .................................................................5

     B.    Factual Background...............................................................7

          1.    Gadd's Transformation Of His Real-Life Traumas Into Creative Works ........................................................7

          2.    Harvey Stalks Gadd For More Than Two Years .........................8

          3.    The *Baby Reindeer* Play.............................................14

          4.    The *Baby Reindeer* Series .........................................15

          5.    Harvey Claims Publicly That She Is The Martha Character .................................................................17

     C.    This Litigation ..................................................................18

     D.    District Court's Decision......................................................21

SUMMARY OF ARGUMENT .....................................................................23

STANDARD OF REVIEW ..........................................................................26

ARGUMENT ...........................................................................................27

**Page**

I.    *BABY REINDEER* IS A DRAMATIZED AND FICTIONALIZED ACCOUNT OF GADD'S STORY THAT A REASONABLE VIEWER WOULD UNDERSTAND DOES NOT PURPORT TO STATE ACTUAL FACTS "OF AND CONCERNING" HARVEY HERSELF ...................................................................................29

    A.    Harvey Failed To Meet Her Burden To Show The Series Asserts Factual Statements "Of And Concerning" Her ....................................31

    B.    The District Court's Contrary Determination Was Wrong.................35

III.    IN ANY EVENT, EVEN IF A REASONABLE VIEWER WOULD BELIEVE THE STATEMENTS WERE "OF AND CONCERNING" HARVEY, HARVEY FAILED AS A MATTER OF LAW TO ESTABLISH THAT NETFLIX ACTED WITH ACTUAL MALICE.........43

    A.    The Actual Malice Standard Requires Harvey To Prove Netflix's State Of Mind By Clear And Convincing Evidence ...........................44

    B.    The Evidence In The Record Shows Only That Netflix Acted In Good Faith Without Actual Malice Toward Harvey ..........................46

    C.    The District Court Erred In Finding Actual Malice Based On A Newspaper Article That Was The Epitome Of Inadmissible Hearsay And Stated Nothing About Netflix's State Of Mind ............49

CONCLUSION ...........................................................................................57

STATEMENT OF RELATED CASES .................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aguilar v. Universal City Studios, Inc.*,
174 Cal. App. 3d 384 (1985) ...............................................................28, 29, 36

*Annette F. v. Sharon S.*,
119 Cal. App. 4th 1146 (2024) ...........................................................49

*Blatty v. New York Times Co.*,
42 Cal. 3d 1033 (1986) .......................................................................31, 32

*Bose Corp. v. Consumers Union of United States, Inc.*,
466 U.S. 485 (1984)............................................................................27

*Christian Research Institute v. Alnor*,
148 Cal. App. 4th 71 (2007) ...............................................................45, 46, 52

*Church of Scientology v. Wollersheim*,
42 Cal. App. 4th 628 (1996) ...............................................................5

*Colborn v. Netflix Inc.*,
661 F. Supp. 3d 838 (E.D. Wis. 2023) ...............................................40

*Copp v. Paxton*,
45 Cal. App. 4th 829 (1996) ...............................................................44, 45, 53, 54

*Couch v. Verizon Communications Inc.*,
105 F.4th 425 (D.C. Cir. 2024)...........................................................44

*Davis v. Costa-Gavras*,
654 F. Supp. 653 (S.D.N.Y. 1987) .....................................................33

*De Havilland v. FX Networks, LLC*,
21 Cal. App. 5th 845 (2018) ...............................................................30, 44, 48, 53, 56

*Dworkin v. Hustler Magazine Inc.*,
867 F.2d 1188 (9th Cir. 1989) ............................................................47

*Ferlauto v. Hamsher*,
74 Cal. App. 4th 1394 (1999) .............................................................29, 32

iv

**Page(s)**

*Geary v. Goldstein,*
No. 91-cv-6222, 1996 WL 447776 (S.D.N.Y. Aug. 8, 1996) ...........................38

*Good Government Group of Seal Beach, Inc. v. Superior Court,*
22 Cal. 3d 672 (1978) ........................................................57

*Greene v. Paramount Pictures Corp.,*
813 F. App'x 728 (2d Cir. 2020) .......................................32

*Guglielmi v. Spelling-Goldberg Productions,*
25 Cal. 3d 860 (1979) ....................................................3, 57

*Hilton v. Hallmark Cards,*
599 F.3d 894 (9th Cir. 2010) ................................................6

*Issa v. Applegate,*
31 Cal. App. 5th 689 (2019) .............................................38

*Khodorkovskaya v. Gay,*
5 F.4th 80 (D.C. Cir. 2021).................................................30

*Laker v. Board of Trustees of California State University,*
32 Cal. App. 5th 745 (2019) ......................................7, 46, 50

*Lords Landing Village Condominium Council of Unit Owners v.*
*Continental Insurance Co.,*
520 U.S. 893 (1997)...........................................................51

*Lovingood v. Discovery Communications, Inc.,*
800 F. App'x 840 (11th Cir. 2020) .............................42, 47

*Makaeff v. Trump University, LLC,*
715 F.3d 254 (9th Cir. 2013) ....................................5, 6, 26

*Manzari v. Associated Newspapers Ltd.,*
830 F.3d 881 (9th Cir. 2016) .............................................50

*McGarry v. University of San Diego,*
154 Cal. App. 4th 97 (2007) ..............................................29

*Metabolife International, Inc. v. Wornick,*
264 F.3d 832 (9th Cir. 2001) ......................................*passim*

v

**Page(s)**

*Middlebrooks v. Curtis Publishing Co.*,
  413 F.2d 141 (4th Cir. 1969) ...................................................33

*Naantaanbuu v. Abernathy*,
  816 F. Supp. 218 (S.D.N.Y. 1993) .......................................52

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..............................................................43

*Newton v. National Broadcasting Co.*,
  930 F.2d 662 (9th Cir. 1990) ..........................................54, 55

*Orr v. Bank of America, NT&SA*,
  285 F.3d 764 (9th Cir. 2002) ................................................52

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ................................30, 34, 35, 37, 41

*Planet Aid, Inc. v. Reveal*,
  44 F.4th 918 (9th Cir. 2022) ..................................................7

*Planned Parenthood of Columbia/Willamette, Inc. v. American
  Coalition of Life Activists*,
  290 F.3d 1058 (9th Cir. 2002) ..............................................27

*Reader's Digest Association v. Superior Court*,
  37 Cal. 3d 244 (1984) ...........................................................55

*Reed v. Gallagher*,
  248 Cal. App. 4th 841 (2016) .........................................48, 49

*Sanchez v. Bezos*,
  80 Cal. App. 5th 750 (2022) .................................................52

*Sandoval v. County of San Diego*,
  985 F.3d 657 (9th Cir. 2021) ..........................................26, 52

*Selleck v. Globe International, Inc.*,
  166 Cal. App. 3d 1123 (1985) .............................................39

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)......................................................45, 53, 55

**Page(s)**

*Tamkin v. CBS Broadcasting, Inc.*,
193 Cal. App. 4th 133 (2011) ..................................................*passim*

*Taus v. Loftus*,
40 Cal. 4th 683 (2007) ...............................................................7

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021) ....................................................27

*United States v. Huerta-Macias*,
26 F.3d 134, 1994 WL 209817 (9th Cir. 1994)........................51

*Varian Medical Systems, Inc. v. Delfino*,
35 Cal. 4th 180 (2005) .............................................................27

*Wilcox v. Superior Court*,
27 Cal. App. 4th 809 (1994) ......................................................6

## STATUTES

28 U.S.C. § 1291 ..........................................................................5

28 U.S.C. § 1332 ..........................................................................4

Cal. Civ. Proc. Code § 425.16 .....................................................4

Cal. Civ. Proc. Code § 425.16(b).................................................6

Cal. Civ. Proc. Code § 425.16(e)(4) ............................................6

## OTHER AUTHORITIES

Fed. R. App. P. 4(a) .....................................................................5

*Oxford English Dictionary* (2015, online).................................40

Robert Brian Taylor, *Is 'Fargo' Based on a True Story*, Collider,
https://collider.com/is-fargo-based-on-a-true-story/ (last updated
Apr. 17, 2024)..........................................................................42

Will Storr, *The Unpersuadables* (2014) ....................................40

## INTRODUCTION

This case concerns the right of storytellers like Richard Gadd, the comedian and creator of the award-winning Netflix series *Baby Reindeer* (the Series), to draw from their own life experiences to tell stories through the medium of a dramatic film or series.  If allowed to proceed, Plaintiff Fiona Harvey's lawsuit for nearly two hundred million dollars based on alleged defamation and related claims would undermine Gadd's First Amendment rights and those of studios like Netflix that distribute stories on issues of considerable public importance.  That would ultimately chill important and thought-provoking creative works like *Baby Reindeer*.

Much is disputed.  But Gadd and Harvey agree about one crucial point at the heart of this case:  the Series "is a work of fiction," and its main character "cannot be [Harvey]" because she "is a fictional character . . . of [Richard Gadd's] imagination."  Mot.,[1] Piers Morgan Interview at 7:32, 14:37, 17:22.  Those are Harvey's own words, and Richard Gadd has echoed them:  the Series "is my

---

[1]  "Mot." refers to Defendants-Appellants' Motion for Leave to Transmit Physical Exhibits (Video) to the Court, filed concurrently with this brief, requesting transmission of thumb drives containing video files of Plaintiff-Appellee Fiona Harvey's May 9, 2024 interview on *Piers Morgan Uncensored*, filed as Exhibit A to the Declaration of Marvin S. Putnam (Dkt. 26-7), and the episodes comprising the Netflix Series entitled *Baby Reindeer*.  These videos were originally lodged with the district court, *see* 2-ER-106 (Netflix's Notice of Manual Lodging), and were relied upon by the district court, *see* 1-ER-5, 10.  Harvey's *Piers Morgan Uncensored* interview is publicly available at https://www.youtube.com/watch?v=mK-isQXd_Qw&t=1075s.

emotionally true story," and it features "fictionalized characters . . . [as] foils to aid my exploration of my own experiences and trauma." 3-ER-304 (¶10). Yet Harvey brought this lawsuit accusing Netflix of defamation for distributing Gadd's "work of fiction": his story about how he struggled with his own sexual identity and sexual abuse crisis while being stalked by another person after a simple act of kindness.

Harvey's claim is based almost entirely on the fact that the Series includes a screen that states, "this is a true story," once, about two minutes into the first episode and after the first scene. Mot., Ep. 1 at 1:28. But this line must be viewed—from the perspective of a reasonable viewer—in the context of the rest of the Series' content and dramatic devices, including its creative cinematography, intentionally ironic and absurd scenes, and cheeky music. Not to mention the disclaimer that appears at the end of each episode, stating that "certain characters, names, incidents, locations, and dialogue have been fictionalized for dramatic purposes." *Id.* at 30:43. In context, the "this is a true story" line—presented in the same cheeky style and font as a main character's texts and emails shown throughout the Series—functions as a dramatic device akin to others present throughout the Series. A reasonable viewer would understand that, while the Series tells Gadd's story of struggling through a personal crisis while being stalked by a woman he met at a pub, it is a drama infused with fictionalized elements—not a real-life documentary.

2

Harvey's claim conflicts with settled principles of defamation law, and it violates the First Amendment. *See, e.g.*, *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 865-68 (1979). The First Amendment carefully safeguards the right to tell one's own story—a liberty that takes on special importance when it comes to difficult issues of public significance, such as sexual violence and abuse. And it is all the more critical when the storyteller is using a dramatic medium to process and communicate their own traumatic experiences. Through fictionalized characters, dialogue, camera angles, music, and other dramatic devices, *Baby Reindeer* allowed Gadd to share his journey through a sexual identity and abuse crisis with millions of viewers—and sparked broader conversations on important topics like mental illness, the lingering impacts of past sexual abuse, gender biases, and the ambiguities of victimhood. 2-ER-203–15 (Putnam Exs. I, J, K). By denying Netflix's anti-SLAPP motion and allowing Harvey's defamation case to move forward, the district court's decision risks silencing creators like Gadd who use dramatization to convey the gravity and significance of the real issues they have faced.

The district court's decision overrides basic First Amendment interests on the flimsiest of grounds. Harvey had the burden to show that a reasonable person would believe the Series stated actual facts about her. But instead of holding Harvey to that burden, the district court focused on the possibility that a cybersleuth, with the right internet searches, could identify certain similarities between the show's main

3

character and Harvey. Likewise, the district court failed to hold Harvey to her burden of showing that a reasonable viewer would believe that the Series—in the context of all its dramatic devices—was a real-life documentary, as opposed to a drama that included fictionalized elements and exaggerations to tell Gadd's story. And instead of demanding the clear and convincing evidence of actual malice that the First Amendment requires in cases involving public figures like Harvey, the court relied solely on inadmissible triple hearsay to find that Netflix intended to defame Harvey—namely, a newspaper article's paraphrased description of the views of unnamed "[s]ources in the TV industry" that Gadd had expressed "concerns" about labeling the Series a "true story." 1-ER-5, 15 (citation omitted).

In short, the district court wrongly diluted the standard a defamation plaintiff must meet in order to pass the gateway hurdle for maintaining suit in California. This misstep threatens to stifle creative expression and silence writers like Gadd, who seek to tell their own stories on issues of critical public importance using dramatic devices to effectively convey their own unique perspectives.

The district court's decision should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332. On September 27, 2024, the district court denied Netflix's motion to strike all claims under California's "anti-SLAPP" statute (Cal. Civ. Proc. Code § 425.16). 1-ER-2–19. On October 3,

2024, Netflix filed a timely notice of appeal. 2-ER-288; *see* Fed. R. App. P. 4(a). This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

## STATEMENT OF THE ISSUES

1. Whether the district court erred by concluding that Harvey met her burden of establishing that a fictionalized series, which did not use her name and included numerous dramatic devices, made factual statements "of and concerning" Harvey.

2. Whether the district court erred by concluding that Harvey met her burden of proving that Netflix acted with actual malice in streaming a dramatized series based solely on inadmissible and anonymous hearsay in a newspaper article.

## STATEMENT OF THE CASE

### A.    Legal Background

California, like several other states, has enacted a statute specifically designed to discourage "strategic lawsuits against public participation," or SLAPPs. As the California courts have explained, these lawsuits aim to stifle free speech and block defendants "from exercising their political rights," *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 644-45 (1996) (citation omitted), by "chilling expression through costly, time-consuming litigation," *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). SLAPP suits often "masquerade" as "ordinary" civil claims such as defamation as a means of transforming public debate

5

into lawsuits. *Wilcox v. Super. Ct.*, 27 Cal. App. 4th 809, 816-17 (1994) (citation omitted).

California's anti-SLAPP statute is a powerful tool designed to facilitate the swift dismissal of such lawsuits, thereby safeguarding defendants from unnecessary drains on their resources for exercising their constitutional rights. *See Metabolife*, 264 F.3d at 839. Under the statute, a defendant can file a special motion to strike at the lawsuit's inception. Cal. Civ. Proc. Code § 425.16(b). California courts then evaluate a defendant's anti-SLAPP motion using a two-step process.

At the first step, the defendant must make a threshold showing that the plaintiff's suit arises from protected activity—"conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." *Id.* § 425.16(e)(4); *see, e.g.*, *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010). Recognizing the important "'public interest'" in "'encourag[ing] continued participation in matters of public significance,'" the statute itself mandates that it be "construed broadly" to prevent the chilling of public participation through judicial abuse. *Hilton*, 599 F.3d at 902 (citation omitted).

Once the defendant shows that the plaintiff's claims target such "protected activity," "[t]he burden then shifts to the plaintiff . . . to establish a reasonable probability that it will prevail on its claim." *Makaeff*, 715 F.3d at 261-62. To meet

this burden, the plaintiff must demonstrate that "the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Metabolife*, 264 F.3d at 840 (citation omitted). This means that, when a defendant's anti-SLAPP motion challenges the evidentiary support for a claim, the plaintiff cannot "rely solely on [her] complaint," but instead must present "competent admissible evidence" backing up her claims. *Laker v. Board of Trs. of Cal. State Univ.*, 32 Cal. App. 5th 745, 768 (2019); *see Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 923, 928-29 (9th Cir. 2022).

This evidentiary requirement exists to weed out, at an early stage, unsubstantiated claims that "pose[] a potential chilling effect on speech-related activities." *Taus v. Loftus*, 40 Cal. 4th 683, 714 (2007).

## B. Factual Background

### 1. Gadd's Transformation Of His Real-Life Traumas Into Creative Works

This case stems from Richard Gadd's story about his experience of being stalked by a woman while he was undergoing his own personal challenges. Gadd, a renowned Scottish comedian, writer, and actor, has endured a series of harrowing experiences involving sexual abuse, harassment, and stalking—experiences he has transformed into powerful dramatic works. 3-ER-302–03 (¶¶3-5, 8).

In 2016, Gadd channeled some of these experiences into his acclaimed comedy show *Monkey See Monkey Do*. 3-ER-302 (¶3). In this production, Gadd's

character spends much of the performance running on a treadmill, chased by a gorilla, as he trains for the "Man's Man Final"—a contest designed to test participants' ability to complete ultra "manly" tasks. *Id.* The competition serves as a metaphor for Gadd's struggle to reclaim his masculinity and sense of self following past experiences with sexual assault, while the gorilla symbolizes the primal emotions of fear and anger that overwhelmed Gadd during this period in his life. *Id.*

Gadd built on these same themes in *Baby Reindeer*, which he wrote and performed as a one-man stage production that premiered in Edinburgh in 2019, and then adapted into the dramatic series distributed by Netflix. 3-ER-303 (¶5).

## 2. Harvey Stalks Gadd For More Than Two Years

Fiona Harvey, a Scottish woman, played a significant role in Gadd's real-life distress. Before she even met Gadd, Harvey had engaged in a five-year campaign from 1997 to 2002 of harassing a former Member of Parliament and his wife, the Wrays. 3-ER-306 (¶19); 2-ER-243–52 (¶¶3-32). Public reports detailed that Harvey had made death threats against the couple and falsely accused them of mistreating their developmentally disabled child to law-enforcement authorities. 2-ER-216–23 (Putnam Exs. M, N); *see also* 2-ER-244–50 (¶¶5-22). The coverage also reported that Harvey had stalked politician Donald Dewar, the inaugural First Minister of Scotland. 2-ER-216–19 (Putnam Ex. M).

Harvey then stalked and harassed Gadd over a three-year period from 2014 to 2017. 3-ER-305, 317–20 (¶¶15, 51-65). Gadd's first encounter with Harvey seemed harmless enough. Harvey appeared at the pub where Gadd worked as a bartender, Hawley Arms. Observing her apparent distress, Gadd offered her a cup of tea on the house, sparking what he believed to be a friendly chat about their shared Scottish heritage. 3-ER-304–05 (¶14). But that seemingly benign interaction marked the start of a far darker chapter. Harvey began to frequent Hawley Arms, severely impacting Gadd's ability to do his job. 3-ER-305 (¶15). Harvey would frequently interrupt Gadd while he served tables, announcing to customers that he was a comedian or using innuendos to embarrass him in front of the staff. *Id.* (¶16). Harvey also attempted to touch Gadd in inappropriate—and sexual—ways. 3-ER-305 (¶17). Despite Gadd's repeated pleas for Harvey to stop, Harvey pinched and touched various parts of Gadd's body, including his bum. 3-ER-305–06 (¶17).

Harvey engaged in other forms of physical abuse, too. Once, Harvey mentioned to a fellow customer a negative review of Gadd's comedy she had seen online. 3-ER-306 (¶19). Gadd retorted by mentioning news coverage he had seen of Harvey's five-year harassment of a former Member of Parliament and his wife. *Id.* Upon hearing this, Harvey stormed out, only to return and find Gadd crouched in a corner sorting a cupboard. *Id.* Without warning, Harvey approached Gadd from behind and shoved him in the back of his neck, launching into a tirade about how

Gadd's "mouth would get [him] into trouble." *Id.* With bar patrons watching, Gadd—torn between fear and embarrassment—quickly apologized to defuse the situation. *Id.* Harvey subsequently stormed out of the pub, reiterating her threat that Gadd's mouth would land him in trouble. *Id.*

As Harvey's visits to the pub grew more intense, Gadd often found himself forced to hide during his shifts, hoping she would eventually tire and leave. 3-ER-306–07 (¶20). The constant fear of what Harvey might do—especially after reading about her past behavior—kept Gadd perpetually on edge. *Id.* Harvey's behavior towards Gadd became so severe and unpleasant that, by mid-2014, Harvey was banned from Hawley Arms. 2-ER-176–77 (¶¶1-5).

But that did not stop the abuse. In July 2014, Harvey found Gadd's email address online. 3-ER-307 (¶22). She then began bombarding Gadd with emails at all hours, often sending multiple messages in a single day. *Id.* Over the course of two years, Harvey sent Gadd thousands of emails, often including sexual, violent, and derogatory content. 3-ER-308 (¶23). For example, Harvey threatened Gadd with an "ultimatum," demanding "sex three times at night and twice in the morning" and stating "I just want to give u loads and loads of blow jobs to make you sleep." 3-ER-310 (¶33); 3-ER-326–31 (Exs. 18-20). Harvey also sent numerous emails discussing Gadd's body, including his "bum." 3-ER-311 (¶35); 3-ER-332–39. And

she sent emails with photos of herself and her underwear. 3-ER-311 (¶36); 3-ER-340–48 (Exs. 28-30).

Harvey's emails also contained threats of physical violence and racist and homophobic language. 3-ER-308–10 (¶¶25-26, 30). For example, Harvey once warned Gadd to "shut [his] ignorant little failed actor mouth" because he was "finished." 3-ER-309 (¶29); 3-ER-322–23 (Ex. 11). She later stated that she would "kill a Muslim if they attacked you," "[I] hate [M]uslims . . . noise noise noise act like animals," and "[a]ll Moslems [sic] should be tied up by the balls to hang from trees." 3-ER-308 (¶25). In another email, Harvey admitted "[n]o wonder I'm a racist." *Id.* And at one point, Harvey stated: "I can't stand this gay business . . . It makes me squirm actually . . . [y]uk yuk." *Id.* Harvey also raged that "the minute I see [Labor Party members] I want to stab them in the face." 3-ER-324–25 (Ex. 13).

Harvey's emails confirmed that she regularly attended Gadd's comedy performances. 3-ER-12 (¶38). For instance, on August 28, 2016, Harvey sent Gadd an email speculating "I think you were assaulted and I'll tell you why," which included details she could have only observed from attending a performance. *Id.*

Despite being barred from the pub, Harvey often lurked outside, waiting for Gadd to leave and then following him around town, sometimes alarmingly close to his home. 3-ER-307 (¶21); 2-ER-177 (Seymour). Harvey also frequently appeared uninvited at Gadd's comedy and theatre performances, sometimes causing

11

disruptions. 3-ER-307 (¶21). For example, before a show began in 2016, Gadd's producer spotted Harvey in the audience. To avoid a scene, the producer discreetly informed everyone in the audience except Harvey that they would pretend the show was cancelled, but the audience could return 10 minutes later once Harvey left. *Id.* As Gadd stepped out for fresh air, Harvey confronted him about the cancellation—prompting another member of the production team to have to intervene as Harvey grew increasingly agitated. *Id.*

After years of enduring Harvey's stalking, harassment, abuse, and threats, Gadd went to the police in February 2016. 3-ER-313 (¶40). The police warned Gadd that "police intervention might exacerbate the situation, and lead to further prolonged contact from [Harvey]," recommending that they simply refer Harvey "to the appropriate mental health/community intervention team for support." *Id.* (citation omitted).

In the following months, Gadd continued to receive hundreds of emails from Harvey and, in May 2016, he reached back out to the police to express his concerns and reopen the harassment case. 3-ER-313 (¶41). In response, the police recommended that Gadd block Harvey's email address for the time being. *Id.*

Then, in September 2016, Harvey obtained Gadd's telephone number. 3-ER-314 (¶42). Over just a few days, she left Gadd hundreds of voicemails that included more verbal abuse. 3-ER-314 (¶44). Harvey called Gadd a "bipolar alcoholic," and

claimed the "whole of Glasgow" hated him and had an "axe to grind." *Id.* She also made threats against Gadd's family, stating "I know your family," and they have "enemies." *Id.* And Harvey warned Gadd not to tell the police about her voicemails and emails, claiming to have "access" to the police files. *Id.*

On September 17, 2016, Gadd again emailed the police, informing them about the hundreds of voicemails and preparing a document outlining the "particularly threatening" and "aggressive" moments. 3-ER-315 (¶45). On September 21, 2016, Gadd followed up and sent the police another email attaching 30 emails Harvey had sent over the last two years. 3-ER-316 (¶47). And on September 30, 2016, Gadd emailed the police again to coordinate dropping off a "pendrive with all the information regarding Fiona Harvey," including the voicemail recordings. 3-ER-317 (¶50).

By this point, Harvey's relentless harassment had tormented Gadd for over two years—and he was fearful for his safety. 3-ER-317 (¶51). He constantly changed his daily routines to avoid Harvey, steering clear of areas he knew she frequented. *Id.* Even now, certain parts of London make Gadd uneasy. *Id.* During this period, Gadd had trouble sleeping—and, when he could sleep, he often awoke drenched in sweat, gripped by panic and paranoia. *Id.*

Finally, after many months of speaking to the police, Gadd secured a "First Instance Harassment Warning" against Harvey. 3-ER-318 (¶53). This brought a

halt to the barrage of emails and voicemails, but Harvey's abusive behavior did not stop. *Id.* (¶¶53-54). For example, Harvey sent Gadd a handwritten letter along with underpants, stating, "you've not unblocked your email . . . so have not checked my emails. Here are some lucky [under]pants." 3-ER-318 (¶54).

### 3. The *Baby Reindeer* Play

Gadd's harrowing experiences with Harvey, along with his personal struggles with sexual identity and sexual abuse, inspired him to write and star in the theatre production *Baby Reindeer*. 3-ER-303 (¶¶4, 8). This one-man play employs fictionalized characters and dramatized scenes to explore the emotional and physical consequences of being stalked. 2-ER-187–97 (Putnam Exs. C, D).

"Baby Reindeer"—the nickname given to Gadd by his stalker based on a stuffed animal she had as a child—narrates his unsettling relationship with "Martha," a fortysomething woman whose obsession jumps from mildly amusing to deeply disturbing. 2-ER-194–202 (Putnam Exs. D, E). The story lays bare Gadd's darkest thoughts about his stalking: he wrestles with self-blame, questioning whether he somehow encouraged Martha, and reflects on the police's dismissive responses to his complaints, wondering if their reaction would have been different if he were a woman. 2-ER-187–97 (Putnam Exs. C, D). The play also invites audiences to grapple with the unsettling emotions tied to feeling empathy for one's abuser, while

exploring Gadd's sexual-identity crisis and experiences of sexual abuse during the period he was stalked by Harvey. 2-ER-194–97 (Putnam Ex. D).

*Baby Reindeer* garnered critical acclaim, winning The Scotsman Fringe First Award for New Writing and a Stage Award for Acting Excellence. 3-ER-303 (¶4).

### 4. The *Baby Reindeer* Series

In March 2020, Netflix acquired the rights to Gadd's stage play *Baby Reindeer*, including streaming rights for a television series adaptation. 2-ER-135 (¶2). Netflix released the *Baby Reindeer* television series (the Series) on April 11, 2024. *Id.* (¶3). Like the *Baby Reindeer* play, the Series is not a documentary or beat-by-beat recounting of events from Gadd's life. Instead, it is a fictionalized retelling of Gadd's story of his emotional journey through sexual abuse, sexual-identity struggles, stalking, and self-discovery—employing fictionalized characters, dramatized scenes, and dramatic devices to allow Gadd to tell his story in a compelling and impactful way. 3-ER-303–04 (¶¶9-13); 2-ER-136 (¶¶6-7).

Described by Netflix as an "offbeat, psychological" drama/comedy, the Series follows "Donny," a fictionalized aspiring comedian played by Gadd who grapples with his sexual identity and past sexual abuse. 2-ER-135 (¶3). The words "this is a true story" are typed across the screen once, two minutes into the first episode—in the same font and style as "Martha's" many emails and messages to Donny. Ep. 1 at 1:28. But all the characters are fictional and the Series is a drama. Harvey is

never mentioned in the Series.  And the Series is replete with dramatic devices that signal to viewers that it is neither a documentary nor an attempt at realism—for example, it features a dramatic score and cheeky music like "Happy Together," creative cinematography, reverse and inconsistent chronology, ironic and absurd scenes, and a disembodied narrator offering insight into Donny's thoughts.  Ep. 1 at 00:10, 01:36, 28:34; Ep. 4 at 08:20, 20:21; 3-ER-303–04 (¶¶5, 9-10, 13).

The Series also includes a disclaimer at the end of each episode following the credits, stating:  "This program is based on real events: however, certain characters, names, incidents, locations, and dialogue have been fictionalized for dramatic purposes."  Ep. 1 at 30:43.

In the Series, Donny first meets Martha at his bartending job when she enters the pub crying and he offers her a free drink.  *Id.* at 02:06.  Martha then begins stalking Donny:  showing up at his shows, harassing him, asking him on dates, and bombarding him with emails filled with sexual, violent, and derogatory content.  *Id.* at 20:21, 23:07, 09:44; Ep. 3 at 12:20, 14:10, 27:07.  Donny repeatedly reports Martha to the police, but to little avail.  *See, e.g.*, Ep. 4 at 42:04; Ep. 5 at 15:44, 17:45.  In a "dramatic[]" scene, 2-ER-269 (¶56), Martha ultimately pleads guilty to stalking and harassment, is sentenced to prison, and a restraining order is issued.  Ep. 7 at 13:34.  After the sentencing, Donny stops into a bar, orders a drink, and listens to some of Martha's old voicemails.  *Id.* at 25:50.  He then finally discovers the

meaning behind Martha's pet name for him: Martha had a toy baby reindeer during her troubled childhood—the "only good thing" she could cling to when her parents fought. *Id.* at 26:25. In a poetic, full-circle moment, Donny starts to cry and the bartender offers him his drink for free. *Id.* at 27:59.

The Series immediately garnered critical acclaim and has won numerous awards, including six Emmy awards and two Golden Globe Awards. Critics have praised the Series as "brilliant across the board," with excellent "writing" and "fictionalized" characters crafted to provoke thought on topics such as the complexities of mental illness, the ambiguities of victimhood, the lingering impacts of past abuse, and the reality of gender biases. 2-ER-203–15 (Putnam Exs. I-K).

### 5. Harvey Claims Publicly That She Is The Martha Character

Soon after Netflix released the Series, viewers began speculating about real-life inspirations for its fictional characters, including the Martha character. 2-ER-224–41 (Putnam Exs. P-S). A British journalist reported on several fan theories for the Martha "character," listing Fiona Harvey as one possibility. 2-ER-234–41 (Putnam Ex. S). Gadd immediately urged viewers to stop speculating, underscoring that "that's not the point of our show." 3-ER-320–21 (¶67); 2-ER-107–08 (Ex. 61); 2-ER-224–26, 230–33 (Putnam Exs. P, R). Gadd stated that he had never intended for the *Baby Reindeer* play or Series to link any real person to its fictionalized characters, including the Martha character. *Id.* Gadd intentionally avoided

mentioning Harvey—or his other previous abuser—in the play or the Series.  *See* 3-ER-320 (¶66).

Nonetheless, two weeks after the Series launched on Netflix, Harvey herself claimed on Facebook that she was the supposed inspiration for the Martha character. 2-ER-234–37.  She then went on *Piers Morgan Uncensored* to reaffirm her claim. *See* Piers Morgan Interview.  During that interview, Harvey claimed that, contrary to the depiction of Martha and Donny's relationship in the show, she never sent Gadd any communications, or if any, just a small number; she never called Gadd; she never went to Gadd's home; she only interacted with Gadd for two or three months, and only met him a few times.  *See, e.g.*, *id.* at 3:56, 7:45, 10:58, 16:46, 23:45, 37:00.  In the same interview, Harvey described the Series as "a work of fiction" and "hyperbole," and said that Martha "cannot be me" because she "is a fictional character . . . of [Gadd's] imagination."  *Id.* at 7:32, 14:37, 17:22.

## C.    This Litigation

But Harvey was not done.  On June 6, 2024, she filed this lawsuit against Netflix (but not Gadd) alleging defamation, intentional infliction of emotional distress, and certain related claims, and seeking nearly two hundred million dollars in damages.  2-ER-254–87.  Each of Harvey's claims centers on her allegation that "all viewers" of the Series would have understood Harvey to have done the same "monstrous things" that the character Martha did in the Series.  2-ER-262 (¶29).

18

Harvey further alleges that some viewers understood the Martha character to be the real-life Harvey because Donny jokes he will "hang [Martha's] curtains," and some cybersleuths were reportedly able to find a tweet Harvey allegedly once sent to Gadd in 2014 that made a similar reference.  2-ER-263–66 (¶¶30-39).

Harvey's suit focuses on five "statements" allegedly about Harvey in the *Baby Reindeer* series that form the basis of her claims:  that (1) Harvey was a twice-convicted stalker that spent five years in prison; (2) Harvey sexually assaulted Gadd in a dark alley, grabbing his genitals without consent; (3) Harvey violently attacked Gadd by smashing a glass over his head and gouged his eyes; (4) Harvey stalked a policeman; and (5) Harvey waited outside Gadd's residence every day up to 16 hours a day.  2-ER-277 (¶88).  Harvey claims that Netflix failed to conduct due diligence on these false "claims" before it released the Series.  2-ER-278 (¶92).  In her suit, Harvey does not deny stalking Gadd, or previously stalking others.

On July 29, 2024, Netflix filed a Special Motion to Strike Harvey's Complaint under California's anti-SLAPP statute.  2-ER-293.  Netflix argued that Harvey's claims all challenge Netflix's distribution of the Series, which is protected free-speech activity under the statute.  2-ER-123–24.  Netflix then argued that Harvey had not met her burden to establish that her claims have minimal merit.  2-ER-124–32.  First, no reasonable viewer would understand the Series as a documentary making specific factual assertions about actual people—let alone assertions about

Harvey, who is never mentioned—given the Series' dramatic, cinematic elements. 2-ER-124–28.  And, second, Netflix argued that Harvey is a public figure, and she could not demonstrate Netflix's actual malice, given that Harvey is never once mentioned in the Series and each episode includes a disclaimer that the Series was fictionalized for dramatic purposes.  2-ER-131.[2]

Harvey opposed Netflix's motion to strike, but did not request discovery or otherwise propound any discovery on Netflix before the resolution of that motion. 2-ER-72.  Nor did Harvey dispute that she had stalked, harassed, and threatened Gadd, the Wrays, and Dewar—and also that she could have been convicted for this conduct, as Netflix's evidence established.  Instead, Harvey focused on the "this is a true story" line that appears once in the first episode, arguing that this line showed the Series made factual statements and demonstrated Netflix's actual malice given differences between the Martha character depicted in the Series and Harvey.  For support, she cited a Sunday Times article claiming that anonymous "[s]ources in the

---

[2]    Netflix also explained that the "story" Gadd tells in the Series is substantially true because Harvey did, in fact, harass and stalk Gadd (and others) in real life.  2-ER-128–29.  Indeed, Netflix submitted unrebutted, expert testimony from a British prosecutor establishing that Harvey could have been convicted of stalking, a crime punishable by up to eight years in prison, based on her emails, letters, voicemails, and actions—actions and communications Harvey does not dispute in this case.  2-ER-160–67 (¶¶80-84).

TV industry ha[d] told [the author] that this line was a request from Netflix, and that Gadd expressed concerns about presenting it as such."  2-ER-95.

In a separate filing, Netflix objected to the vast majority of Harvey's evidence, arguing that her declarations were riddled with hearsay, improper legal conclusions, and other flaws that made them inadmissible and unlikely to be admissible at trial and thus unsuitable for consideration in connection with Netflix's motion.  2-ER-33–59.  In particular, Netflix addressed the Sunday Times article relied on by Harvey, explaining that it was classic hearsay, nowhere explained how the author obtained any facts about the Series, and relied solely on the author's paraphrased statements from unnamed sources with no apparent connection to Netflix.  2-ER-37–38.

Harvey did not respond to Netflix's separate brief raising its evidentiary objections or otherwise defend the admissibility of her evidence.  Nor did she ever propound any discovery requests on Netflix before the district court decided Netflix's motion to strike.  *See* 2-ER-30.

### D.    District Court's Decision

On September 27, 2024, without holding a hearing, the district court denied Netflix's motion to strike.  1-ER-2–19.  The court first agreed with Netflix that all of Harvey's claims stem from protected activity, as the Series contributes to public debate on issues of widespread public interest, such as sexual abuse, harassment, and

stalking.  1-ER-7–8.  But the court held that Harvey had shown a probability of prevailing on the merits of her claims.  1-ER-8–15.

The district court first determined that a reasonable person would interpret statements about Martha as referring to Harvey, even though the Series never mentions Harvey by name and, instead, uses fictional characters.  1-ER-9.  The court pointed to certain traits Martha and Harvey share, like being "Scottish lawyers living in London, twenty years older than Donny/Gadd"—brushing aside the need for "cybersleuthing" to make that connection.  *Id.*  The court also concluded that the Series contains "assertions of fact" about Harvey.  1-ER-10.

While acknowledging that "dramatic devices may demonstrate that a statement is not an assertion of fact," the court dismissed the Series' cinematic elements as insufficiently "absurd" or "surreal" to counter a viewer's expectation of absolute truth—an expectation the district court assumed would arise solely because of the first episode's claim that "this is a true story."  *Id.*  The court then found that the Series' "statements" purportedly about Harvey being convicted, stalking a police officer, sexually assaulting and attacking Gadd, and waiting outside his home were sufficiently factual because they can be proven true or false.  1-ER-10–11.

The district court agreed with Netflix that Harvey qualifies as a public figure due to her political candidacy and publicly reported stalking of the Wrays and Dewar, requiring her to prove actual malice.  1-ER-13–14.  But the district court concluded

that Harvey had met this heavy burden.  1-ER-14–15.  In a single paragraph relying entirely on the Sunday Times article, the court found that Harvey had shown actual malice.  In doing so, the court explained that Gadd's theater play had stated that it was "*based* on a true story," while the Sunday Times article reported that Netflix proposed adding the "this *is* a true story" line to the Series "despite Gadd's concerns." *Id.* (emphasis added) (citations omitted).  The district court did not address Netflix's hearsay objections to this article.  Instead, it included a broad footnote early in its opinion overruling all evidentiary objections "to the extent that the [c]ourt relies on evidence to which either party has objected."  1-ER-4 n.2.

The district court then denied Netflix's motion to dismiss the defamation and emotional distress claims, while granting Netflix's motion to dismiss Harvey's other causes of action and her request for punitive damages.  1-ER-16–19.  In dismissing Harvey's request for punitive damages, the court cited a lack of "factual allegations showing oppression, fraud, or malice"—despite its finding that Netflix acted with actual malice in denying Netflix's motion to strike.  1-ER-19.

## SUMMARY OF ARGUMENT

The district court's decision denying Netflix's anti-SLAPP motion runs roughshod over First Amendment principles and defamation law and, if allowed to stand, will chill dramatic storytelling on important issues.  It should be reversed.

**I.**  The district court erred as a matter of law in concluding that Harvey met

her threshold burden of establishing that the Series makes any factual statements "of and concerning" Harvey.  Harvey's name is never once mentioned in the Series, and Netflix and Gadd never identified the Martha character as Harvey.  In fact, the one who broadcasted the asserted connection was Harvey herself on a Piers Morgan talk show.  Given that context, Harvey has a heavy burden of showing that a reasonable viewer would nevertheless identify the statements in question about Martha as being statements about Harvey.  She does not meet this burden.

Most fundamentally, the show's creative and offbeat style conveys to any reasonable viewer that the Series is a fictionalized drama of Gadd's experiences from his own perspective, not a factual documentary about Harvey or anyone else.  The district court erred by dismissing the Series' dramatic elements as not absurd or surreal enough, ignoring the key question:  how a reasonable viewer would understand *Baby Reindeer* as a whole.  The acknowledged differences between Martha and Harvey, combined with the Series' clear use of dramatic techniques—like fictional names, cheeky music, and edgy cinematic techniques—would convey to a reasonable viewer that the Series is a fictionalized narrative, not a beat-by-beat, factual recounting like a "true life" documentary.  And the disclaimer that appears in the credits at the end of each episode explicitly states just that.

The district court invoked the fact that cybersleuths were able to identify some similarities between Harvey and the Martha character, but that misunderstands the

test twice over.  Dedicated cybersleuths are the opposite of the "reasonable" viewer that is the focus of the "of and concerning" test.  And even if someone could identify certain similarities between Harvey and the Martha character, that does not establish what is needed—that a reasonable viewer would view the specific statements in question to be factual statements about Harvey, rather than the fictionalized Martha.

In today's online world, adopting the district court's cybersleuthing standard would essentially eliminate a time-honored medium for storytelling through the dramatization of events and use of composite characters.  The test is whether a reasonable viewer would understand the allegedly defamatory statements to be about the plaintiff based on the work as a whole—not whether an enterprising cybersleuth could drill down on Google to find any dated link to real life people or events.

**II.**  In any event, even assuming Harvey met this threshold burden, the district court erred in holding that Harvey met the heavy burden necessary to demonstrate—with competent and admissible evidence—that Netflix acted with actual malice.  The admissible evidence points decisively in one direction:  Both Netflix and Gadd acted in good faith and believed the Series to be a fictionalized drama—and any reasonable viewer would see the Series as just that.  Had Netflix intended to defame Harvey, it would have used her name.  Moreover, it would not have deployed dramatic elements in a drama series format, and it certainly would not have included a disclaimer in each episode that characters and events were fictionalized.

The district court's contrary finding was based solely on unreliable, inadmissible hearsay that the district court had no grounds to consider. The inclusion of the Series' "this is a true story" line does not suggest Netflix intended to defame Harvey. This dramatic device did not mean that Netflix believed every aspect of an undisputedly dramatic series to be accurate in the real world (to the contrary, Netflix knows well the difference between a drama and a documentary)—much less that a reasonable viewer would believe as much. But equally important, the "story" told by *Baby Reindeer* is of Gadd's deeply personal and emotional experience of being stalked while exploring his own sexual identity and confronting a sexual abuse crisis. That story is true, and did happen to Gadd—something Harvey has never disputed. The First Amendment protects Gadd's right to tell that story through the medium of a drama series that includes fictionalized elements or dramatizations.

If allowed to stand, the district court's contrary conclusion—based on inadmissible hearsay—would radically lower the evidentiary and substantive bar for establishing actual malice and, thus, chill valuable dramatic works like Gadd's.

## STANDARD OF REVIEW

This Court reviews de novo the district court's denial of a motion to strike under California's anti-SLAPP statute. *Makaeff*, 715 F.3d at 261. It reviews for an abuse of discretion evidentiary rulings made in the context of such motions. *See Metabolife*, 264 F.3d at 839; *Sandoval v. County of San Diego*, 985 F.3d 657, 665

(9th Cir. 2021). But in all First Amendment cases, this Court must "'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (citation omitted). This means that the Court not only may—but must—review "constitutional facts" de novo, including facts concerning whether the defendant acted with actual malice. *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021); *see Planned Parenthood of Columbia/Willamette, Inc. v. American Coal. of Life Activists*, 290 F.3d 1058, 1068 (9th Cir. 2002).

## ARGUMENT

California's anti-SLAPP statute is a critical safeguard against baseless attacks seeking to "chill the valid exercise of the constitutional right[] of freedom of speech." *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 192 (2005). The statute requires a plaintiff's lawsuit to be dismissed if she cannot make "a prima facie showing" using "admissible evidence" that there is a "reasonable probability of prevailing" on her claims. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001) (citation omitted). Here, that required Harvey to establish all the elements of her defamation claim, including (as relevant here) that (1) the allegedly defamatory

27

statements were factual assertions of and concerning Harvey, (2) the statements were false, and (3) that Netflix acted with actual malice.[3]

Harvey bases this defamation action on a handful of statements made throughout a seven-episode drama series that she claims defamed her insofar as the *Martha* character was portrayed as being convicted of stalking and engaging in other conduct. In crediting Harvey's claims without any admissible evidence, the district court cavalierly disregarded the anti-SLAPP standard and the First Amendment. It considered the actions of cybersleuths, instead of reasonable viewers, to conclude that Harvey had shown that *Baby Reindeer*'s fictionalized account of Gadd's story of how he was stalked was "of and concerning" Harvey. And it credited evidence that was double or triple hearsay and had no prospect of being admissible at any trial in finding that Harvey had met the heavy burden of showing actual malice.[4] These errors, and others, now require reversal of the district court's decision.

---

[3]  For purposes of this appeal, Netflix focuses on the first and third elements. It reserves its right to argue that Harvey failed to meet the second element as well.

[4]  While the district court focused on Harvey's defamation claim, it acknowledged that her claim for intentional infliction of emotional distress rose and fell on the same grounds as the defamation claim because the two have largely overlapping elements. 1-ER-15; *see also, e.g.*, *Aguilar v. Universal City Studios, Inc.*, 174 Cal. App. 3d 384, 387 (1985) (recognizing the two claims have overlapping elements). Netflix's arguments, if accepted, therefore necessitate overturning the district court's ruling in full, striking both of Harvey's remaining claims.

I. ***BABY REINDEER*** **IS A DRAMATIZED AND FICTIONALIZED ACCOUNT OF GADD'S STORY THAT A REASONABLE VIEWER WOULD UNDERSTAND DOES NOT PURPORT TO STATE ACTUAL FACTS "OF AND CONCERNING" HARVEY HERSELF**

The starting point of the defamation analysis is critical in this case: Harvey must show that a reasonable person, viewing the Series as a whole, "would understand the character [Martha] was, in actual fact, [Harvey] conducting herself as described." *Aguilar v. Universal City Studios, Inc.*, 174 Cal. App. 3d 384, 387 (1985). Otherwise, there is no defamation. This "of and concerning" element incorporates two requirements: *first*, that the Series be understood as being "of and concerning" Harvey, and *second*, that it be reasonably interpreted as containing assertions of "fact" about her. The burden of proof for both lies with Harvey. *See id.* at 388; *McGarry v. University of San Diego*, 154 Cal. App. 4th 97, 117 (2007).

As for the first requirement, the First Amendment demands that the allegedly defamatory statement "specifically refer to, or be 'of and concerning,' the plaintiff." *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 146 (2011) (citation omitted). When dealing with a potentially fictional character, the question is whether "a reasonable person . . . would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described." *Id.* (alteration in original) (citation omitted). There are only two ways to meet this standard: by showing that a statement identifies the plaintiff "by name" or "by 'clear implication.'" *Ferlauto*

*v. Hamsher*, 74 Cal. App. 4th 1394, 1404 (1999). Here, it is undisputed that the Series does not reference Harvey by name, so Harvey must rely on clear implication.

Even when a statement is "of and concerning" the plaintiff, however, it must still contain an "assertion of an objective fact" to support a defamation claim. *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995). If the "sum effect of the format, tone and entire content" suggests that the author "was expressing a point of view only," the statement is "immune from liability." *Id.* (citation omitted). Context is crucial in making this determination, as a reasonable viewer will understand that "dramatized, fact-based movies and miniseries" often fictionalize or imagine "scenes" and "conversations," so would not interpret every detail in such a series as being "factual." *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 866 (2018); *see also Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021) (viewers understand that, for fictional works, "drama and dramatic license are generally the coin of the realm," and creators are artists, not "journalists or documentarians").

Harvey fell well short of her burden to establish that the Series makes factual assertions "of and concerning" her. The Series never mentions her name, it refers to Gadd's character as "Donny," it is replete with dramatized, imaginative, and cinematic elements, and it includes a disclaimer stating that names, events, and characters were "fictionalized for dramatic purposes." Ep. 1 at 30:43. Harvey's rush to publicly identify herself as the Martha character changes none of that. The district

court's contrary conclusion was riddled with errors, all stemming from its failure to grasp that the critical question is how a reasonable viewer would perceive the Series *as a whole*, given its presentation as a dramatized and fictionalized work.

### A. Harvey Failed To Meet Her Burden To Show The Series Asserts Factual Statements "Of And Concerning" Her

Three circumstances together establish that a reasonable viewer would not view the Series as stating assertions of fact "of and concerning" Harvey.

*First*, *Baby Reindeer* employs entirely fictional character names. Not only does the Martha character have a different name than Harvey, but Gadd's character uses a made-up name as well. And the fact that Harvey's name never once appears in the Series is legally significant. It is well-settled that "mere similarity or even identity of names is insufficient to establish a work of fiction is of and concerning a real person." *Tamkin*, 193 Cal. App. 4th at 146-47 (citation omitted). If that is the standard when a work *does* employ real names, then the bar is even higher when the plaintiff's name is entirely absent from the allegedly defamatory statement. In that situation, there is a *de facto presumption* that the work is not "of and concerning" the plaintiff. *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1044, 1046 (1986).

To rebut this presumption, Harvey needed to prove that she would be identified by "clear implication." *Id.* at 1044. That "clear implication" exception, however, is exceedingly narrow and, ordinarily applies only when a statement does not identify *anyone* by name—not when it uses an entirely *different* name to refer to

31

an individual. *See, e.g.*, *Ferlauto*, 74 Cal. App. 4th at 1405 (finding that statements did not implicate plaintiff in part because plaintiff was "never referred to by name"); *Greene v. Paramount Pictures Corp.*, 813 F. App'x 728, 732 (2d Cir. 2020) (same). In *Blatty*, the California Supreme Court gave an example of when it could apply: "[I]f a company consists of Smith, Jones, and Doe, and a publication asserts 'Smith and Jones are the only honest members of the company,' [that] publication . . . accuses [Doe] of dishonesty by clear implication." 42 Cal. 3d at 1044 n.1. There is nothing like such a "clear" implication of Harvey in the Series.

*Second*, the Series diverges from reality in several significant ways that Harvey herself has acknowledged, further confirming the Martha character does not identify Harvey by "clear" implication. Harvey herself has stated that she is "considerably" older than the actress that plays Martha—by 18-20 years—has a "very different" accent, and simply shares dark hair and a Scottish nationality with Martha, as millions of others do. 1-ER-182 (¶¶15-16); *see* Piers Morgan Interview at 8:32, 19:13.

This is more than enough to show the two are not the same for defamation purposes. In cases such as *Tamkin*, admitted differences of this kind were enough to preclude a finding that the statements "of and concern[ed]" the plaintiff—even where there was an *identity* of names. *See* 193 Cal. App. 4th at 146-47 (emphasizing that plaintiff and character did not share a special feature, like a "birthmark" or

"fashion accessory," or a "unique" biographical similarity, like "schooling," though they had the same name and physical characteristics); *see also Middlebrooks v. Curtis Publ'g Co.*, 413 F.2d 141, 142-43 (4th Cir. 1969) (dismissing given differences in age and employment, even though defendant used variation on plaintiff's name and "many witnesses" testified they believed the character was the plaintiff). Here, Harvey herself has affirmatively pointed to multiple differences in arguing that a show with *different* names is *not* about her. That is fatal to her claim.

*Third*, and most importantly, the Series is presented in the format of a drama series—not a documentary—and Harvey's claims must be analyzed in that context. Harvey herself described the Series as "a work of fiction" and "hyperbole," and has declared that Martha "cannot be me" because she is "a fictional character . . . of [Gadd's] imagination." 2-ER-182 (alteration in original) (citation omitted); Piers Morgan Interview at 17:24; *see also* 2-ER-236 (Putnam Ex. S) ("I am not Martha. I am Fiona." (quoting Facebook post)); 2-ER-262 (¶27) (admitting story of "Martha" is "fabricated"). This distinction is crucial because reasonable viewers understand that dramas, and even docudramas, utilize fictionalized and composite characters to express the author's "creative interpretation of reality," rather than presenting exact truths about real individuals. *Davis v. Costa-Gavras*, 654 F. Supp. 653, 658 (S.D.N.Y. 1987). As this Court aptly put it in a docudrama case:

> [T]he general tenor of the docudrama . . . tends to negate
> the impression that the statements involved represented a

33

false assertion of objective fact. As the Supreme Court has noted, statements made in "a so-called docudrama or historical fiction should not be accepted unquestioningly." *Masson* [*v. New Yorker Mag., Inc.*], 501 U.S. [496,] 512-13 [1991]. Docudramas, as their names suggests, often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience. *We believe that viewers in this case would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts.*

*Partington*, 56 F.3d at 1154-55 (emphasis added).

That principle applies directly to *Baby Reindeer*. Far from purporting to be a documentary, each episode of the Series ends with a disclaimer, stating: "This program is based on real events: however, certain characters, names, incidents, locations, and dialogue have been fictionalized for dramatic purposes." Ep. 1 at 30:43. And, as the district court acknowledged, 1-ER-10, *Baby Reindeer* uses a wide range of dramatic devices—including flashbacks, severe camera angles, music, sound effects, narrative voiceovers, and a symbolic ending—that reinforce that the Series is a drama, not a documentary. *See supra* at 15-17.

For instance, when Donny receives a friend request from Martha right after discovering her incriminating history, rapid cuts between his face and the computer screen heighten the drama, all while "Happy Together" by The Turtles plays in the background. Ep. 1 at 28:34. The upbeat melody of "Happy Together" creates a striking and ironic contrast to the suspenseful scene. Meanwhile, the Martha

34

character's final conviction and sentencing is preceded by a frenetic sequence that involves her voice playing over a montage of Donny—the audio frequently sped up or reversed to create a fever-dream quality in the scene. Ep. 7 at 12:22. And, earlier, a line stating that the Series was "written & created by" Gadd flashes on the screen. Ep. 1 at 3:54. All of this would signal to a reasonable viewer that the Series should not be understood as making particular assertions of fact "of and concerning" Harvey. *See Partington*, 56 F.3d at 1154-55.[5]

## B. The District Court's Contrary Determination Was Wrong

The district court's contrary conclusion was flawed for multiple reasons. The district court failed to consider whether a reasonable viewer would believe Harvey "was, in actual fact, [Martha] *acting as described*," *Tamkin*, 193 Cal. App. 4th at 146 (emphasis added) (citation omitted), instead focusing on whether "cybersleuths" could make certain connections between Harvey and the Martha character, 1-ER-9. It wrongly demanded that dramatic devices be "fantastical" or "surreal" to dispel what it assumed to be reasonable viewers' expectation that every detail in a drama is true, despite caselaw showing that reasonable viewers expect the exact opposite.

---

[5] Nor can a plaintiff establish the "of and concerning" requirement by insisting publicly that she is the character, as Harvey did here. The question is not whether Harvey believed Martha was intended to be her, but whether a reasonable viewer—unconnected to the events—would do so.

1-ER-10.  And it isolated the "this is a true story" line from its context, disregarding settled law.  *Id.*  Each of these missteps demands correction.

1.     The district court first reasoned that, even though the Series never once mentions Harvey's name, a reasonable viewer would nonetheless understand it to be making concrete, factual statements about her—like a "true life" documentary—simply because viewers might engage in "research and 'cybersleuthing'" to "find [Harvey]."  1-ER-9.  That reasoning is flawed in two different ways.

*First*, the question is not whether someone can identify *certain* similarities between Martha and Harvey, such as a social media post with similar language to a line in the Series.  The question is whether a reasonable viewer would believe that the Series was conveying that Martha "was, in actual fact, [Harvey] *acting as described*."  *Tamkin*, 193 Cal. App. 4th at 146 (emphasis added) (citation omitted); *see also Aguilar*, 174 Cal. App. 3d at 387.  In other words, the reasonable viewer would need to believe not only that Martha was modeled on Harvey, but also that all of the Martha character's actions—including the alleged defamatory statements and actions in question—would be reasonably interpreted as factual statements about what Harvey herself has said or done in real life in a documentary style.

Given the Series' unquestioned dramatic elements and the significant differences between the characters, a reasonable viewer—presumed to understand that dramas are "more fiction than fact"—would not reach that conclusion.

36

*Partington*, 56 F.3d at 1154-55.  After all, Harvey *herself* has described the show as "hyperbole," *supra* at 33, meaning even she acknowledges it is an obviously fictionalized and exaggerated work not meant to be taken literally.  And, as discussed, Harvey herself has stressed the significant differences between her and the Martha character.  *Supra* at 32.  This severely undercuts the district court's argument, as *Harvey* bore the burden of proving that a reasonable viewer would believe that everything that is depicted in the Series about the fictional Martha character was actually a true statement of fact *about Harvey herself.*

*Second*, the district court's view that a "reasonable" viewer would engage in cybersleuthing and connect Harvey with Martha is not reasonable.  The court rejected a similar argument in *Tamkin*.  There, the plaintiff argued that if someone had picked the right Google search—the plaintiff's name and a few key words—they would have found a website that tied the plaintiff to the alleged defamatory statements.  *See Tamkin*, 193 Cal. App. 4th at 149.  But "these searches [we]re not representative of a reasonable person" searching for information generally *about the plaintiff*—not about the character.  *Id.*  If googling the plaintiff's actual name with a key word was not reasonable, then cybersleuthing on social media using a wide array of different references plumbed from the show to try to find a hit on a real person, when the names and details are otherwise different, certainly is not.

37

Nor does it matter that Harvey submitted evidence suggesting some of *Baby Reindeer's* millions of viewers believed the Martha character was based on Harvey due to a nearly decade-old internet post. In *Middlebrooks*, the court upheld summary judgment for the defendant despite the plaintiff producing "many witnesses" who testified they believed a character was the plaintiff. 413 F.2d at 142. The court deemed their belief unreasonable due to "dissimilarities between the fictional character and the plaintiff," including "difference in ages," and the work's overall fictional tenor. *Id.* at 143. So too here: The acknowledged differences between Martha and Harvey, coupled with the Series' obvious use of dramatic elements— like naming the character Gadd plays "Donny"—renders any such belief, by a handful of viewers and even those who reportedly know Harvey, unreasonable.

Regardless, if the reasonable viewer is a cybersleuth scouring the internet to search for Martha or determine whether the Martha character was real, then that same viewer can be presumed to see the Series' disclaimer that it contains fictional events, people, and dialogue, confirming that not every detail was intended as a true statement of fact. *See, e.g.*, *Issa v. Applegate*, 31 Cal. App. 5th 689, 703 (2019) (emphasizing the importance of "context" when considering whether statement was defamatory); *Geary v. Goldstein*, No. 91-cv-6222, 1996 WL 447776, at *2 (S.D.N.Y. Aug. 8, 1996) (refusing to include "channel-surfing" viewers in category of "reasonable viewers" given the importance of "context").

After all, the credits or end notes would be the first place any interested viewer would ordinarily look to see if a show was dramatized, or not. And as California courts have explained, a publication "may not be divided into segments and each portion treated as a separate unit"; instead, a defamatory meaning must be found, if at all, only after reading the publication "*as a whole.*" *Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1131-33 (1985) (emphasis added) (examining newspaper's headlines, caption and article to determine whether statement was "reasonably susceptible of a defamatory meaning").

2.    The district court also concluded that a reasonable viewer would understand the Series to be making "assertions of fact," dismissing *Baby Reindeer*'s dramatic elements as not "absurd or surreal" enough and fixating on the "this is a true story" line. 1-ER-10. That was error too.

The district court once again failed to consider what truly matters: how the reasonable viewer would understand *Baby Reindeer* "*as a whole.*" *Selleck*, 166 Cal. App. 3d at 1131 (emphasis added). A reasonable viewer, considering the Series in its full context, would unquestionably recognize it as a drama containing, by definition, fictionalized elements. For example, the contrast between the style and effects of a drama, like *Baby Reindeer*, and a documentary, like Netflix's *Making a Murderer*, is striking. Right from the beginning, *Making a Murderer* anchors itself in reality—prominently branding itself a "documentary series" and featuring real

39

names, real photographs, and authentic footage. *Cf. Colborn v. Netflix Inc.*, 661 F. Supp. 3d 838, 846 (E.D. Wis. 2023) (describing *Making a Murderer*).

*Baby Reindeer* has none of these features or elements. It does not use real names, contain actual photographs or footage, or purport to present events in a documentary style. Instead, it leverages actors, made-up names (including for the character Gadd plays), intense voiceovers, dynamic camera angles, cheeky music, and mood-setting lighting to create a powerful and immersive experience, signaling that elements have been altered to allow Gadd to tell the story of his journey through sexual abuse, stalking, and sexual-identity struggles most effectively.

The "this is a true story" line does not contradict any of this. The Series never claimed to be a "documentary series" or to depict real individuals, events, or dialogue. It said it was a "true story"—and rightly so, capturing the story of Gadd's experience of being stalked while undergoing his own personal crises and suffering sexual abuse. As one author notes, a "story" is understood to be a "description of something happening that contains some form of sensation, or drama. It is, in other words, an explanation of cause and effect that is *soaked in emotion*." Will Storr, *The Unpersuadables* 189 (2014) (emphasis added). Dictionaries further define a "story" as a "narrative" based on imaginary or real events "*composed for the entertainment of the listener*." *Oxford English Dictionary* (2015, online) (emphasis added).

Here, this line serves as a dramatic device—appearing only after the show has begun in the same font and style of Martha's countless emails and texts to Donny, and solely in the first episode after Donny tries to report his stalking to a skeptical policeman. It signals to viewers that the *essence* and *emotion* of the story is true and something Gadd experienced, without representing that every scene, piece of dialogue, setting, or event discussed in the show is factually accurate. Like any drama, the Series dramatizes events and characters for storytelling and entertainment purposes—much like when a comedian shares a "personal story" with her audience, with elements obviously exaggerated for comedic effect. When an audience member takes their seat at a comedy show, or a viewer presses play on a Netflix series featuring actors and scripted dialogue, they understand the primary aim from that point forward is to entertain, "maintain the interest," and share a message—not to provide a precise factual recounting. *Partington*, 56 F.3d at 1154-55.

That is particularly true given the Series' many, undisputed deviations from reality—such as the use of fictional names, including the name "Donny" for Gadd's character—which make it undeniably clear to any reasonable viewer that it is not a beat-by-beat recounting of factual events. At most, "this is a true story" conveys to a reasonable viewer that the Series is, as Harvey herself has described it, "hyperbole," *supra* at 33—depicting Gadd's very real "emotional journey," using dramatic

41

devices and exaggeration to effectively convey his emotions and the complexities of abuse, stalking, and sexual identity in a compressed timeframe.  3-ER-304 (¶13).

Likewise, other shows have paired the phrase "this is a true story" with disclaimers that scenes and characters were dramatized, underscoring that these two concepts can coexist seamlessly in a viewer's mind.  *See Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 847-48 (11th Cir. 2020) (concluding that the "overall format, tone, and direction of" a film made clear it was fictionalized, notwithstanding statement it was a "true story").[6]

Some have suggested that the Series could have said *based on* a true story. But the use of "based on a true story" versus "this is a true story" in this context is a creative decision, and one that must be weighed by a reasonable viewer in the context of the entire Series.  In that respect, the use of "this *is* a true story" is no more dispositive of Harvey's claim than a defense would be if the Series had declared it is *not* a true story, yet used Harvey's full name, adopted a real-life documentary style, and included numerous falsehoods about Harvey.  Either way, the line must be

---

[6] As another example, the FX series "Fargo" has a "[t]his is a true story" line at the opening of the series as well, even though the series is almost entirely fictionalized.  *See* Robert Brian Taylor, *Is 'Fargo' Based on a True Story*, Collider, https://collider.com/is-fargo-based-on-a-true-story/ (last updated Apr. 17, 2024). This illustrates how the line can be, and is, used as a dramatic device.

viewed in context, along with all the other dramatic elements contained in the Series as a whole, from the perspective of a reasonable viewer.

The district court erroneously downplayed and overlooked the numerous dramatic elements deployed by the Series. It portrayed *Baby Reindeer* as if it were— and would reasonably be viewed as—a real-life documentary, just like *Making a Murderer,* rather than a drama where the creator has dramatized and fictionalized certain events to tell his story. This interpretation of the Series defies established law, and is reason enough to reverse the district court's judgment.

## III. IN ANY EVENT, EVEN IF A REASONABLE VIEWER WOULD BELIEVE THE STATEMENTS WERE "OF AND CONCERNING" HARVEY, HARVEY FAILED AS A MATTER OF LAW TO ESTABLISH THAT NETFLIX ACTED WITH ACTUAL MALICE

Even if Harvey could surmount these precursor elements of defamation, she did not come close to showing that Netflix acted with actual malice. Harvey qualifies as a public figure, as the district court correctly recognized. 1-ER-13–14. The First Amendment therefore requires her to make an especially high showing: She must demonstrate that Netflix made the statements at issue with "actual malice." *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-83 (1964). But the district court wrongly diluted Harvey's burden by finding actual malice based solely on a paraphrased statement attributed to unnamed TV industry sources in a Sunday Times article. 1-ER-15. That unprecedented ruling violates Netflix's First Amendment rights. And if upheld, it provides a roadmap to silence speech on issues of public

43

importance based on anonymously sourced statements in newspaper articles rather than the competent, admissible evidence the anti-SLAPP statute requires. Harvey's inability to produce any such evidence to prove actual malice, and the district court's failure to cite any such evidence, is fatal to her case.

### A. The Actual Malice Standard Requires Harvey To Prove Netflix's State Of Mind By Clear And Convincing Evidence

The actual malice standard is "famously 'daunting.'" *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024) (citation omitted). Here, it requires Harvey to prove—"by clear and convincing evidence"—that Netflix, which distributed the Series, made the allegedly defamatory statements with either "knowledge of [their] falsity," or with "reckless disregard of [their] truth or falsity." *Copp v. Paxton*, 45 Cal. App. 4th 829, 846 (1996).

As discussed, fictionalized works do not purport to convey actual facts about actual people; they are "imagined, made-up." *See De Havilland*, 21 Cal. App. 5th at 869. In other words, they are by definition "false." *Id.* But mere streaming of such works cannot demonstrate that the streamer acted with actual malice. *See id.* Harvey instead must demonstrate that Netflix hoped to "insinuat[e] a defamatory import" to the viewer, or that it "knew or acted in reckless disregard of whether [its] words would be interpreted by the average [viewer] as defamatory statements of fact." *Id.* at 870 (last alteration added) (citation omitted). Put differently, Harvey

must show that Netflix knew or recklessly disregarded that a reasonable viewer would view the statements at issue as defamatory statements of fact about Harvey.

This standard requires subjective proof. Harvey must produce sufficient evidence to show that Netflix itself *actually* knew reasonable viewers would view the allegedly defamatory statements as false statements about Harvey, or "to permit the conclusion that [Netflix] *in fact* entertained serious doubts" on this matter. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). The inquiry "turns on the subjective good faith of" Netflix, *Copp*, 45 Cal. App. 4th at 847—and not on what "the reasonable man or the prudent publisher" would have done—because "the First Amendment protect[s] some erroneous publications as well as true ones" to "insure the ascertainment and publication of the truth about public affairs," *St. Amant*, 390 U.S. at 731-32.

Reflecting the First Amendment interests at stake, the evidentiary burden to prove actual malice is also substantial. Harvey must prove actual malice "by clear and convincing evidence"—a "'heavy burden, far in excess of the preponderance sufficient for most civil litigation.'" *Christian Rsch. Inst. v. Alnor*, 148 Cal. App. 4th 71, 84 (2007) (citation omitted). This burden of proof "requires a finding of high probability." *Copp*, 45 Cal. App. 4th at 846 (citation omitted). The evidence must be so clear as to "leave no substantial doubt," and "sufficiently strong to command the unhesitating assent of every reasonable mind." *Id.* (citation omitted).

Moreover, a defamation plaintiff like Harvey cannot merely "rely on the allegations of the complaint" to meet this high evidentiary burden at the anti-SLAPP stage. *Christian*, 148 Cal. App. 4th at 80. She instead "must produce *evidence* that would be admissible at trial." *Id*. (emphasis added) (citation omitted); *Laker v. Board of Trs. of Cal. State Univ.*, 32 Cal. App. 5th 745, 768 (2019) (requiring plaintiff to produce "competent admissible evidence" (citation omitted)).

## B. The Evidence In The Record Shows Only That Netflix Acted In Good Faith Without Actual Malice Toward Harvey

Harvey came nowhere close to making the required showing. Far from offering clear and convincing evidence, Harvey offered *no* "competent admissible evidence," direct or indirect, on Netflix's state of mind with respect to the statements at issue. *Laker*, 32 Cal. App. 5th at 768. The total lack of such evidence guts Harvey's case. And the admissible evidence in the record points in only one direction: Netflix acted in good faith without any actual malice toward Harvey.

*First*, Harvey offered no evidence to suggest that Netflix itself viewed *Baby Reindeer* as stating any facts about Harvey. The only competent evidence in the record on Netflix's subjective state of mind establishes that it "acquired the rights to Richard Gadd's stage play *Baby Reindeer*" and decided to stream it as a series with the understanding that the show is "a fictionalised work based on Richard Gadd's real life experiences." 2-ER-135–36 (¶¶2, 7). As explained, Netflix "always understood that *Baby Reindeer* the play and Series contained purposefully created,

fictionalised characters and invented fictionalised dialogue." 2-ER-136 (¶7). And "Netflix would have never released the Series had it believed the Series would be understood as stating actual facts about anyone, including Fiona Harvey." 2-ER-137 (¶9). As discussed, reasonable viewers would not have understood *Baby Reindeer* as stating actual facts about Harvey. *See supra* at 29-43. But to eliminate any doubt, Netflix included a disclaimer at the end of every episode stating that "certain characters, names, incidents, locations, and dialogue have been fictionalized for dramatic purposes." 2-ER-136 (¶8).

Such conduct refutes, rather than establishes, actual malice. It demonstrates that Netflix intended viewers to understand that *Baby Reindeer* was a fictionalized drama series. And Netflix cannot be liable for defaming a public figure when it did not believe that a reasonable viewer would even understand it to be stating facts about that figure. *See, e.g.*, *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1194-95 (9th Cir. 1989) (concluding that even if a speaker publishes a "literally untrue statement without holding the statement out as true, he may still lack subjective knowledge or recklessness" required for actual malice); *Lovingood*, 800 F. App'x at 847 (noting that in the context of a film, the actual malice analysis "must take into account how a reasonable viewer would understand the contents of the scene").

As discussed, even putting aside the disclaimer, the Series employed numerous dramatic devices—fictional names, severe camera angles, cheeky music,

47

and so on—that would convey to a reasonable viewer that *Baby Reindeer* was a drama series and not a real-life documentary. But in determining whether Netflix acted with actual malice, Harvey must show not just that a reasonable viewer would view *Baby Reindeer* as stating facts about Harvey—but that *Netflix* could not reasonably believe that such a viewer would understand that *Baby Reindeer* was a drama series. *See De Havilland,* 21 Cal. App. 5th at 870. At a minimum, there is no basis for finding that Netflix did not at least reasonably believe that reasonable viewers would see *Baby Reindeer* as a drama series, rather than a documentary.

*Second*, Harvey failed to establish that Netflix knew or was reckless to the falsity of the statements. In fact, the "gist or sting" of the alleged defamatory statements "is not so very different from the 'truth'" of the actions Harvey committed in real life. *Reed v. Gallagher*, 248 Cal. App. 4th 841, 863 (2016). Although *Baby Reindeer* is a fictionalized drama about Gadd's experiences with harassment and stalking, it is undisputed that Harvey did in fact harass and stalk Gadd in real life. *See* 3-ER-305–18 (¶¶15-56); *see supra* at 8-14, 20. Between 2014 and 2017, she frequently appeared at Gadd's place of work; she touched him in inappropriate and sexual ways; she threatened and intimidated him; she followed him around town; she turned up at his comedy and theater performances; and she sent him "thousands of emails, hundreds of voicemails, and a number of handwritten letters" that were often "sexually explicit, violent, and derogatory content, hateful speech, and threats."

48

3-ER-305–18 (¶¶15-56).  If anything, the Series portrayed Martha in a more positive and sympathetic light than Harvey's real life conduct would warrant, especially as Gadd expressed conflicting feelings towards Martha throughout the Series.

Given these undisputed facts, this is not a situation where the statements at issue are "so obviously false that any reasonable person would have known" them to be untrue, much less that Netflix would know that to be the case.  *Reed*, 248 Cal. App. 4th at 862; *Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1170 (2024) (noting that "false statements that have some element of truth to them are logically less susceptible" to a finding that they were "made with actual malice").

### C. The District Court Erred In Finding Actual Malice Based On A Newspaper Article That Was The Epitome Of Inadmissible Hearsay And Stated Nothing About Netflix's State Of Mind

In concluding otherwise, the district court found actual malice based on a single newspaper story:  A Sunday Times article citing unidentified "[s]ources in the TV industry" who claimed that the line "this is a true story" was "a request from Netflix, and that Gadd expressed concerns" about it.  1-ER-14–15; 2-ER-95.  The district court erred in relying on this article for two separate reasons.  First, the article is inadmissible double or triple hearsay that could not be used to prove actual malice on an anti-SLAPP motion, let alone at trial.  And second, even if the article could somehow be competent or admissible evidence, it failed on its own terms to prove actual malice, much less by clear and convincing evidence.

49

1.      The Sunday Times article was categorically insufficient to show actual malice.  For Harvey to meet her actual malice burden at the anti-SLAPP stage, she was required to produce "competent admissible evidence."  *Laker*, 32 Cal. App. 5th at 768 (citation omitted).  This requirement ensures that speech on matters of public concern is not strategically stifled by mere allegations of defamation that a plaintiff has no prospect of proving at trial.  On occasion, this Court has observed that a plaintiff can meet her high evidentiary burden by establishing "a *probability* that . . . she can produce such clear and convincing evidence."  *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 889 (9th Cir. 2016) (citation omitted); *cf. Metabolife*, 264 F.3d at 840 ("Under the anti-SLAPP statute, a plaintiff must meet its burden of proving prima facie falsity with admissible evidence.").  But even applying that standard, the Sunday Times article does not come close to passing muster.

As a preliminary matter, Netflix objected to the Sunday Times article before the district court, explaining in a stand-alone brief detailing Netflix's evidentiary objections that it was "inadmissible hearsay" and contained "layers of double hearsay," and that Harvey could not proffer such evidence to meet her burden in anti-SLAPP proceedings.  2-ER-38.  Harvey never responded to this objection (or

the brief including it). And the district court failed to consider this objection in its one-paragraph analysis of actual malice in this case. 1-ER-14–15.[7]

The Sunday Times article—which states that unidentified "[s]ources in the TV industry" claimed that the "this is a true story" line was added at the request of Netflix over Gadd's concerns—undeniably is inadmissible double or triple hearsay. It is an out-of-court statement by a reporter, Rosamund Urwin, about what unnamed others said, introduced to prove the truth of the matter asserted. 2-ER-95. And the reporter claims to have consulted unnamed and an unspecified number of out-of-court "[s]ources in the TV industry." *Id.* Neither the text of any actual statement or the source is described. Nor does the article specify whether those sources are even related to Netflix, or how. And, in fact, the reference to "sources in the TV industry," not attributed to Netflix, strongly suggests otherwise.

Such unreliable hearsay has no prospect of being admitted at any future trial. *See, e.g.*, *United States v. Huerta-Macias*, 26 F.3d 134, 1994 WL 209817, at *1 (9th Cir. 1994) ("[F]or someone without direct, personal knowledge of the facts as

---

[7]   The district court summarily stated that it denied Netflix's evidentiary objections to the extent that it relied on evidence to which Netflix objected. 1-ER-4 n.2. But it included no reasoning. That sort of summary resolution of serious evidentiary objections cannot protect the important First Amendment interests raised by defamation claims. *Cf. Lords Landing Vill. Condo. Council of Unit Owners v. Continental Ins. Co.*, 520 U.S. 893, 896-97 (1997) (per curiam) (noting that a court's summary resolution of an issue "does not establish that it actually considered and rejected" a party's arguments with respect to that issue).

reported in the newspaper article to read or discuss the contents thereof as evidence would result in several layers of inadmissible hearsay."); *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 228 (S.D.N.Y. 1993) ("The production of a single newspaper article . . . without further supporting evidence, is insufficient to generate an issue of material fact. The article is inadmissible hearsay . . . and may not be considered on this summary judgment motion." (citation omitted)). The article thus was categorically insufficient to establish actual malice. *See Sanchez v. Bezos*, 80 Cal. App. 5th 750, 769-72 (2022) (concluding that "reporters' unsworn out-of-court statements" cannot be considered at the anti-SLAPP stage).

Harvey also provided no indication that she would be able to remedy the article's inadmissibility at trial. She did not demonstrate that either the reporter or any of her unnamed sources would be able to testify as to Netflix's state of mind with respect to the statements at issue. *Cf. Sandoval v. County of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). As discussed, she failed to do so even after Netflix objected to the Sunday Times article as inadmissible hearsay and, instead, ignored Netflix's objection.[8] Given that failure, the district court was required to disregard the article. It abused its discretion by considering it without explanation. *Cf. Orr v.*

---

[8]  Harvey's opposition to Netflix's anti-SLAPP motion made vague references to needing discovery "to establish the full extent of Netflix's actual malice." 2-ER-81.  But Harvey never timely moved for discovery. *See Christian*, 148 Cal. App. 4th at 93.  She has thus waived any argument that she was entitled to discovery.

*Bank of Am., NT&SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

2.     Even if the district court could rely on the Sunday Times article, the court erred in finding the article to be clear and convincing evidence of actual malice. As noted, Harvey was required to show that Netflix "*knew or acted in reckless disregard of* whether [its] words would be interpreted by the average [viewer] as defamatory statements of fact." *De Havilland*, 21 Cal. App. 5th at 870 (first alteration in original) (emphasis added) (citation omitted).  As discussed, the actual malice inquiry turns on the "subjective good faith" of Netflix, *Copp*, 45 Cal. App. 4th at 847, and whether it "*in fact* entertained serious doubts" about the statements at issue, *St. Amant*, 390 U.S. at 731 (emphasis added).

The Sunday Times article's uncorroborated statement that the line "this is a true story" was "a request from Netflix" indicates nothing about Netflix's subjective state of mind as to the alleged defamatory statements Harvey specifically challenges. It does not indicate whether Netflix had any knowledge or serious doubts about Harvey's criminal record, the people Harvey had previously stalked, the extent of Harvey's interactions with Gadd, or any other events bearing on her claim.  Nor does it indicate whether Netflix believed or recklessly disregarded that reasonable viewers would treat every statement in *Baby Reindeer* as one of fact, as opposed to

understanding that the show is a fictionalized drama of Gadd's story about his real experience of being stalked while going through his own personal crises.

This kind of speculation "falls short of clear and convincing evidence." *Copp*, 45 Cal. App. 4th at 847-48. And even if this Court concludes that the "this is a true story" line suggested to reasonable viewers that the Series depicted actual, concrete facts about Harvey, that still would not establish that Netflix actually knew or recklessly disregarded the Series would be interpreted that way.

Harvey submitted *no* evidence showing that Netflix knew or recklessly disregarded that reasonable viewers would understand the line "this is a true story," when viewed in context with all the show's various cinematic elements and disclaimer, to suggest that every detail in the fictionalized account portrayed by *Baby Reindeer* is true—from the particular outfits Martha wore, the degree to which her apartment was in a state of disarray, to the fact that she was convicted of stalking. Netflix knows well the difference between a documentary like *Making a Murderer* and a drama series like *Baby Reindeer*, and could reasonably believe that reasonable viewers would appreciate the differences in those genres as well.

The actual malice test is "deliberately subjective" and requires evidence of knowledge or reckless disregard. *Newton v. National Broad. Co.*, 930 F.2d 662, 680 (9th Cir. 1990). It accordingly does not matter what Netflix "should have" known or done because such inquiries concern only negligence, which is not enough to

prove actual malice. *Id*. (citation omitted); *see also id.* (explaining that a "should have been foreseen" standard is "an objective negligence test" that fails to meet "the actual malice test of *New York Times*"); *St. Amant*, 390 U.S. at 731 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.").

Without any evidence bearing on Netflix's subjective state of mind, arguments that Netflix should have investigated the truthfulness of the statements at issue are insufficient. *See Reader's Digest Ass'n v. Super. Ct.*, 37 Cal. 3d 244, 258 (1984) ("The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice . . . ."). That is particularly true where the statements at issue were created by someone other than the targeted party (here, Netflix as distributor). *See id.* at 258-59.

The actual malice standard exists to protect the strong First Amendment interest in encouraging—rather than chilling—speech on matters of public concern. That interest is directly implicated here given the important and sensitive issues— including harassment, sexual orientation, and sexual abuse—explored by Gadd's story. If left undisturbed, the district court's decision will open the floodgates to defamation claims against public figures based on anonymous sources and paraphrased statements in news articles. As a result, stories like Gadd's that dramatize accounts of real events to convey the creator's emotional truth will never

see the light of day. And discussion and exploration of important issues of public importance will be stifled. The First Amendment requires a different result.[9]

*    *    *

*Baby Reindeer* depicts one individual's experiences with "sexual abuse, manipulation, exploitation, obsession, sexual identity, self-loathing, self-destruction, and self-discovery." 3-ER-303. In doing so, it deploys dramatic devices and cinematic elements to convey Gadd's emotional truth and the seriousness of the issues from Gadd's perspective. If a viewer might nevertheless believe the show to be a documentary that asserts facts about Harvey, then defamation law, California's anti-SLAPP statute, and the First Amendment protect Gadd's right to tell this valuable and creative story, and Netflix's right to distribute it.

After all, the purpose of anti-SLAPP laws is to "encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights." *De Havilland*, 21 Cal. App. 5th at 855 (citation omitted). By encouraging plaintiffs to bring defamation suits based on flimsy statements in anonymously sourced news articles and the connections drawn by some cybersleuths, the district court flouted that purpose. Allowing plaintiffs such

---

[9]    Underscoring the problems with the district's actual malice analysis, the court inexplicably found that Harvey had *not* shown any malice on Netflix's part when it came to Harvey's request for punitive damages. 1-ER-19.

56

free rein to shut down the individuals willing to depict and discuss their personal experiences on important and sensitive matters would be detrimental to "preserv[ing] an uninhibited marketplace of ideas" and "'robust and wide-open debate' on public issues." *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 866 (1979) (citation omitted). "[T]he result would be a hobbling of free speech by the continuing fear of liability . . . ." *Good Gov't Grp. of Seal Beach, Inc. v. Super. Ct.*, 22 Cal. 3d 672, 684 (1978). "[A] democratic system of government" has no place for such restraints on "[t]he right to self-expression." *Guglielmi*, 25 Cal. 3d at 866.

The district court's decision demands reversal.

## CONCLUSION

The judgment of the district court should be reversed.

Dated:  February 26, 2025

Respectfully submitted,

*/s/ Gregory G. Garre*

Marvin S. Putnam
Laura R. Washington
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA  90067
(424) 653-5500

Gregory G. Garre
  *Counsel of Record*
Peter E. Davis
Christina R. Gay
Sakina Haji*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2207

*Admitted in New York; all work
supervised by a member of the DC Bar.

*Counsel for Defendants-Appellants
Netflix, Inc. and Netflix Worldwide Entertainment, LLC*

57

**STATEMENT OF RELATED CASES**

Defendants-Appellants are unaware of any cases pending in this Court that are related to this appeal, as defined and required by Circuit Rule 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>24-6151</u>

I am an attorney for Defendants-Appellants Netflix, Inc. and Netflix Worldwide Entertainment, LLC.

This brief contains 13,882 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[  ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>*s/ Gregory G. Garre*</u>        **Date:** <u>February 26, 2025</u>