**No. 24-6151**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**FIONA HARVEY,**

*Plaintiff-Appellee,*

v.

**NETFLIX, INC. and NETFLIX WORLDWIDE ENTERTAINMENT, LLC,**

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Central District of California, Case No. 2:24-cv-04744-RGK-AJR
The Honorable R. Gary Klausner

---

### ANSWERING BRIEF
### OF PLAINTIFF-APPELLEE FIONA HARVEY

---

Brian Levenson
Richard A. Roth
THE ROTH LAW FIRM, PLLC
295 Madison Avenue, Fl. 22
New York, NY 10017
Phone: (212) 542-8882

Allen Hyman
THE LAW OFFICE OF
ALLEN HYMAN
10737 Riverside Drive
North Hollywood, CA 9160
Phone: (818) 763-6289

*Counsel for Plaintiff Appellee,*
*Fiona Harvey*

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................1

STATEMENT OF THE ISSUES .................................................................................4

STATEMENT OF THE CASE.....................................................................................5

FACTUAL BACKGROUND .......................................................................................5

    A. The *Baby Reindeer* Play ..................................................................................5

    B. The *Baby Reindeer* TV Series .........................................................................5

    C. Richard Gadd ....................................................................................................6

    D. "Martha" ...........................................................................................................7

    E. "Hang My Curtains" – Harvey is Identified.....................................................7

    F. Netflix's Defamatory Statements....................................................................11

        1. Harvey Has Never Been Convicted of a Crime ...................................12

        2. Harvey Never Sexually Assaulted Gadd...............................................14

        3. Harvey Never Stalked Gadd's Residence .............................................14

        4. Harvey Never Stalked a Police Officer.................................................16

        5. Harvey Never Attacked Gadd ...............................................................16

    G. Netflix Makes False Statements About Harvey in the House of Commons .17

    H. This Litigation .................................................................................................19

    I. Standard on an Anti-SLAPP Motion ...............................................................20

i

SUMMARY OF ARGUMENT.......................................................................22

ARGUMENT ...........................................................................................24

I.    THE DISTRICT COURT CORRECTLY HELD NETFLIX'S
STATEMENTS WERE OF AND CONCERNING HARVEY.................24

    A. Netflix's Defamatory Statements Pointed to Harvey by Descriptions
and Circumstances That Clearly Identified Her.................................25

    B. Netflix Failed to Offer Any Evidence to Rebut Harvey's Claim That It
Was Easy to Identify Her....................................................................27

    C. For Those Who Know Her, It Was "Obvious" the Defamatory
Statements Referred to Harvey ..........................................................28

    D. Fictional Works Can Defame Real People...........................................29

    E. Netflix's Disclaimer Does Not Immunize It From Liability For
Defamation .........................................................................................31

        1. Netflix's "Disclaimer" Is Unreasonable................................33

    F. Netflix's Case Law is Not Relevant and is Misrepresented................34

        1. Netflix's Caselaw Does Not Support its Position that the Use
of Fictional Names is Sufficient to Avoid Defamation ..........35

            a. *Blatty v. New York Times Co.*...........................................35
            b. *Ferlauto v. Hamsher* .......................................................37
            c. *Greene v Paramount Pictures Corp.* ..............................38

2. "Differences" Between the Plaintiff and the Character Do Not Preclude a Finding That a Statement is Of and Concerning the Plaintiff ................................................................................38

    a. *Middlebrooks v. Curtis Pub. Co.* ...................................39

    b. *Tamkin v. CBS Broadcasting, Inc.* ................................40

II.    HARVEY ESTABLISHED ACTUAL MALICE....................................41

A. Netflix Had Actual Knowledge That the Series Was Not a True Story ...........................................................................................42

B. Netflix Recklessly Disregarded That the Series Was Not a True Story ...........................................................................................45

III.    HARVEY IS NOT A PUBLIC FIGURE....................................................48

A. All-Purpose Public Figures ................................................................50

B. Netflix Did Not Establish That Harvey is an All-Purpose Public Figure....................................................................................................50

C. Limited Public Figures ......................................................................55

D. Netflix Did Not Establish That Harvey is a Limited Public Figure....56

1. Netflix Failed to Identify Any "Public Controversy" Concerning Harvey.................................................................57

2. Netflix Failed to Establish Any Voluntary Acts by Harvey to Influence the Resolution of the Public Controversy ..............58

3. Netflix's Defamation of Harvey Is Not Germane to Any Public Controversy ................................................................59

IV.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS NOT AT ISSUE ON THIS APPEAL..................61

LEAVE TO AMEND SHOULD BE GRANTED.....................................................62

CONCLUSION ................................................................................................62

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Aguilar v. Universal City Studios, Inc.*,
174 Cal. App. 3d 384 (1985) ........................................................................61

*Ampex Corp. v. Cargle*,
128 Cal.App.4th 1569 (2005) ......................................................................56

*Annette F. v. Sharon S.*,
119 Cal.App.4th 1146 (2004) ................................................................. 57-58

*Bindrim v. Mitchell*,
92 Cal.App.3d 61 (1979) ...................................................3, 24, 29-30, 36-37

*Blatty v. New York Times Co.*,
42 Cal. 3d 1033 (1986) ........................................................................... 35-37

*Bui v. Ngo*,
101 Cal.App.5th 1061 (2024) ................................................................. 56-58

*Church of Scientology of California v. Flynn*,
744 F.2d 694 (9th Cir.1984) .................................................................. 24-25, 36

*Crane v. Arizona Republic*,
972 F.2d 1511 (9th Cir. 1992) ........................................................ 43, 50-52

*Dickinson v. Cosby*,
37 Cal.App.5th 1138 (2019) .........................................................................44

*DiGiorgio Fruit Corp. v. AFL–CIO*,
215 Cal.App.2d 560 (1963) ....................................................................24, 36

*Ely v. Wal\*Mart, Inc.*,
875 F.Supp. 1422 (C.D.Cal. 1995) ..............................................................61

*Fairstein v. Netflix, Inc.*,
553 F.Supp.3d 48 (S.D.N.Y. 2021) ..............................................................31

*Ferlauto v. Hamsher*,
   74 Cal.App.4th 1394 (1999) ..................................................................35, 37

*Fraser v. Goodale*,
   342 F.3d 1032 (9th Cir. 2003)...................................................................47

*Gaprindashvili v. Netflix, Inc.*,
   2022 WL 363537 (C.D.Cal 2022) .........................................................29, 31

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 342 (1974)............................................................... 50, 54-55, 59

*Gordon v. Random House, Inc.*,
   486 F.2d 1356 (3rd Cir. 1973)...................................................................49

*Gospel Missions of America v. City of Los Angeles*,
   328 F.3d 548, 557 (9th Cir. 2003) ..............................................................42

*Greene v. Paramount Pictures Corp.,*
   813 F.App'x 728 (2d Cir. 2020) ...........................................................35, 38

*Harris v. Tomczak*,
   94 F.R.D. 687 (E.D.Cal. 1982).................................................................49

*Harte-Hanks Communications v. Connaughton*,
   491 U.S. 657 (1989)................................................................................45

*Kapellas v. Kofman*,
   1 Cal. 3d 20 (1969) ................................................................................54

*Khawar v. Globe Intern., Inc.,*
   19 Cal.4th 254 (1998)......................................................................42, 43, 45

*Kohler v. Inter–Tel Techs.,*
   244 F.3d 1167, 1180 n. 9 (9th Cir.2001) .....................................................42

*Lovingood v. Discovery Communications, Inc.*,
   800 F. App'x 840 (11th Cir. 2020)....................................................... 32-33

*MacDonald v. Brodkorb*,
   939 N.W.2d 468 (Ct. of Appeals of Minn. 2020)..........................................53

*Mann v. Quality Old Time Serv., Inc.*,
   120 Cal.App.4th 90 (2004) .......................................................................21

*Masimo Corporation v. Mindray DS USA, Inc.*,
   2014 WL 12597114 (C.D.Cal. 2014) ...........................................................62

*Masson v. New Yorker Magazine, Inc.*,
   960 F.2d 896 (9th Cir. 1992) ....................................................................43

*Middlebrooks v. Curtis Pub. Co.*,
   413 F.2d 141 (4th Cir. 1969) ............................................................... 38-39

*Miller v. Sawant*,
   811 Fed.Appx.408 (9th Cir. 2020) ...............................................................25

*Mindy's Cosmetics, Inc. v. Dakar*,
   611 F.3d 590, 598 (9th Cir. 2010) ........................................................ 20-21

*Mitchell v. Twin Galaxies, LLC*,
   70 Cal.App.5th 207 (2021)........................................................................42

*Monster Energy Co., v. Schechter*,
   7 Cal.5th781, 788 (2019) ..................................................................... 20-21

*Muzikowski v. Paramount Pictures Corp.*,
   322 F.3d 918 (7th Cir. 2003) ....................................................................32

*Nevada State Journal Pub. Co. v. Henderson*,
   294 F.60 (9th Cir. 1923) ................................................................. 44, 47-48

*Newson v. Henry*,
   443 So. 2d 817 (Miss.1983)......................................................................53

*Newton v. National Broadcasting Co., Inc.*,
   930 F.2d 662 (9th Cir. 1990).....................................................................43

vii

*Ngoc Jenny Tran v. Velocity Investments LLC*,
2019 WL 11322802 (C.D.Cal. 2019) ...................................................... 48-49

*Okorocha v. Duff*,
2012 WL 12865303 (C.D.Cal. 2012) ........................................................61

*Onokohwomo v. Sterling Jewelers, Inc.*,
2022 WL 2256321 (9th Cir. 2022) ...................................................25, 27, 36

*Partington v. Bugliosi,*
56 F.3d 1147, 1155 (9th Cir. 1995)...........................................................29

*Peterson v. Rasmussen*,
47 Cal.App.3d 694 (1920) ........................................................................3

*Reader's Digest Assn. v. Superior Court*,
37 Cal.3d 244 (1984) .......................................................................44, 60

*Rebozo v. Washington Post Co.*,
637 F.2d 375 (5th Cir. 1981) ...................................................................49

*Rosenblatt v. Baer*,
383 U.S. 75 (1966)................................................................................52

*Rutt v. Bethlehems' Globe Pub. Co.*,
335 Pa.Super 163, 181 (Pa. 1984) ....................................................... 52-54

*Ryder v. Time, Inc.*,
557 F.2d 824 (D.C. Cir. 1976)..................................................................53

*SDV/ACCI, Inc. v. AT&T Corp.*,
522 F.3d 955 (9th Cir. 2008) ..............................................................25, 36

*State Farm Mutual Auto. Ins. Co. v. Penske Truck Leasing Co. L.P.*,
2021 WL 4810642 (9th Cir. 2021)............................................................58

*Tamkin v. CBS Broad., Inc.*,
193 Cal.App.4th 133, 146 (2011).................................................... 30, 38-41

*Time, Inc. v. Firestone*,
424 U.S. 448 (1976)..............................................................................57-58

*Umfress v. City of Memphis, Tennessee*,
2021 WL 2828023 (6th Cir. 2021) ...........................................................25

*Unsworth v. Musk*,
2019 WL 8220721 (C.D.Cal 2019) ...........................................................60

*Verizon Del., Inc. v. Covad Commc'ns*,
377 F.3d 1081 (9th Cir. 2004) ..................................................................62

*Waldbaum v. Fairchild Publications, Inc.*,
627 F.2d 1287 (D.C. Cir. 1980) .....................................................50, 57, 60

*Webber v. Telegram-Tribune Co.*,
239 Cal.Rptr.489 (1987) ...........................................................................58

*Wolston v. Reader's Digest Association*,
443 U.S. 157 (1979)......................................................................50, 57, 59

*Z.F. Ripon Unified Sch. Dist.*,
482 F.Appx 239, 240 (9th Cir. 2012) .......................................................49

*Zerangue v. TSP Newspapers Inc.*,
814 F.2d 1066 (5th Cir. 1987) ..................................................................44

**Statutes**

Cal.Civ.Proc.Code § 426.16(b)(2) .............................................................21

Fed. R. Civ. P. 15(a) .................................................................................62

Fed. R. Evid. §802 ...................................................................................29

Fed. R. Evid. § 803 ...................................................................................29

## INTRODUCTION

Netflix promoted *Baby Reindeer* (the "Series") as the true story of Richard Gadd's stalker, "Martha," a convicted criminal who spent four and a half years in prison. In the Series, Martha – once she is released from prison – waits outside Gadd's home all day and night, rapes him in a dark alley, and violently smashes his head and gouged out his eyes, only to return to prison after pleading guilty in court to crimes against Gadd.

Although Netflix believed the Series was fictionalized, it did not tell its viewers that. Instead, Netflix chose to keep that belief to itself and promoted *Baby Reindeer* as a "captivating true story." And for good economic reason . . . Netflix had a hit on its hands. The Series is one of the most watched in television history, with more than 50 million subscribers having viewed it.

That left only one question: Who was the real Martha? Within days of Netflix's release of *Baby Reindeer* on April 11, 2024, plaintiff Fiona Harvey was easily identified. Harvey, like Martha, had the same schooling, occupation, birthplace, residence, accent, physical appearance, and knew Gadd. In addition, Harvey, like Martha in the Series, was reported to have stalked a lawyer and sent the same, publicly viewable message to Gadd on social media as shown in the Series. Immediately after being identified, Harvey received death threats and was contacted by thousands of people who identified her as Martha, called her a rapist and told her

1

to kill herself. Harvey became fearful, stopped sleeping, and did not leave her home for weeks.

Desperate to clear her name, on May 8, 2024, Harvey appeared on the Piers Morgan Show to confirm that she was not a criminal. Also on May 8, 2024, Netflix appeared before the House of Commons' Culture, Media and Sport Committee and was asked about its duty of care to Harvey who had been identified as the real 'Martha.' Netflix was defiant, stating "[*Baby Reindeer*] is obviously a true story of the horrific abuse that the writer and protagonist Richard Gadd suffered at the hands of a *convicted* stalker." On May 17, the Committee followed up with a written demand for evidence of "the serious claim" Netflix made to the Committee concerning Harvey's criminal record. On May 23, 2024, in response to the Committee's inquiry, Netflix admitted in writing "the person on whom the show is based" did not have any convictions. Notwithstanding its admission that *Baby Reindeer* was about a real person – Harvey – who had never been convicted of any crime, Netflix continued to assert "this is a true story" in the Series' title card.

On June 6, 2024, Harvey filed suit against Netflix for defamation. Netflix moved to strike Harvey's claims pursuant to California's anti-SLAPP law on the basis that Netflix should not be liable for its false statements about Harvey in the Series because Netflix changed Harvey's name in the Series to 'Martha' and the Series is a drama. However, there are no such loopholes in the law. It has been settled

California law for one hundred years that a person need not be identified by name to be defamed. *Peterson v. Rasmussen*, 47 Cal.App.3d 694 (1920). Likewise, it has been California law for at least 45 years that even fictional works can defame real people. *Bindrim v. Mitchell*, 92 Cal.App.3d 61 (1979).

In this appeal, Netflix does not contend that any of its statements about Harvey are true. Rather, Netflix insists that when it said *Baby Reindeer* was a "true story" it meant "a drama infused with fictionalized elements," Br. 2 – and any reasonable viewer would have known that. Netflix's argument is not serious. Not only did the Series' title card unflinchingly state "this is a true story" but so did the promotional materials for the Series, articles on Netflix's website, Netflix's social media accounts, and Netflix repeated it during a hearing in the House of Commons. Netflix now responds that its repeated assertions that *Baby Reindeer* told a true story were merely an attempt to be "cheeky." Br. 2. What is cheeky is Netflix's argument.

Netflix has no defense. On this appeal, as well as in the underling motion, Netflix resorts to further humiliation of Harvey by filling its brief with irrelevant details about Harvey's past and showing the Court irrelevant private emails between Harvey and Gadd that have no relevance and serve no purpose other than to humiliate Harvey.

*Baby Reindeer* destroyed Fiona Harvey's life. Harvey brought this defamation lawsuit to hold Netflix accountable, and the district court correctly held that Harvey

3

demonstrated a probably of prevailing on the merits. This Court should affirm the decision.

## STATEMENT OF THE ISSUES

1.       Whether the district court erred by concluding that Harvey met her burden of establishing that Harvey was identifiable as 'Martha' in Netflix's "true story," *Baby Reindeer*, where Harvey and Martha are both overweight female Scottish lawyers, living in London, the same age, who look, sound and dress alike, and who have a reported history of stalking a lawyer, communicated with Richard Gadd on social media, and Harvey's easily searchable social media posts to Gadd are referenced in the Series.

2.       Whether the district court erred by concluding Netflix had actual malice where Netflix knew *Baby Reindeer* was fictionalized and Harvey did not have any criminal record, but asserted it was a true story to make the Series more compelling and gain subscribers, or alternatively, where Netflix recklessly disregarded that the source material for the Series was a play ("*based* on a true story") written by an unreliable source, Richard Gadd, an admitted heroin user, desperate for fame, who lied to the police about his contacts with Harvey, and who demonstrated hostility toward to Harvey, and failed to confer with Harvey about the truth of its statements in the Series prior to its release, even after Gadd expressed concerns about stating *Baby Reindeer* was a true story.

4

## STATEMENT OF THE CASE

Netflix defamed Fiona Harvey when it promoted and released the series *Baby Reindeer* as a "true story" in which Netflix falsely stated Harvey was a convicted criminal who went to prison, raped Gadd, waited outside his home, smashed his head with a glass, gouged his eyes, stalked a police officer, and then pled guilty to more crimes. The fact that Netflix changed Harvey's name in the Series to 'Martha' does not insulate Netflix from liability, nor does Netflix's claim that *Baby Reindeer* is a drama. The district court correctly held that Harvey's case surpasses the "minimal merit" threshold and denied Netflix's motion to strike.

## FACTUAL BACKGROUND

### A. The *Baby Reindeer* Play

The Netflix television series *Baby Reindeer* (the "Series") was adapted from Richard Gadd's 80 page, one-person stage play (the "Play") of the same title. 3-ER-303, ¶ 6; 2-ER-135, ¶ 2. In the Play, the main characters are named "Gadd," played by Gadd, and "Martha," played by a bar stool with a northern Irish accent. 1-SER-44, ¶ 8, 1-SER-98. The Play stated that it was "*based* on a true story." 1-SER-98 (emphasis added).

### B. The *Baby Reinder* TV Series

In March 2020, Netflix acquired the rights to the Play, including the streaming rights to the Series. 2-ER-135, ¶ 2. The draw for the Series is the representation made

5

by Netflix that this is a true story. At the 1:39 mark of Episode 1, the following image appears on screen for four seconds:



## C. Richard Gadd

Richard Gadd wrote and created the Play *Baby Reindeer* and starred in it, playing himself. 3-ER-303 (¶ 4). Gadd also wrote, produced and starred in the Series. 3-ER-302 (¶ 1). In the Series, Gadd admits he is a crack, meth, and heroin user (Ep. 4 at 26:00), he has a history of masturbating to Harvey (Ep. 5 at 20:00), he followed her home and spied on her through her window, (Ep. 1 at 17:00 – 19:00), and lied to the police about his contacts with her. (Ep. 6 at 7:00):



6

The Series tracks Gadd's progress in a comedy competition while he works as a bartender at the pub, The Heart, in Camden, London.

**D. "Martha"**

To overcome the uninteresting "true story" of Gadd's inability to advance professionally in the London comedy circuit, Netflix included as the main plot of *Baby Reindeer*, the fabricated "true story" of a convicted stalker, 'Martha', that Gadd meets at the pub, in order to make *Baby Reindeer* more compelling.

According to Netflix, the real 'Martha' is a twice-convicted criminal. 2-ER-269 (¶ 54), 2-ER-270 (¶ 57). She spent a total of five years in prison for stalking Gadd and a lawyer that she worked with at a law firm. *Id.* In addition, the Series tells viewers that Martha stalked a policeman (2-ER-272 (¶ 67), sexually assaulted Gadd in a dark alley (2-ER-270 (¶¶ 59-61), violently gouged his eyes and smashed his head with a glass (2-ER-273 (¶¶ 69-70), and waited outside his home every day for up to 16 hours a day, including at 3:00am (2-ER-271 (¶¶ 64-66). The real Martha is reasonably understood by all viewers to have done all these monstrous things because Netflix stated this was true. 2-ER-263 (¶ 21); 1-ER-10.

**E. "Hang My Curtains" – Harvey is Identified**

A recurring joke throughout *Baby Reindeer* is the phrase "hang my curtains" as a euphemism for Gadd having sex with 'Martha.' For example, in Episode 1 at 8:30, Gadd's fellow bartenders ask Gadd when he and "Martha" are "going to shag."

7

Gadd responds that he does not believe in sex before marriage to which "Martha" replies that she is marriage material and that all she needs is someone to hang her curtains:



Gadd narrates that "hang her curtains" sounded "vaguely sexual" and he responds to "Martha" by joking, "I'll hang your curtains!" to which the bar erupts in laughter.



Later in Episode 1 (at 9:45) 'Martha' sends Gadd 80 emails per day including this one stating: "my curtains are waiting for you they are ready" (spelling corrected):



2-ER-264 (¶ 33). In real life, this tweet from Harvey to Gadd, was publicly searchable – and easily found – on Twitter when *Baby Reindeer* was released in April 2024:



1-SER-26 (¶ 11), 1-SER-33; 1-SER-133 (¶ 6); 1-SER-136 (¶ 4).

Within days after the release of *Baby Reindeer* on April 11, 2024, Fiona Harvey was identified as "Martha." 1-SER-27 (¶ 17). *Thousands* of strangers began to message Harvey on Facebook and even *called* her. 1-SER-27 (¶ 17). The messages received by Harvey identified her as 'Martha,' called her a "rapist,"

9

encouraged Harvey to kill herself, and specifically referenced Harvey's 'hang my curtains' tweet. 1-SER-27 (¶ 17); 2-ER-265 (¶ 37). Examples include:

Be very afraid
Apr 22, 2024 10:42:18am

you're a psycho. you deserve prison. kill yourself.
Apr 23, 2024 8:03:18pm

rapist dog
Apr 24, 2024 6:28:27am

Oi ya fat pasty chested brick shithouse, I hope you get publicly executed
Apr 24, 2024 9:46:25pm

You are her lol your Martha
Apr 25, 2024 10:03:09pm

did you get your curtains hung
Apr 25, 2024 12:09:18pm

Rapist
Apr 26, 2024 12:05:48pm

See e.g. 2-SER-138-184

The identification of Harvey as 'Martha' was easy as Harvey's entire identity was depicted. 2-ER-265, ¶ 36-37; 1-SER-25 (¶¶ 3-5, 8-9); 1-SER-127-128 (¶¶ 5-8). Like 'Martha," Harvey is an overweight Scottish lawyer, living in London, twenty years older than Gadd, was accused of stalking a barrister in a newspaper article, communicated with Gadd on social media in the years 2014-2015, and who bears an uncanny resemblance to 'Martha'. 1-ER-9; 2-ER-266 (¶¶ 40-41). Further, Martha's

10

accent, manner of speaking and cadence is indistinguishable from Harvey's. 2-ER-266, ¶ 41; 1-SER-128 (¶ 6).



It is implausible that there is any female Scottish lawyer, living in London, twenty years older than Gadd, who was accused of stalking a lawyer in a newspaper article, and who communicated with Gadd on social media, other than Harvey. 1-ER-9. Gadd's and Netflix's statement that *Baby Reindeer* was a true story was reasonably viewed as invitation to identify the real Martha. 1-ER-9.

Harvey was tormented after she was identified as 'Martha'. Harvey Decl., 1-SER-27 (¶ 19). Harvey experienced anxiety, panic attacks, insomnia, and extreme stress as a direct result of being identified as 'Martha'. 1-SER-27 (¶ 19). Harvey went weeks without leaving her home out of fear of being attacked and has become extremely secluded and isolated as a result of *Baby Reindeer*. 1-SER-27 (¶ 19).

## F. Netflix's Defamatory Statements

Netflix made false and defamatory statements about Harvey throughout the Series. Netflix argued in the underlying motion to strike that each statement

identified below was "substantially true." The district court correctly rejected Netflix's arguments. Netflix does not appeal this portion of the district court's decision. The facts below are provided for the context of Netflix's false and defamatory statements in Harvey's Complaint, Netflix's motion to strike, and the factual background of this appeal.

### 1. Harvey Has Never Been Convicted of a Crime

It is undisputed that Harvey has never been convicted of any crime and has never been to prison. 1-SER-26 (¶ 13); 1-SER-43 (¶ 5), 1-SER-90. Even so, the central plot, and the arc of the Series, is that Gadd befriended Harvey, a convicted stalker, who then returns to prison for stalking Gadd. 2-ER-269 (¶ 54); 2-ER-270 (¶ 57). In Episode 1, Netflix falsely claimed that Harvey received a "four-and-a half-year prison sentence." Ep. 1 at 28:40; 2-ER-269 (¶ 54):



Episode 1 ends with the following repeated refrain from Gadd:

> *I had a convicted stalker stalking me*
>
> *I had a convicted stalker stalking me*
>
> *I had a convicted stalker stalking me*

Ep. 1 at 29:10; 2-ER-269 (¶ 55). The final episode of the Series, Episode 7, climaxes with a two-minute-long courtroom scene in which Harvey dramatically pleads guilty from behind bars and is convicted of three charges of stalking Gadd and harassment of his mother and father. Ep. 7 at 13:30-15:55; 2-ER-270 (¶ 57).



In Episode 7, Netflix falsely claims that Harvey was "sentenced to nine months in prison and a five-year restraining order was issued that same day." Ep. 7 at 15:42; 2-ER-270 (¶ 57). In fact, Harvey has never pled guilty to, or been convicted of, any crime.1-SER-26 (¶ 13). The district court rejected Netflix's claim that its statement was substantially true. 1-ER-11-12. Netflix does not argue the district court erred.

## 2. Harvey Never Sexually Assaulted Gadd

In addition to lying about Harvey being a criminal, *Baby Reindeer* makes the outrageous false claim that Harvey raped Gadd in a dark alley. 1-ER-11; 1-SER-26 (¶ 10, 13); 2-ER-270 (¶¶ 59-61). In a disturbing scene at the end of Episode 2, Netflix falsely stated that Harvey sexually assaulted Gadd in a dark alley, by pushing Gadd against a wall and grabbing his penis without consent. Ep. 2 at 24:30. Gadd claims he said, "please stop" and Martha responded, "keep still" and continued to grab Gadd until she 'made him beat'. Ep. 2 at 24:50; 2-ER-270 (¶ 60).



In fact, Harvey has never had any sexual encounter with Gadd and does not recall ever being alone with him. 1-SER-26 (¶ 13). The district court rejected Netflix's argument that this statement was substantially true. 1-ER-11-12. Netflix does not contend the district court erred.

## 3. Harvey Never Stalked Gadd's Residence

For approximately two and a half minutes during Episode 3, Netflix falsely claimed that Harvey stalked Gadd by sitting at a bus stop on the same street – thirty yards away – as Gadd's residence, from morning to night including at 3:00am:

14

*Every day now, Martha would be outside. This ticking time bomb on my life. I would leave first thing in the morning and she would be there. Then I would come back sometimes as late as 11 or 12 at night and she would still be there. . . It was all catcalls and snatched glimpses, as she devoted 15, 16-hour days to a fleeting encounter.*



Ep. 3 at 14:10 – 16:54; 2-ER-272 (¶¶ 64-66). Netflix's statement that Harvey waited outside on the same street as Gadd's residence every day, for up to 15-16 hours a day, including at 3:00 am, and in the rain and cold, is another false statement. 1-SER-26 (¶¶ 10, 13). The district court rejected Netflix's argument that this statement was substantially true. 1-ER-11-12. Netflix does not contend the district court erred.

**4. Harvey Never Stalked a Police Officer**

In Episode 5, Netflix falsely stated that when Gadd went to the police to report Harvey, the police detective informed Gadd that Harvey is "a very serious woman. So serious that she once stalked a policeman." Ep. 5 at 17:50; 2-ER-272 (¶¶ 67-68).



This never happened. 1-SER-26 (¶ 13). This particular falsehood about Harvey is reprehensible because it gives Netflix's defamation the authority of official police statements. The district court rejected Netflix's argument that this statement was substantially true. 1-ER-11-12. Netflix does not contend the district court erred.

**5. Harvey Never Attacked Gadd**

In Episode 6, Netflix falsely stated that Harvey violently smashed a glass over Gadd's head and gouged his eyes with her thumbs in a horrific physical assault that left Gadd's head bloodied. Ep 6 at 16:15; 2-ER-273 (¶¶ 69-70).



This never happened. 1-SER-26 (¶ 13). The district court rejected Netflix's argument that this statement was substantially true. 1-ER-11-12. Netflix does not contend the district court erred.

### G. Netflix Makes False Statements About Harvey in the House of Commons

On May 8, 2024, Netflix executive, Benjamin King, appeared before the House of Commons Culture, Media and Sport Committee, on behalf of Netflix and in his capacity as Senior Director of Public Policy of Netflix. 1-SER-43 at ¶ 3; 1-SER-50 at Q346. At the Committee hearing, Mr. King was asked by Member of Parliament, John Nicolson, about the duty of care due to the woman now identified as 'Martha' from *Baby Reindeer.* 1-SER-80 at Q401. Mr. King responded:

> *Baby Reindeer* is **obviously a true story** of the horrific abuse that [Richard Gadd] suffered at the hands of a convicted stalker. We did take every reasonable precaution in disguising the real life identities of the people whilst striking a balance with the veracity and authenticity of the story.

1-SER-80 at Q401.

17

MP John Nicolson sent Mr. King a follow up written inquiry requesting "evidence for this serious claim which [Mr. King] to Nicolson at the Select Committee":



2-ER-275, ¶ 79. Six days later, on May 23, 2024, Mr. King responded in writing to Media and Sport Select Committee, and confirmed that "the person upon whom the show was based" was never the subject of any criminal conviction:

18

23 May 2024

Dear Dame Caroline,

Thank you for the opportunity to speak with the Culture, Media and Sport Committee on May 8 as part of your inquiry into British film and high-end television.

As I said in my oral evidence, Netflix is investing heavily in quality British TV, with a string of recent hits, including Baby Reindeer.

In response to a question about the characters portrayed in that series, I said that: "it's an extraordinary true story ... of the horrific abuse that the writer and protagonist Richard Gadd suffered at the hands of a convicted stalker".

I wanted to clarify our understanding that the person on whom the show is based — who we have at no point sought to identify — was subject to a court order rather than a conviction. The writer of Baby Reindeer endured serious harassment over many months (as it now seems has been the case for many others), which had a significant impact on his wellbeing.

Yours sincerely,
Benjamin King
Senior Director, Public Policy Netflix

1-SER-35, ¶ 5., Exh. 3; 1-SER-90. Notwithstanding this admission, Netflix continued to state that *Baby Reindeer* was a true story. 2-ER-81.

## H. This Litigation

Two weeks after Netflix's admission, Plaintiff filed this action on June 6, 2024, asserting numerous causes of action, including defamation. 2-ER-254. Netflix moved to dismiss and strike pursuant to California's anti-SLAPP law on July 29, 2024. 2-ER-109. On September 27, 2024, the district court denied Netflix's motion to strike. 1-ER-2-15. As relevant here, the Court held that 'Martha' was identifiable as Harvey and that *even if* Harvey was a public figure, an issue not decided, Harvey could show actual malice. 1-ER-9,14-15. Netflix appealed the district court's

decision that Netflix's statements were of and concerning Harvey and that Harvey could show actual malice. Br., p. 5.

## I. Standard on an Anti-SLAPP Motion

"The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." *Monster Energy Co., v. Schechter*, 7 Cal.5th 781, 788 (2019). The anti-SLAPP statute "requires only a minimum level of legal sufficiency and triability" to survive dismissal, or "minimal merit" *Mindy's Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010).

Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. *Monster Energy* at 788. If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.

In this second step of the anti-SLAPP inquiry, the burden shifts to the plaintiff to show a probability of success. *Mindy's Cosmetics* at 598-599. (internal citations omitted). To satisfy this second prong, the plaintiff "must show a 'reasonable probability' of prevailing in its claims for those claims to survive dismissal." *Id.* The court is to consider "the pleadings and supporting and opposing affidavits stating the

20

facts upon which the liability or defense is based." Cal.Civ.Proc.Code § 426.16(b)(2).

"Reasonable probability" in the anti-SLAPP statute has a specialized meaning. *Mindy's Cosmetics* at 599. The statute requires only a "minimum level of legal sufficiency and triability." *Id*. Indeed, the second step of the anti-SLAPP inquiry is often called the "minimal merit" prong.

To establish "minimal merit," the plaintiff need only "state and substantiate a legally sufficient claim." *Id*. "Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Mindy's Cosmetics* at 598-599 (internal citation omitted). The plaintiff's alleged facts are entitled to "a generous interpretation" and plaintiff's evidence is accepted as true. *Mindy's Cosmetics* at 600; *Monster Energy* at 788.

Critically, "[a] plaintiff is not required to prove the specified claim to the trial court; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim."). *Mindy's Cosmetics* at 599 (citing *Mann v. Quality Old Time Serv., Inc.*, 120 Cal.App.4th 90, 105 (2004)).

## SUMMARY OF ARGUMENT

The district court's decision correctly denied Netflix's anti-SLAPP motion. The purpose of the anti-SLAPP law is to deter frivolous claims that limit First Amendment rights. This is not such a case. Here, Netflix made a television show, *Baby Reindeer,* about Harvey, in which it outrageously and knowingly asserted falsehoods about Harvey including that she was a convicted criminal who spent five years in prison. The district court's decision should be affirmed.

I.       The district court correctly decided that the Series makes factual statements "of and concerning" Harvey. Although Harvey's name is not used, and Netflix claims the Series is a dramatic work, it is settled California law that a person need not be defamed and that even fictional works can defame real people.

There can be no reasonable dispute whether the Series is of and concerning Harvey. As noted by the district court, "this is not the typical case." 1-ER-9. Harvey and Martha have the same nationality, residence, schooling, occupation, age, physical appearance, accent, clothing, personality, and critically, reported history of stalking another lawyer, and the same social media messages to Gadd. Those who knew Harvey prior to the Series have stated it was "obvious" that Martha was Harvey, including Netflix's own witness, Laura Wray. Further, Netflix confirmed the Series is based on a real Martha (who was never convicted of a crime) and Gadd confirmed in his declaration that Martha is Harvey. Harvey was easily identified as

22

Martha by the public and was contacted by thousands of people in response to the Series. Harvey was called a rapist, told to kill herself, and received death threats. Harvey became so fearful that she stopped sleeping and did not go outside for weeks.

II. The district court correctly held that Netflix had actual malice. Netflix admitted that despite the fact that it always understood that *Baby Reindeer* was fictionalized, Netflix asserted the Series was true. Netflix admitted in writing to the House of Commons that it knew Harvey had never been convicted of a crime but refused to retract its statements and continued to state that Harvey is a twice-convicted criminal who was imprisoned for five years.

In addition to Netflix's serious doubts that the Series was a true story, and actual knowledge that it was not true, Netflix recklessly disregarded the falsity of its statements, which also constitutes actual malice. Netflix was on notice that the source material was merely *based* on a true story indicating that some events were not true, yet Netflix insisted on promoting the Series as a true story over Gadd's concerns about doing so. Netflix and Gadd do not dispute this fact in their declarations. Further, Gadd was an unreliable source because he is an admitted heroin user who is desperate for fame, and who demonstrated hostility toward Harvey in the Series. Despite this, Netflix never conferred with Harvey about the truth of its statements. Netflix consulted with Gadd who affirmed then and in his declaration the story is fictionalized and has "imagined" events and expressed

23

concerns about stating that the Series was a true story. Despite Gadd's concerns, Netflix insisted on calling the Series a "true story" because true stories were more compelling and Netflix needed to maintain and add subscribers to its streaming service.

The issues on appeal are not close calls. A clearer and more outrageous case of defamation is hard to find. Defamation law exists to protect individuals from having false and defamatory statements asserted about them. Try as Netflix might to convince this Court that the district court's decision will chill "storytelling," it will not. Netflix drove through enormous legal barriers to get a hit TV show and destroyed Harvey in the process. Now, Netflix must be held accountable.

## ARGUMENT

### POINT I

### THE DISTRICT COURT CORRECTLY HELD NETFLIX'S STATEMENTS WERE OF AND CONCERNING HARVEY

"Under California law, there is no requirement that the person defamed be mentioned by name." *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir.1984) (citing *DiGiorgio Fruit Corp. v. AFL–CIO,* 215 Cal.App.2d 560 (1963); *Bindrim v. Mitchell,* 92 Cal.App.3d 61, 75–76 (1979). It is sufficient "if the publication points to the plaintiff by description or circumstance tending to identify him" or "if it is capable of being understood as referring to the plaintiff and there is evidence, direct or circumstantial, that the statement was "so understood by a third

24

party." *Church of Scientology* at 697; *Onokohwomo v. Sterling Jewelers, Inc.*, 2022 WL 2256321, *1 (9th Cir. 2022) (citing *SDV/ACCI, Inc. v. AT&T Corp.*, 522 F.3d 955, 959–60 (9th Cir. 2008). A plaintiff may use extrinsic facts to show that the statements were "of and concerning" them. *Miller v. Sawant*, 811 Fed.Appx.408, n.3 (9th Cir. 2020); *Ball v. Taylor*, 416 F.3d 915, 916 (8th Cir. 2005); *Umfress v. City of Memphis, Tennessee*, 2021 WL 2828023, *1-3 (6th Cir. 2021).

### A. Netflix's Defamatory Statements Pointed to Harvey by Descriptions and Circumstances That Clearly Identified Her

Netflix's statements in *Baby Reindeer* plainly point to Harvey by description or circumstance. *Church of Scientology*, 744 F.2d at 697. Harvey has the same nationality, age, occupation, residence, physical appearance, accent and cadence as 'Martha'. 2-ER-266, ¶¶ 40-41; 1-SER-25 (¶¶ 3, 4, 8, 20); 1-SER-127-128 (¶¶ 5-6). In addition, Harvey and Martha are both highly stressful, emotional, bright and at times funny individuals. 1-SER-127 (¶ 5). Harvey and Martha both sent Gadd messages about "hanging my curtains" as a euphemism for sex in around the year 2014, and both were alleged in a newspaper article to have stalked another lawyer. 1-SER-25 (¶11), 1-SER-33; 1-SER-45 (¶ 11), 1-SER-105; 1-SER-136 (¶ 4); 2-ER-265-266 (¶¶ 35, 40). A jury can infer that Netflix's statements apply to Harvey. *Church of Scientology* 744 F.2d at 697.

Further, Netflix submitted a declaration from Gadd that confirms that Harvey *is* Martha. Gadd's declaration recounts his "real life" experiences with Fiona Harvey

that are depicted in the Series, note for note. 3-ER-304-308 (¶¶ 14-23). For example, Gadd declares under oath that, in real-life, Gadd offered Harvey a free cup of tea at the pub where he worked (3-ER-304, ¶ 14) (Episode One at 1:43); Harvey hung around the pub constantly while Gadd worked (3-ER-305, ¶ 15) (Episode Two at 12:00-13:00); Harvey mentioned to a customer at the bar a bad review about Gadd which she had seen online (3-ER-306, ¶ 19) (Episode Six at 14:45); Harvey attended Gadd's comedy shows (3-ER-307, ¶ 21) (Episode One at 20:20); Harvey emailed Gadd relentlessly (3-ER-307, ¶ 22 ) (Episode One at 9:50); Harvey sent Gadd hundreds of voicemails (3-ER-308, ¶ 23) (Episode Seven at 10:15-12:00). The district court held:

"[t]his not the typical case where a plaintiff happens to be one of hundreds of people that match a fictional character's broad characteristics. Rather Martha and Plaintiff have specific similarities that few others could claim to share. Specifically, Martha and Plaintiff are both Scottish lawyers living in London, twenty years older than Donny/Gadd, accused of stalking a lawyer in a newspaper article, who communicated Donny/Gadd on social media. While there may be numerous Scottish lawyers living in London of the same approximate age as Plaintiff, it is very likely that only Plaintiff has been accused of

26

stalking a lawyer in a newspaper article while also communicating with Gadd on social media."

1-ER-9.

### B. Netflix Failed to Offer Any Evidence to Rebut Harvey's Claim That It Was Easy to Identify Her

The district court correctly rejected Netflix's argument that a reasonable person would not have identified Plaintiff without "cybersleuthing" because Netflix did not offer any evidence to rebut Plaintiff's claim that it was easy to find Plaintiff based on Plaintiff's "hang my curtains" joke on social media. 1-ER-9. In example, Plaintiff submitted a declaration from Kerri-Anne Armstrong who confirmed she easily identified Harvey by searching twitter for the "curtains" comment. 1-SER-136 (¶ 4). Plaintiff also submitted a declaration from John Dingwall, who confirmed that in April 2024, he identified Fiona Harvey in *minutes* on Google and Twitter. 1-SER-133 (¶ 6). Further, Harvey submitted evidence that thousands of people not only identified her as 'Martha,' but went further, and contacted her on Facebook and *called* her. 2-SER-138-184; 1-SER-27 (¶ 17); *Onokohwomo v. Sterling Jewelers, Inc.*, 2022 WL 2256321, *1 (9th Cir. 2022) (defamatory sufficiently identifies the plaintiff if it was "so understood by a third party."). In addition, the district court observed that the statement that Martha was based on a real stalker could arguably be viewed as an invitation to find Plaintiff. 1-ER-9; 1-SER-133 (¶ 6); 1-SER-136 (¶ 4).

## C. For Those Who Know Her, It Was "Obvious" the Defamatory Statements Referred to Harvey

Moreover, Plaintiff submitted unrebutted evidence that that for those who knew Harvey prior to the Series, it was "obvious" that 'Martha' was Harvey based on the depiction of her character in the Series. For example, John Hala, the owner of the hair salon that Harvey frequents, submitted a declaration affirming that after he watched the first episode of *Baby Reindeer* with his wife, he turned to her and said, "that's my customer, Fiona Harvey." 1-SER-127 (¶ 4). Hala made this "**very obvious**" identification because, like Harvey, Martha is spicy Scottish woman who lived in Camden, is an attorney, overweight, and spoke with the same accent and cadence. 1-SER-127 (¶ 5). In addition, Martha' looks like her, dresses like her, has emotional issues, is highly stressful, extremely funny and endearing. 1-SER-127 (¶ 5). Hala even noted tiny details about Harvey depicted in Martha such as her tea drinking, too-tight wristwatch, and penchant for eating microwave food. 1-SER-128 (¶ 8). Finally, Hala affirmed that his entire staff of sixteen individuals at the salon talk about how closely Gadd depicted Martha as Harvey. 1-SER-127-128 (¶¶ 2, 14).

In addition, *Netflix's own witness*, Laura Wray, who submitted a declaration in support of Netflix's motion to strike (2-ER-242), publicly stated on the Piers Morgan show that 'Martha' was "obviously" Harvey:

when [I] saw 'Martha' in *Baby Reindeer* [I] couldn't believe it. From the very beginning **it was obvious that it was same the woman. It was Fiona**

28

**Harvey.** The actress, who does a very good job, sounds like her, looks like her, mimicked her to a tee.

1-SER-46 (¶13 at 3:35-4:05); 2-ER-252 (¶28 confirming appearance on Piers Morgan's program). Wray's statement is admissible under Fed. R. Evid. §§ 802, 803 (1)-(3). Regardless, Wray stated that she would testify at trial in her affidavit. 2-ER-243 (¶ 20). Accordingly, not only was Harvey easily identified as 'Martha' by the public based on the idiosyncratic facts about Harvey referenced in the Series, but those who know Harvey thought it "obvious" as well.

## D. Fictional Works Can Defame Real People

On appeal, Netflix argues that it cannot have defamed Harvey because *Baby Reindeer* is "fictionalized." Br. at 33. Netflix's argument is wrong as a matter of law. See *Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537, *5 (C.D.Cal 2022) ("the fact that the Series was a fictional work does not insulate Netflix from liability for defamation if all the elements of defamation are otherwise present.") (citing *Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979), cert. denied, 444 U.S. 984 (1979) (fictional character in the novel was identifiable as the real person). See *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (creators of docudramas that mix fact and fiction "must attempt to avoid creating the impression that they are asserting objective facts"). "In actions based on the identification of a fictional character with the actual plaintiff, 'the test if whether a reasonable person . . . would understand that the

29

fictional character therein pictured was, in actual fact, the plaintiff acting as described." *Tamkin v. CBS Broad., Inc.*, 193 Cal.App.4th 133, 146 (2011) (quoting *Bindrum v. Mitchell*, 92 Cal.App. 3d, 61, 78 (1979).

*Bindrim v. Mitchell*, 92 Cal.App.3d 61 (1979) is squarely on point. In *Bindrim*, the defendant book publisher argued the fact that the book was marketed as a "novel" barred any claim that the publisher could be found to have implied that any character in the book was a factual representation of any actual non-fictional person. *Id*. at 78. The Court disagreed and explained "the test is whether a reasonable person, reading the book, would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described." *Id*. The Court of Appeal left undisturbed the jury's conclusion that the fictional "Dr. Herford" was the plaintiff acting as described because, notwithstanding physical dissimilarities, the plaintiff was identified by numerous witnesses as the fictional Dr. Herford as they both employed "nude marathons" as a unique group therapy device. *Id*. at 75.

On this appeal, Netflix makes the same argument as the defendant book publisher in *Bindrim* but on much weaker facts. Netflix, like the defendant book publisher in *Bindrim*, argues that Martha cannot be understood as a factual representation of Harvey because it claims the Series is a drama. The district court correctly rejected Netflix's argument, reasoning, "the very first episode states unequivocally that "this is a true story," thereby inviting the audience to accept the

statements as fact." 1-ER-10. In addition, Harvey provided evidence that the public not only accepted Netflix's invitation to accept *Baby Reindeer* as fact, but *thousands* of people contacted Harvey, identified her as 'Martha', threatened her, called her a 'rapist' and told her to kill herself. 1-SER-27 (¶ 17); 2-SER-138-184; 2-ER-265 (¶ 37). Moreover, Harvey submitted a declaration from reporter John Dingwall, who published a story about Harvey, and stated *he* received "intense" feedback from the public who accepted *Baby Reindeer* as fact and objected to him giving a voice to a "convicted criminal" like Harvey. 1-SER-134 (¶ 9). Netflix's argument that it may falsely assert defamatory facts about Harvey, provided it does so in a drama, must be rejected.

### E. Netflix's Disclaimer Does Not Immunize It from Liability for Defamation

The district court rejected Netflix's argument that its disclaimer in the end credits immunized Netflix from liability, reasoning "it is not clear that viewers would understand how to interpret it given the conflicting 'this is a true story' line in the first episode." 1-ER-10, n. 3. Netflix has tried, and failed, to assert the same disclaimer defense in other litigations. See *Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537, *6 (C.D.Cal. 2022) (rejecting Netflix's disclaimer and holding "in context, therefore, Netflix created the impression that it was asserting objective facts."); *Fairstein v. Netflix, Inc.*, 553 F.Supp.3d 48, 59 (S.D.N.Y. 2021) (statements in Netflix docudrama were actionable notwithstanding a disclaimer that appeared in

31

each episode). See also *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918 (7th Cir. 2003) (defamation claim stated notwithstanding disclaimer "this is a fictious story and no actual persons . . . have been portrayed.").

Netflix cites an unusual and easily distinguishable, unpublished, out-of-circuit case, *Lovingood v. Discovery Communications, Inc.*, 800 F. App'x 840, 847-848 (11th Cir. 2020) for its argument that reasonable viewers can understand that the statement "this is a true story" means it is fictionalized. In *Lovingood*, the plaintiff, a former NASA manager, brought suit against Discovery alleging its made-for-TV movie about the Challenger explosion was defamatory because, although it was true, he testified before Congress that the movie did not quote his testimony verbatim. *Id.* at 844. The Court framed (and rejected) the plaintiff's claim as seeking an exception to defamation law for failure to quote sworn testimony accurately. *Id.* at 846 ("Lovingood invites us to create an exception to the well-established *New York Times* standard for situations involving the fictionalization of sworn testimony"). Thus, the only issue on appeal was whether a reasonable viewer would understand the film accurately quoted the testimony given by the plaintiff, "verbatim." *Id.* at 848. The Eleventh Circuit held, "Overall, a reasonable viewer would understand the film as generally not purporting to present verbatim dialogue from the pages of history." *Id.* at 848-849

32

*Lovingood* is not relevant and is plainly distinguishable because Harvey did not bring any claim against Netflix for failing to quote her accurately in *Baby Reindeer* – let alone sworn testimony.[1] Further, in *Lovingood*, the title card, "this is a true story" also included the line "some scenes have been created for dramatic effect." *Id*. at 843, 847. Of course, *Baby Reindeer* only includes the first statement in its title card.

Finally, in *Lovingood*, the Eleventh Circuit found it relevant in determining a reasonable viewer's understanding of the truth of the movie, that its protagonist was "portrayed by a recognizable actor." *Id*. at 848. With respect to *Baby Reindeer*, a reasonable viewer's belief that the Series is true is elevated because Gadd plays himself, reliving the true story he wrote, of how Harvey stalked *him*. 2-ER-269 (¶ 55) ("I had a convicted stalker stalking me").

### 1. Netflix's "Disclaimer" Is Unreasonable

In addition to the district court's reasoning that Netflix's disclaimer was ineffectual, Netflix's disclaimer should be rejected for other reasons not considered in the district court's decision. Plaintiff submitted evidence that when *Baby Reindeer* is viewed on Netflix's streaming service, the next episode in the series begins to play automatically *before* the credits appear on screen, such that credits never appear. 1-

---

[1] Netflix promoted the Series on social media by stating that "Martha's emails from Baby Reindeer. Every one of them real." 1-SER-44 (¶ 9), 1-SER-103.

SER-44-45. In order to view the credits, the viewer must manually select 'watch credits within the mere seconds allotted by Netflix before the next episode plays. *Id*. Even if 'watch credits' is selected, the viewer must then wade halfway through three minutes of credits to find the actual disclaimer sandwiched between a warning about copyright infringement, various credits, and a logo. 1-SER-45. Netflix failed to submit evidence to the contrary, including whether any of the 50 million plus viewers of *Baby Reindeer* selected "watch credits" and stayed through the credits until the disclaimer was seen.

This is in sharp contrast to the thumb drive of distinct and discreet files of episodes Netflix lodged with the district court and on this appeal in which the next episode does not automatically begin to play before the credits appear, as is the case when the Series is streamed on Netflix's platform. The thumb drive lodged with the Court is not only unrepresentative of the way the Series is streamed in reality, but it is also not how any Netflix subscriber has ever viewed the Series. Netflix argued that Plaintiff's counsel's declaration was insufficient as an evidentiary matter to establish this fact (2-ER-35), however, Netflix failed to submit any evidence to the contrary or even claim this is not case (because it is true).

## F. Netflix's Case Law is Not Relevant and is Misrepresented

Netflix mispresents the holdings of several cases as standing for rules of law that do not appear anywhere in the decisions. Specifically, Netflix represents to this

Court that the cases it cites stand for the rule that there is a *de facto* presumption that a work is not of and concerning the plaintiff where the plaintiff's name is not used. Br. at 31. In addition, Netflix contends caselaw holds that where any divergences exist between the plaintiff and a character in a work, the work cannot be of and concerning the plaintiff. Br. at 32. Netflix made this up. Each of the cases is discussed below.

1. **Netflix's Caselaw Does Not Support its Position that the Use of Fictional Names is Sufficient to Avoid Defamation.**

Netflix argues there is a "de facto presumption" that a work is not of and concerning the plaintiff where a fictional or different name than the plaintiff's is used in the work. Br. at 31. Netflix cites *Blatty v. New York Times Co.*, 42 Cal. 3d 1033 (1986), *Ferlauto v. Hamsher*, 74 Cal.App.4th 1394 (1999) and *Greene v. Paramount Pictures Corp.*, 813 F.App'x 728 (2d Cir. 2020) in support of this argument. *Id.* Netflix is incorrect and has misrepresented the holding of each of these cases.

a. *Blatty v. New York Times Co.*

Netflix wrongly claims that "when the plaintiff's name is entirely absent from the allegedly defamatory statement . . . there is a *de facto presumption* that the work is not 'of and concerning' the plaintiff." Br. at 31 (emphasis in original) (citing *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1044, 1046 (1986). Netflix made this up.

35

The California Supreme Court's decision in *Blatty* does not contain any discussion of "de facto presumptions" or any presumptions. The word presumption does not even appear in the decision and there is no such presumption, de facto or otherwise, under the law. Netflix has completely misrepresented *Blatty* and has made up this purported rule.

The longstanding rule under California law is just the opposite: a person does not need to be named to be defamed. *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697, (9th Cir.1984) (citing *DiGiorgio Fruit Corp. v. AFL–CIO,* 215 Cal.App.2d 560 (1963); *Bindrim* at 75–76 (1979); *Onokohwomo v. Sterling Jewelers, Inc.*, 2022 WL 2256321, *1 (9th Cir. 2022) (citing *SDV/ACCI, Inc. v. AT&T Corp.*, 522 F.3d 955, 959–60 (2008).

In *Blatty*, the plaintiff sued the New York Times for libel for failing to include his book on its list of best sellers – the libelous statement being that the plaintiff's work was not a bestseller. *Id*. at 1036-1037. The California Supreme Court held that Blatty failed to meet the "of and concerning" requirement because the New York Times' statement – a list of bestsellers – applied to a large group of people (every author not on the best seller list) and accordingly, the plaintiff could not show the New York Times' statement was "of and concerning" *him*. *Id*. at 1046. *Blatty* is easily distinguished on the facts as *Baby Reindeer* is only about Harvey. *Blatty* has no relevance at all.

36

**b.** *Ferlauto v. Hamsher*

Next, Netflix argues that *Ferlauto v. Hamsher*, 74 Cal.App.4th 1394, 1405 (1999) stands for the rule that when a statement "uses an entirely *different* name to refer to [the plaintiff]" the statement cannot be of and concerning the plaintiff. Br. at 31-32 (emphasis in original) (citing *Ferlauto* at 1405). Under these circumstances, according to Netflix, the clear implication "exception" in defamation law does not apply. *Id.* (citing *Blatty* at n.1) ("*we emphasize*, the plaintiff need not be mentioned by name, but may be identified by clear implication"); *Bindrim v. Mitchell*, 92 Cal.App.3d 61 (1979) (statements about fictional character Dr. Herford were of and concerning the plaintiff, Paul Bindrim).

*Ferlauto* does not contain any such holding, comment or explanation on the law. Further, *Ferlauto* plainly stated that clear implication is not an "exception," but rather, it is the rule. *Id*. at 1404 (plaintiff may establish "statements are "of and concerning," him either by name or by "clear implication."). In *Ferlauto*, the court dismissed the plaintiff's defamation claim concerning the statement "not an ethical one" because the statement was an opinion (not an assertion of fact). In addition, the statement "not an ethical one" was made in reference to a problem, not a person, and therefore was not 'of and concerning' the plaintiff (or anyone). *Id*. at 1405. Accordingly, this case is not relevant.

37

### c. *Greene v. Paramount Pictures Corp.*

Netflix also relies on *Greene v. Paramount Pictures Corporation*, 813 Fed.App'x. 728, 732 (2d Cir. 2020) for the purported rule that a statement cannot implicate the plaintiff if he is not referred to by name. Br. at 32. However, *Greene* contains no such holding and is not relevant. In *Greene*, the Second Circuit held the plaintiff could not establish that the statements in the film *The Wolf of Wall Street* were of and concerning him, because the plaintiff's job differed from the character's. *Id*. at 731 ("[I]n the Film the Koskoff character worked as a broker at Stratton who works on the trading floor. Greene, on the other hand, was the head of the Corporate Finance Department who did not work on the trading floor."). In Harvey's case, Harvey has the same profession as 'Martha'.

### 2. "Differences" Between the Plaintiff and the Character Do Not Preclude a Finding That a Statement is Of and Concerning the Plaintiff.

Netflix also argues that where there are any differences between the plaintiff and the character, the work cannot be of and concerning the plaintiff. Br. at 32, 37. In support of this assertion, Netflix cites *Middlebrooks v. Curtis Pub. Co.*, 413 F.2d 141 (4th Cir. 1969) and *Tamkin v. CBS Broadcasting, Inc.*, 193 Cal.App.4th 133 (2011). *Id. Middlebrooks* and *Tamkin* merely held that the particular character at issue in those cases could not be the plaintiff because the similarities were too commonplace.

38

### a. *Middlebrooks v. Curtis Pub. Co*.

In *Middlebrooks v. Curtis Pub. Co.*, 413 F.2d 141 (4th Cir. 1969) the Fourth Circuit held that the plaintiff could not be reasonably identified as the character in the fictional book because of "marked dissimilarities between the fictional character and the plaintiff." *Id*. at 143. Specifically, there were differences in the fictional character's age and employment, and the story did not "parallel the plaintiff's life in any significant manner." *Id*. at 143. The case is plainly distinguishable as, here, where Harvey and 'Martha' have the same age, employment and life story and the only differences between the two are trivial or defamatory.[2]

*Middlebrooks* also rejected Netflix's separate argument that a work of fiction cannot be defamatory (Br. at 32), holding "a "fictional setting does not insure immunity when a reasonable man would understand that the fictional character was a portrayal of the plaintiff." *Middlebrooks* at 143. The *Middlebrooks* court added, "reputations may not be traduced with impunity, whether under the literary forms of fiction or in jest." *Id*.

---

[2] Netflix points out that Harvey said in the Piers Morgan interview that she is older than the actress playing Martha. Br. at 32. This is not relevant because Harvey is the same age as the character, Martha, which is what matters. 2-ER-266 (¶ 40); 1-SER-25 (¶ 3). Netflix also notes Harvey stated she had a different accent than Martha. Br. at 32. Perhaps Harvey's Scottish ears can detect Jessica Gunning, the English actress playing Martha, speaking in an unnatural Scottish accent, which required an accent coach. To non-Scottish ears, the differences are imperceptible. The pertinent question is why does Martha have Scottish accent if she lives in London? Of course, because she is playing Harvey.

**b.** *Tamkin v. CBS Broadcasting, Inc.*

Finally, *Tamkin v. CBS Broadcasting, Inc.*, 193 Cal.App.4th 133 (2011), cited by Netflix, is easily distinguished on its facts, because the fictional characters did not share any distinctive similarities with the plaintiffs.

In *Tamkin*, the plaintiffs, married real estate agents, Scott and Melinda Tamkin, brought a defamation suit against CBS alleging that a description of characters in a casting synopsis for an episode of the television show, CSI, that was leaked to the Internet (the character names were changed when the episode aired), was defamatory because the characters in the casting synopsis had the same names as plaintiffs, but unlike plaintiffs, engaged in bondage and porn watching. *Id*. at 146. The Court held that a reasonable person would not understand the casting synopsis as referring to the plaintiffs because the description of the characters in the synopsis as "mid to late 30s" and "attractive" were too "sparse" and would apply to many actors on television shows. *Id*. at 147. In addition, the synopsis lacked any biographical references about the real Tamkins, such as "birthplace" or "schooling," that would assist a reasonable person in recognizing the fictional characters as the Tamkins. *Id*. Further, the Court rejected the plaintiffs' evidence that internet searches for "scott tamkin bondage" or "Melinda tomkin bondage" showed an association between the plaintiff and the defamatory statement because "these searches are not

40

representative of a reasonable person looking for a real estate agent or searching for the Tamkins." *Id*. at 149.

*Tamkin* is plainly distinguishable because here, there is no shortage of distinctive biographical references that would allow a reasonable person to conclude that 'Martha' is Harvey including those cited by the *Tamkin* court including, "birthplace," "schooling," "occupation" and "plaintiff met the writer of the Series." *Tamkin* at 147. In addition, Martha and Harvey have identical physical appearances, ages, accents, residences, go to Gadd's pub, attend his comedy shows, and interact with him on social media, and have the same articles written about them. Further, the internet searches employed by Dingwall and Armstrong – "real life Martha" and "hang my curtains" – were not only reasonable, but were invited by Netflix when it stated *Baby Reindeer* is a true story. 1-ER-9; 1-SER-136 (¶ 4); 1-SER-133 (¶¶ 6-7).

## POINT II

## HARVEY ESTABLISHED ACTUAL MALICE

The district court correctly held that *even if* Harvey may qualify as a public figure, she can establish actual malice. 1-ER-14. This Court should affirm the district court's decision that Netflix engaged in actual malice because (1) Netflix believed the Series was not a true story, but asserted it was true anyway; and alternatively, (2) Netflix recklessly disregarded that the Series was not a true story.

41

## A. Netflix Had Actual Knowledge That the Series Was Not a True Story

Netflix confirms in its sworn declaration that it believed that *Baby Reindeer* was a fictionalized drama, but instead of including *that* disclaimer in the Series' title card, Netflix represented that the Series was true. See 2-ER-136 at ¶ 6 ("Netflix understood that the Series was a fictionalized work based on Richard Gadd's real-life experiences, which Richard used as inspiration for the *Baby Reindeer* play and the Series.") 2-ER-136 at ¶ 6. Netflix's declaration confirms it believed the Series was fictionalized *before* it was released. 2-ER-136 at ¶ 8 (Netflix included a disclaimer at the end of each episode "to make clear the Series was fictionalized"). Netflix's Opening Brief on this appeal repeats this admission: "[Netflix] believed the Series to be a fictionalized drama" (Br. at 25).[3]

Netflix's admissions that it *understood* and *believed* the Series was fictionalized, but asserted it was true, is dispositive of actual malice. *Khawar v. Globe Intern., Inc.*, 19 Cal.4th 254, 275 (1998) ("Actual malice means that the

---

[3] The Ninth Circuit has discretion to consider statements made in an appellate brief to be judicial admissions. *Gospel Missions of America v. City of Los Angeles*, 328 F.3d 548, 557 (9th Cir. 2003) (citing *Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1180 n. 9 (9th Cir.2001). Here, the Court should exercise its discretion because Netflix has unequivocally admitted to the mental state required to establish actual malice. 2-ER-136 (¶ 6); *Mitchell v. Twin Galaxies, LLC*, 70 Cal.App.5th 207, 221 (2021) ("the existence of actual malice turns on the defendant's subject belief as to the truthfulness of the allegedly false statement").

defamatory statement was made with knowledge that it was false or with reckless disregard of whether it was false or not."). See *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 668 (9th Cir. 1990) (citing *Bose,* 466 U.S. at 511 n. 30) (actual malice exists when the defendant "subjectively entertained serious doubt as to the truth of his statement" but chooses to publish it anyway). *Crane v. Arizona Republic*, 972 F.2d 1511, 1523 (9th Cir. 1992); *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992). Netflix's declaration and judicial admissions establish clear-cut actual malice.

Furthermore, even after Netflix admitted in writing to the House of Commons that it knew Harvey was never convicted of a crime, Netflix continued to state *Baby Reindeer* was a true story. Netflix did so because *Baby Reindeer* is one of the most popular television series of all time and Netflix admits it needs captivating or "compelling content" like *Baby Reindeer* to maintain and add subscribers. 1-SER-114; *Khawar* at 275 (evidence of motive may establish actual malice).



43

Netflix's continued assertions that the Series is true, and its failure to retract, are sufficient to find actual malice. *Dickinson v. Cosby*, 37 Cal.App.5th 1138, 1156 (2019) ("the evidence shows Cosby . . . declined to issue retractions after Singer published the various statements which Cosby knew contain falsehoods. . . this evidence is sufficient to meet the minimal burden of proof required to survive an anti-SLAPP statute."); *Nevada State Journal Pub. Co. v. Henderson*, 294 F.60 (9th Cir. 1923); *Zerangue v. TSP Newspapers Inc.*, 814 F.2d 1066, 1071 (5th Cir.1987).

Netflix admitted many times that it knew, believed, or understood the Series was fictionalized, including the entire arc of the Series – that Harvey is a convicted criminal (Episode 1) who returns to prison after *pleading guilty in court* in the Series' dramatic climax (Episode 7). Despite this knowledge (or at a minimum, serious doubt) Netflix asserted, and continues to assert, that *Baby Reindeer* is a true story. This is also clear-cut actual malice.

Even if Netflix did not so plainly admit to actual malice, Harvey can still establish actual malice because Netflix recklessly disregarded obvious reasons to doubt the Series was a true story.

**B. Netflix Recklessly Disregarded That the Series Was Not a True Story**

In *Reader's Digest Assn. v. Superior Court*, 37 Cal.3d 244, 258 (1984), the California Supreme Court (in bank) held that a publisher's reckless disregard for whether a statement is false may be established where there are obvious reasons to

44

doubt the veracity of the information and the publisher fails to investigate. *Id.* A publisher's failure to investigate facts asserted by a source who is unreliable, biased, or hostile toward the plaintiff may establish recklessness. *Id.* Likewise, a publisher's failure to interview an obvious witness who could have confirmed or disproved the allegations can also establish recklessness. *Khawar* at 276 (citing *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 688 (1989)).

Here, Netflix recklessly disregarded obvious reasons to doubt that the Series was a true story. First, the source material for the Series was the Play which did not state it was true story, but merely, *based* on a true story. 1-ER-2-3, 5, 14; 1-SER-44 (¶ 8); 1-SER-98. As noted by the district court, this put Netflix on notice that certain details were likely false. 1-ER-14-15. Second, the writer of the Play and the Series, Gadd, was an unreliable source for many reasons, including his use of hard drugs, desperation for fame and hostility toward Harvey.

Gadd admits in the Series that he is a crack, meth, and heroin user who lied to the police about his contacts with Harvey. Gadd also admits he is so desperate for a "little peep at fame" he engaged in sexual acts with a television executive to advance his career. 2-ER-261, (¶¶ 25, 47) (Ep. 4 at 26:00 – 34:50), (Ep. 6 at 7:00, 25:11 – 26:30). Gadd plainly exhibits hostility toward Harvey by including a disturbing and gratuitous scene in the Series, akin to revenge porn, where Gadd is depicted having

45

sexual intercourse with Harvey, which never happened and is repulsive. Ep. 6 at 20:00 – 21:30; 1-SER-26 (¶¶ 12, 14)

Notwithstanding that the source material was from Gadd, an unreliable and hostile source, Netflix failed to contact an obvious witness, Harvey, who could have confirmed or disproved Gadd's allegations, before Netflix proceeded to tell 50 million people that the Series was true. 1-SER-26 (¶ 16). While it seems implausible that Netflix did not consult with Gadd, Gadd likewise could have confirmed that the Series was fictionalized as he did in his declaration submitted in this case. 3-ER-303 (¶ 9) ("[the Series] is a fictionalized retelling of my emotional journey"); 3-ER-303 (¶ 10) ("[the Series] is not intended to portray actual facts."); 3-ER-303 (¶ 13) ("each character" has some "imagined events"). The reckless failure to interview Harvey (or Gadd) under these circumstances establishes actual malice.

While not necessary to affirm given Netflix's actual knowledge and its reckless disregard of the falsity of its statements, the Sunday Times published an article confirming that Netflix did consult with Gadd about the truth of the statements in the Series, Gadd voiced concerns to Netflix about asserting the Series was a true story, but Netflix insisted on doing so. 1-SER-44 (¶ 7); 2-ER-95. Netflix and Gadd submitted declarations in support of Netflix's underlying motion, but neither denied the Sunday Times' reporting and both affirmed under oath they would testify at trial. 2-ER-135 (¶ 1); 3-ER-302 (¶ 1).

46

Under these circumstances, the Sunday Times' reporting was properly considered by the district court on the motion. *Fraser v. Goodale*, 342 F.3d 1032, 1036-1037 (9th Cir. 2003) (diary properly considered on summary judgment motion because "[i]t would be sufficient if the contents of the diary are admissible at trial, even if the diary itself may be inadmissible. At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We focus instead on the admissibility of its contents."). Netflix and Gadd did not dispute that it was Netflix who insisted on stating the Series is a true story over Gadd's concerns. Because the Sunday Times reporting can be presented in admissible form at trial through Gadd and Netflix's testimony (both agreed to testify), the district court properly considered the contents of the article.

To conclude this point, we draw the Court's attention to *Nevada State Journal Pub. Co. v. Henderson*, 294 F.60, 61 (9th Cir. 1923). In *Nevada State Journal*, a newspaper publisher was found to have defamed the plaintiff when it published articles asserting that plaintiff had committed bribery and murder. *Id.* The jury found the publisher had actual malice and the publisher appealed. The Ninth Circuit affirmed the jury's decision with language that applies equally to Netflix's conduct in this case:

When we consider the defamatory character of the publications, their admitted falsity, the entire absence of inquiry or investigation to

ascertain the truth of the charges before publication, the refusal to retract after publication, the assertion of the substantial truth of the charges in the answers filed a year later, and all the surrounding circumstances, the sufficiency of the evidence to support a finding of actual or express malice is beyond question.

*Id*. Indeed, it is "beyond question" that Netflix had actual malice.

## POINT III

### HARVEY IS NOT A PUBLIC FIGURE

The district court correctly held that Harvey can show actual malice. 1-ER-14. However, actual malice is only necessary if Harvey is a public figure under the law. While Netflix asserts that the district court "recognized" that "Harvey qualifies as a public figure," Br. 43, that is not so. Instead, the district court merely commented that Harvey "may qualify" as a public figure, 1-ER-14, and held that, *even if she was* a public figure, plaintiff had sufficiently shown actual malice. 1-ER-14.

The natural reading of the statement in the district court's decision – "Plaintiff may qualify as a public figure" – is that the district court reserved its decision on the issue of whether Netflix met its burden to establish that Harvey is a public figure until a later stage in the case. 1-ER-14.[4] See *Ngoc Jenny Tran v. Velocity Investments*

---

[4] The parties have not exchanged any discovery.

*LLC*, 2019 WL 11322802 (C.D.Cal. 2019) (denying anti-SLAPP motion because "it would be more appropriate to wait until this case has proceeded to the summary judgment stage before weighing this extensive record") (citing *Z.F. Ripon Unified Sch. Dist.*, 482 F.Appx 239, 240 (9th Cir. 2012); *Harris v. Tomczak*, 94 F.R.D. 687, n. 13 (E.D.Cal. 1982) (Disputed questions of fact involving the "constitutional fact" issue of whether the plaintiff is a public figure may be resolved by the court in an evidentiary hearing, *Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir. 1981), or by the court after a trial, *Gordon v. Random House, Inc.*, 486 F.2d 1356,1362 n.8 (3rd Cir. 1973).).).

If this Court agrees that Harvey showed actual malice, then the issue of whether Harvey is a public figure is immaterial. Further, since it is only necessary for Harvey to show actual malice if she is deemed a public figure, and that issue was not decided, this Court can affirm the district court's decision on the basis that the Series is of and concerning Harvey alone. Finally, the Court can affirm by finding that Harvey is not a public figure.

The record is clear that Netflix cannot establish that Harvey is a public figure. Netflix argued Harvey is an all-purpose public figure because she once sought to be a nominee of the Labour party in Scotland (but was not chosen). 2-ER-130; 1-SER-25 (¶ 6). In addition, Netflix argued Harvey is a limited purpose public figure because a newspaper article reported that she harassed her former employer, Laura

49

Wray, after she was fired. 24-ER-130. Netflix is wrong and Harvey is not a public figure with respect to Netflix's false statements about her in the Series because neither her purported candidacy, nor the article about Wray, are related to Netflix's false statements about Harvey in *Baby Reindeer*.

## A. All-Purpose Public Figures

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court first articulated the doctrine of the "all-purpose" public figure, as an individual who attained a position "of such persuasive power and influence," *id*., and of "such pervasive fame or notoriety," *id*. at 351, that he has become a public figure in all situations. The Court stated flatly that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id*. at 352. Accord, *Wolston v. Reader's Digest Association*, 443 U.S. 157, 165 (1979). "The Court in *Gertz* acknowledged freely that under this definition the general public figure is a rare creature." *Waldbaum v. Fairchild Publications, Inc.* 627 F.2d 1287, 1292 (D.C. Cir. 1980).

## B. Netflix Did Not Establish That Harvey is an All-Purpose Public Figure

*Crane v. Arizona Republic*, 972 F.2d 1151 (9th Cir. 1992) is dispositive that Harvey is not a public figure in this litigation based on her purported "candidacy" in 1999. 1-SER-25 (¶¶ 6-7). In *Crane*, the plaintiff, Richard Crane, was a prosecutor

50

who headed the Justice Department's Los Angeles Organize Crime and Racketeering Strike Force for thirteen years before turning to private practice as a lawyer. *Id*. at 1514. Crane filed suit against Arizona Republic newspaper for reporting that, after Crane moved to private practice, Crane used his connections at the Justice Department to halt investigations into Crane's clients who were organized crimes figures. *Id*. at 1514. The district court held that although Crane was the head prosecutor for Strike Force for thirteen years, "Crane did not qualify as a public official because he was in private practice at the time the article came out and because the charges focused on his activities as a private lawyer." *Id.* at 1516.

The Ninth Circuit affirmed on the same ground, holding Crane was not a public figure with respect to the Arizona Republic's false statements because "[t]he article thus addresses neither Crane's performance of official duties nor any misconduct engaged in while prosecutor." *Id*. at 1526.[5] Critically, the Ninth Circuit held that with respect to a small portion of the article that spoke to Crane's activities as a prosecutor, in which it is reported that Crane "avoided prosecuting certain organized crime figures," Crane was a public figure and actual malice was required to be shown. *Id.* at 1526. In other words, the actual malice standard only applied to

---

[5] The Ninth Circuit rejected the defendant's argument that Crane was alternatively a public official because his conduct *allegedly* impacted or influenced prosecutorial policy, holding the allegation alone did not suffice to make Crane a public official. *Id*.

false statements related to Crane's official duties as a public official, and not to statements concerning Crane's activities as a lawyer in private practice.

The Ninth Circuit's holding in *Crane* crystalizes that the actual malice standard does not automatically apply t*o any* statement about a former public official. *Id.* at 1526; See *Rosenblatt v. Baer*, 383 U.S. 75 at 87 n.14 (1966) (actual malice applies to statements about "the manner in which [a public official] fulfilled his responsibilities). Further, *Rosenblatt* envisioned that "there may be cases where a person is so far removed from a former position of authority that *comment on the manner in which he performed his responsibilities* no longer has the interest necessary to justify the [public figure rule]." *Rosenblatt*, 383 U.S. at 87 n.14 (1966).

The Ninth Circuit's decision in *Crane* applies equally to Harvey. Harvey is not a public figure and not required to show actual malice with respect to Netflix's false statements in *Baby Reindeer* because Netflix's statements do not concern Harvey's "candidacy" or official duties. Harvey is not required to show actual malice because the statements at issue exclusively concern Harvey's private life. *Crane* at 1526.

The few courts that have considered this issue – whether "candidates" are public figures who need to establish actual malice – have held that a former candidate is *not* a "public figure" or have alternatively held that actual malice is only required if the defamatory statement is related to the candidacy itself. See *Rutt v.*

*Bethlehems' Globe Pub. Co.*, 335 Pa.Super 163, 181 (Pa. 1984) (within three months after defeat in a primary election, plaintiff was not an all-purpose public figure); *MacDonald v. Brodkorb*, 939 N.W.2d 468, 479-480 (Ct. of Appeals of Minn. 2020) (candidate for office is a limited public figure only during the time he is running for office); *Ryder v. Time, Inc.*, 557 F.2d 824, 825-826 (D.C. Cir. 1976) ("it is true that plaintiff had been a public official for a time and had been a candidate for public office. Yet these public activities had nothing to do with the reference to Ryder in the essay and, in any case, those activities were no longer engaged in by plaintiff."); *Newson v. Henry*, 443 So. 2d 817, 823 (Miss.1983) ("[a public figure] may in time become a private figure, but only with respect to the events of his or her life occurring after he or she leaves public life"). The district court did not discuss *Rutt* or *MacDonald* (both cited in underlying opposition brief at 2-ER-78) or the reasoning applied therein.

*Rutt* is particularly on point. In concluding that the plaintiff in *Rutt* was not a public figure, the court explained:

> The article of which appellant complains did not appear until August 29, 1977, more than three months after his ten day candidacy and defeat in the primary election. There is no evidence that the public or the press followed the actions or ideas of appellant with any interest, report or comment. In fact, it would appear that by the time of publication of the

53

challenged article, appellant had for all purposes disappeared from public view, an understandable result, as his only effort to influence matters of public importance had been notably unsuccessful as well as brief. Appellant, not having attained prominence in the affairs of society nor enjoying the status of a "celebrity", could not, as a matter of law, have been found to be an all-purpose public figure.

*Id.* at 79. See Dingwall Decl., (¶¶ 2-3, 7) (Senior Report for the Scottish Daily Record who has been reporting for 41 years affirmed, "[Harvey's] name was certainly not known to the public to my knowledge. She was a completely unknown person who was thrust in the spotlight as a result of *Baby Reindeer."*).

The district court's decision makes a critical error in observing that Harvey may be a public figure. The decision states, "Persons running for political office are generally all-purpose public figures *See, e.g. Kapellas* v. *Kofman,* 1 Cal. 3d 20, 36 (1969)." This statement is problematic for two reasons. First, *Kapellas* contains no discussion of all-purpose public figures; nor could it, as that doctrine was not articulated until five years later in *Gertz.* Second, the statement of law sweeps too broadly as confirmed by the Ninth Circuit's decision in *Crane.* At most, a person running for political office is a limited purpose public figure with respect to statements about their fitness for office as that is the only public controversy a candidate voluntarily thrusts himself into. *Id.* Even in *Kapellas* the plaintiff brought

54

suit over statements about her while she was running for office. *Id*. at 26-27 (the challenged statements "concerned the qualifications of one seeking a public office.")

Plainly, Harvey's one-time "candidacy" does not make her an all-purpose public figure – a person who "occup[ies] positions of such persuasive power and influence that they are deemed public figures for all purposes." *Gertz* at 345, 3009. Harvey is just a lawyer in ill-fitting clothes, who enjoyed going to the salon, but is now afraid to leave her home because strangers have threatened to kill her as a result of Netflix's statements in *Baby Reindeer*. It is unreasonable to hold that she is now an all-purpose public figure in this case, filed decades later and unrelated to her politics, as a consequence of her short-lived ambition to be picked. Such an outcome cannot be reconciled with the Ninth Circuit's holding in *Crane.*

## C. Limited Public Figures

In *Gertz v. Robert Welch, Inc.*, 418 U.S. at 342 (1974) the Court also first articulated the doctrine of the limited purpose public figure as persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 345. The relevant examination turns on "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352.

Netflix contends Harvey is a limited purpose public figure with respect to Netflix's false statements because a newspaper once published an article that

reported Harvey harassed her former employer, Laura Wray. Netflix overlooks that *even if* that article made Harvey a limited purpose public figure (it did not), the article is unrelated to Netflix's false statements in *Baby Reindeer* that Harvey is a twice-convicted criminal who sexually and physically assaulted Gadd after waiting outside his home all day and night.

**D. Netflix Did Not Establish That Harvey is a Limited Public Figure**

Three elements must be present to characterize someone as a limited purpose public figure. *Bui v. Ngo*, 101 Cal.App.5th 1061, 1073 (2024) (citing *Ampex Corp. v. Cargle*, 128 Cal.App.4th 1569 (2005).) "First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. *Id.* Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue." *Id.* "And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.* (citing *Ampex*, at p. 1577).

The district court's decision, while declining (at this stage of the case) to find that Harvey *is* a limited public figure, did not address numerous key points that would rule out such an outcome. In particular, the district court failed to identify (1) any "public controversy" (as defined in Ninth Circuit law); (2) any voluntary act by Harvey by which she sought to influence the resolution of a "public controversy" (to

56

the extent one existed) and (3) any relationship between Netflix's defamation of Harvey in the Series and her purported status as a limited public figure.

### 1. Netflix Failed to Identify Any "Public Controversy" Concerning Harvey

"The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention." *Waldbaum* at 1296 (citing *Time, Inc. v. Firestone*, 424 U.S. 448, 454-55 (1976)).

The articles relied on by Netflix do not establish a "public controversy" within the meaning ascribed to that term in the Ninth Circuit. The articles do not identify any dispute "debated publicly that had foreseeable and substantial ramifications for nonparticipants." *Bui* at 1073. The first article from January 30, 2000 alleges Harvey (then known as Fiona Muir) harassed her former employer, Wray, who fired her from her law firm. In the article Wray claims Scottish politician, Donald Dewar, said Harvey "sounded like a difficult person." 2-ER-217-220. The second article dated March 3, 2004, is an article about Wray's husband's health following a stroke that does not contain any discussion of Harvey other than a one-line passing reference. 2-ER-222. This is plainly insufficient for Netflix to establish any public debate or substantial ramifications for any non-participant. *Bui* at 1073; See *Annette F. v. Sharon S.*, 119 Cal.App.4th 1146, 1164 (2004) ("To characterize a plaintiff as a limited purpose public figure, the courts must first find that there was a public

57

controversy."). The fact that the "controversy" was publicly reported is immaterial to whether it is a "public controversy." *Reader' s Digest Ass' n. v. Superior Court*, 37 Cal. 3d 244, 254 (1984) ("the mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action."). Further, while not the case, "that an individual allegedly threatens public officials may be a matter of public interest or concern, or be newsworthy, but that alone is insufficient to make that individual a public figure." *Webber v. Telegram-Tribune Co.*, 239 Cal.Rptr.489, 494 (1987) (unpublished)[6] (*Time, Inc. v. Firestone, supra*, 424 U.S. 448, 455–57); *Wolston v. Reader's Digest Assn., Inc.,* 443 U.S. 157, 167–68.)

### 2. Netflix Failed to Establish Any Voluntary Act by Harvey to Influence the Resolution of the Public Controversy

Assuming *arguendo* that Netflix's articles establish a "public controversy," Netflix presented absolutely no evidence that Harvey undertook any act "to influence the resolution of the public issues involved." *Annette F.*, 119 Cal. App. 4th at 1163 (quoting *Reader' s Digest Ass' n. v. Superior Court*, 37 Cal. 3d 244, 208 (1984) (emphasis in original). The full extent of Harvey's public involvement was

---

[6] *State Farm Mutual Auto. Ins. Co. v. Penske Truck Leasing Co. L.P.*, 2021 WL 4810642, *2 (9th Cir. 2021) ("we are not precluded from considering the unpublished opinion").

purportedly her being quoted as stating, "I'll be contacting my solicitor." 2-ER-219. Not only did Harvey not seek to publicly influence the resolution of her private dispute with Wray, when given the opportunity to do so, she actively avoided it. *Id.* Under these circumstances, it is inconceivable that Harvey can be found to have sought to influence the resolution of any public issue.

The district court noted that it may be possible to become a limited public figure by being drawn into a public controversy (1-ER-14), however the Supreme Court has cautioned that "instances of truly involuntary public figures must be exceedingly rare." *Gertz* at 345. Netflix failed to identify any special circumstance that warrants establishing Harvey as an involuntary public figure on these facts, particularly where there is no identifiable public controversy and Harvey actively avoided any opportunity to influence public discussion.

### 3. Netflix's Defamation of Harvey Is Not Germane to Any Public Controversy

Finally, Netflix's false statements concerning Harvey in *Baby Reindeer* are completely unrelated to Harvey's dispute with Wray. Netflix asserted that Harvey is a twice-convicted criminal who waited outside Gadd's home day and night, sexually and physically assaulted him, and stalked a police officer. None of these false statements by Netflix relate to the two articles on which it relies, and which, of course, also do not mention Richard Gadd. See *Waldbaum v. Fairchild Publications,*

*Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980) ("[m]isstatements wholly unrelated to the controversy, however, do not receive [actual malice] protection.")

Netflix argued that the articles are germane to *Baby Reindeer* because they reported that Harvey harassed Wray, and as a result, the articles made Harvey "*at a minimum* . . . a limited purpose public figure on issues related to stalking, harassment, and assault." 2-ER-130. There is no authority for turning Harvey, based on her limited "controversies" with Wray and Dewar into to a public figure on the general issues of harassment, stalking and assault – topics on which she never commented or sought to influence the public. Netflix's argument must be rejected. *Unsworth v. Musk*, 2019 WL 8220721, *5 (C.D.Cal 2019) ("an individual's status as a limited purpose public figure [is] for that specific controversy."); *Reader's Digest Assn.* at 253–254 (limited purpose public figure status applies "only to the extent that the allegedly defamatory communication relates to his role in a public controversy.").

Netflix cannot establish any of the elements required to make Harvey a limited public figure in this case. Plainly, Harvey is not a limited public figure.

## POINT IV

### PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS NOT AT ISSUE ON THIS APPEAL

In a footnote, Netflix contends that although Plaintiffs' claim for intentional infliction of emotional distress was not argued in Netflix's motion to strike, if the

60

Court overturns the Decision, then Plaintiff's claim for intentional infliction of emotional distress should also be dismissed. Netflix Opening Br. at n. 3. In support of this argument Netflix cites *Aguilar v. Universal City Studios, Inc.*, 174 Cal. App. 3d 384, 387 (1985) for purportedly recognizing that claims for defamation and intentional infliction of emotional distress "have overlapping elements."

Netflix's argument must be rejected. First, *Aguilar* does not contain any such holding and does not contain any discussion or analysis of intentional infliction of emotional distress. Second, the elements of defamation do not "overlap" with the elements of a claim for intentional infliction of emotional distress. The elements of a claim for intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Ely v. Wal\*Mart, Inc.*, 875 F.Supp. 1422 (C.D.Cal. 1995). "Outrageous" as used in the analysis means, i.e., "conduct so extreme as to exceed all bounds of that usually tolerated in a civilized society." *Id.* There is no element that overlaps with a claim for defamation. See *Okorocha v. Duff*, 2012 WL 12865303, \*2 (C.D.Cal. 2012) ("the elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage."). Dismissal of Plaintiff's

intentional infliction of emotional distress claim would be improper because it was not the subject of Plaintiff's motion to strike which is the motion at issue in this appeal.

## Leave to Amend Should Be Granted

To the extent the Ninth Circuit is inclined to reverse the district court's decision, Plaintiff requests and should be granted leave to amend her Complaint. See *Masimo Corporation v. Mindray DS USA, Inc.*, 2014 WL 12597114 (C.D.Cal. 2014) (citing *Verizon Del., Inc. v. Covad Commc'ns*, 377 F.3d 1081, 1091 (9th Cir. 2004) ("[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.").

Harvey has not yet filed an amended complaint in this action. Harvey is able to cure any defect in her allegations with a new pleading alleging facts learned after the motion to strike was briefed from counsel's investigation including statements from witnesses.

## Conclusion

For the reasons stated above, Plaintiff Fiona Harvey respectfully requests that this Court affirm the district court's order.

Dated: May 28, 2025          Respectfully submitted,

*/s/ Brian Levenson*

Brian Levenson
Richard A. Roth
THE ROTH LAW FIRM, PLLC
295 Madison Ave., Fl. 22
New York, NY 10017
(212) 542-8882

Allen Hyman
THE LAW OFFICE OF ALLEN HYMAN
10737 Riverside Drive
North Hollywood, CA 91602
(818) 763-6389

63

## STATEMENT OF RELATED CASES

Plaintiff-Appellee is unaware of any cases pending in this Court that are related to this appeal, as defined and required by Circuit Rule 28-2.6.

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** <u>24-6151</u>

I am the attorney for Plaintiff-Appellee Fiona Harvey

**This brief contains 13,894 words,** including 488 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Brian Levenson</u>        **Date** <u>5/28/2025</u>