**No. 24-6151**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**FIONA HARVEY,**

*Plaintiff-Appellee*,

v.

**NETFLIX, INC. and NETFLIX WORLDWIDE ENTERTAINMENT, LLC,**

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Central District of California, Case No. 2:24-cv-04744-RGK-AJR
The Honorable R. Gary Klausner

# REPLY BRIEF OF DEFENDANTS-APPELLANTS NETFLIX, INC. AND NETFLIX WORLDWIDE ENTERTAINMENT, LLC


Marvin S. Putnam
Laura R. Washington
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
(424) 653-5500

Gregory G. Garre
*Counsel of Record*
Christina R. Gay
Sakina J. Haji
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207


July 18, 2025


*Counsel for Defendants-Appellants*
*Netflix, Inc. and Netflix Worldwide Entertainment, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. HARVEY'S INABILITY TO DEFEND THE DISTRICT COURT'S ACTUAL MALICE RULING REQUIRES REVERSAL ........ 3

A. Harvey Does Not Seriously Attempt To Argue That A Triple Hearsay Statement Can Establish Actual Malice ........ 3

B. Harvey's Attempts To Salvage The District Court's Actual Malice Ruling On Other Grounds Should Be Rejected ........ 6

C. Harvey's Attempts To Evade The Actual Malice Inquiry By Denying Her Public Figure Status Should Be Rejected ........ 11

II. HARVEY CANNOT SHOW THAT REASONABLE VIEWERS UNDERSTOOD *BABY REINDEER* TO STATE ACTUAL FACTS ABOUT HER, SEPARATELY REQUIRING REVERSAL ........ 16

A. Harvey Ignores The Broader Context Of The Dramatic Series In Which The Allegedly False "Statements" Appeared ........ 17

B. Harvey's Remaining Arguments Miss The Point ........ 20

III. HARVEY'S TELLING REQUEST FOR LEAVE TO AMEND HER COMPLAINT SHOULD BE REJECTED ........ 27

CONCLUSION ........ 29

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aguilar v. Universal City Studios, Inc.*,
174 Cal. App. 3d 384 (1985) ....................22

*Alaska v. United States*,
201 F.3d 1154 (9th Cir. 2000) ....................28

*American Postal Workers Union v. United States Postal Service*,
830 F.2d 294 (D.C. Cir. 1987)....................23

*Ampex Corp. v. Cargle*,
128 Cal. App. 4th 1569 (2005) ....................16

*Annette F. v. Sharon S.*,
119 Cal. App. 4th 1146 (2004) ....................7

*Bindrim v. Mitchell*,
92 Cal. App. 3d 71 (1979) ....................24, 25

*Blatty v. New York Times Co.*,
42 Cal. 3d 1033 (1986) ....................26

*Brodeur v. Atlas Entertainment, Inc.*,
248 Cal. App. 4th 665 (2016) ....................18, 23

*Christian Research Institute v. Alnor*,
148 Cal. App. 4th 71 (2007) ....................4, 6

*Crane v. Arizona Republic*,
972 F.2d 1511 (9th Cir. 1992) ....................14

*D.A.R.E. America v. Rolling Stone Magazine*,
101 F. Supp. 2d 1270 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793
(9th Cir. 2001)....................8

*De Havilland v. FX Networks, LLC*,
21 Cal. App. 5th 845 (2018) ....................11

**Page(s)**

*Dickinson v. Cosby*,
37 Cal. App. 5th 1138 (2019) ....................8, 9

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013)....................18, 22

*Ferlauto v. Hamsher*,
74 Cal. App. 4th 1394 (1999) ....................26

*Films of Distinction, Inc. v. Allegro Film Productions, Inc.*,
12 F. Supp. 2d 1068 (C.D. Cal. 1998) ....................23

*Fraser v. Goodale*,
342 F.3d 1032 (9th Cir. 2003) ....................4, 5

*Gaprindashvili v. Netflix, Inc.*,
No. 21-cv-07408, 2022 WL 363537 (C.D. Cal. Jan. 27, 2022) ....................24, 26

*Greene v. Paramount Pictures Corp.*,
813 F. App'x 728 (2d Cir. 2020) ....................26, 27

*Jones v. UPS Ground Freight*,
683 F.3d 1283 (11th Cir. 2012) ....................5

*Kapellas v. Kofman*,
1 Cal. 3d 20 (1969) ....................12

*Makaeff v. Trump University, LLC*,
715 F.3d 254 (9th Cir. 2013) ....................11, 12

*Masson v. New Yorker Magazine*,
501 U.S. 496 (1991)....................18, 22

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996)....................8

*Momox-Caselis v. Donohue*,
987 F.3d 835 (9th Cir. 2021) ....................6

*Mossack Fonseca & Co. v. Netflix Inc.*,
No. 19-cv-9330, 2020 WL 8510342 (C.D. Cal. Dec. 23, 2020) ....................26

**Page(s)**

*Muzikowski v. Paramount Pictures Corp.*,
477 F.3d 899 (7th Cir. 2007) .......................................................................27

*Nevada State Journal Publishing Co. v. Henderson*,
294 F. 60 (9th Cir. 1923) ..............................................................................9

*Osheske v. Silver Cinemas Acquisition Co.*,
132 F.4th 1110 (9th Cir. 2025) .....................................................................28

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ..........................................................17, 18, 22, 23

*Philbin v. Trans Union Corp.*,
101 F.3d 957 (3d Cir. 1996) ..........................................................................5

*Planet Aid, Inc. v. Reveal*,
44 F.4th 918 (9th Cir. 2022) ..........................................................12, 14, 15, 16

*Polydoros v. Twentieth Century Fox Film Corp.*,
67 Cal. App. 4th 318 (1997) .......................................................................22

*Sarver v. Hurt Locker LLC*,
No. 10-cv-09034, 2011 WL 11574477 (C.D. Cal. Oct. 13, 2011),
*aff'd sub nom.*, *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016)......................27

*Stolz v. KSFM 102 FM*,
30 Cal. App. 4th 195 (1994) ........................................................................14

*Tamkin v. CBS Broadcasting, Inc.*,
193 Cal. App. 4th 133 (2011) ...................................................................26, 27

*Zerangue v. TSP Newspapers, Inc.*,
814 F.2d 1066 (5th Cir. 1987) ......................................................................9

## OTHER AUTHORITIES

Michael Schneider, *Baby Reindeer, Ripley, Shogun, We Are Lady Parts Among This Year's Peabody Award Winners*, Variety (May 1, 2025), https://variety.com/2025/tv/awards/peabody-awards-2025-winners-baby-reindeer-shogun-ripley-1236383333/ ....................20

## INTRODUCTION

The district court's denial of Netflix's anti-SLAPP motion poses a grave threat to the right of storytellers like Richard Gadd to draw from their own life experiences to create thought-provoking and dramatic works, as well as to the right of studios like Netflix to distribute these works on matters of profound public importance. In her response, Plaintiff Fiona Harvey offers no meaningful defense of the district court's decision. Instead, her brief is an exercise in avoidance, fixating on evidence the district court did not address and arguments the district court did not accept—or ever even receive. To the extent they are not forfeited, Harvey's new arguments are also meritless. The district court's decision should be reversed.

Perhaps most striking, Harvey hardly attempts to defend the district court's conclusion that Netflix acted with actual malice based solely on a paraphrased statement attributed to unnamed TV industry sources in a Sunday Times article. She does not, and cannot, deny that the statement is inadmissible and uncorroborated triple hearsay—meaning it cannot be used to establish actual malice, much less provide *clear and convincing evidence* of it. The district court's reliance on this hearsay statement to find that Harvey met her burden of establishing Netflix's actual malice was a blatant legal error—and itself requires reversal. Harvey's attempt to paper over that glaring error by arguing that she was not a "public figure" in the first place is largely forfeited and, in any event, also meritless.

Harvey fares no better in attempting to defend the district court's "of and concerning" ruling. Her position boils down to the assertion that reasonable viewers would view *Baby Reindeer*—a drama series—as if it were a real-life documentary like *Making a Murderer*. She bases this conclusion on *one* thing: the "this is a true story" screen that appears once, in the Series' first episode. But she completely disregards the broader context, including (1) the Series' use of dramatic elements like exaggerated camera angles, cheeky music, and voice overs; (2) the statement—appearing shortly after the "this is a true story" screen—that the show was "written *& created*" by Gadd; and (3) the disclaimer after every episode stating that characters and events have been "fictionalized for dramatic purposes." Netflix Br. 34-35 (emphasis added) (citation omitted). Harvey's logic—that a reasonable viewer would ignore those elements (and others) and somehow believe *Baby Reindeer* to be a real-life documentary in which every statement is true to life—does not hold water.

But, ultimately, the question for this Court is not whether *Baby Reindeer* is best understood as a drama with fictionalized elements or a documentary depicting real-life events. It is whether Harvey has shown that *Netflix knew or in fact doubted* that—despite the Series' dramatic devices, its use of fictional names, and its disclaimer—reasonable viewers would understand the Series to be a documentary in which everything about Martha was true to life. Harvey has not come close to making that showing. Indeed, Harvey herself proclaimed the Series "a work of

fiction" and Martha "a fictional character . . . of [Gadd's] imagination." Piers Morgan Interview at 7:32, 14:37, 17:22. She was right then.

This Court should reverse.

## ARGUMENT

### I. HARVEY'S INABILITY TO DEFEND THE DISTRICT COURT'S ACTUAL MALICE RULING REQUIRES REVERSAL

The most glaring aspect of Harvey's response is that she hardly attempts to defend the district court's finding of actual malice based solely on inadmissible triple hearsay: a paraphrased statement attributed to unnamed TV industry sources in a newspaper article. That unprecedented ruling is clearly wrong. Harvey's attempts to salvage the district court's actual malice ruling through new arguments never presented to the district court, and to argue that she is not required to prove actual malice at all, smack of desperation and fare no better.

#### A. Harvey Does Not Seriously Attempt To Argue That A Triple Hearsay Statement Can Establish Actual Malice

Harvey runs away from the only basis the district court offered for its conclusion that Netflix acted with actual malice—a Sunday Times article's paraphrased description of the views of unnamed "[s]ources in the TV industry" that Gadd had expressed "concerns" about labeling the Series a "true story." 1-ER-5, 1-ER-15 (citation omitted); *see* Harvey Br. 46 (claiming this article is "not necessary" to her argument). Harvey does not dispute that she must prove actual malice "by clear and convincing evidence" using "evidence that would be admissible

at trial." *Christian Rsch. Inst. v. Alnor*, 148 Cal. App. 4th 71, 80, 84 (2007). And she does not dispute that the commentary in the Sunday Times article is inadmissible triple hearsay. Netflix Br. 49-53. Instead, Harvey attempts to defend the district court's reliance on this hearsay evidence on two fleeting grounds—both unavailing.

*First*, Harvey claims (at 46) that the Sunday Times article properly established Netflix's actual malice because Netflix and Gadd did not specifically "den[y] the Sunday Times' reporting" in their declarations. That argument incorrectly flips the evidentiary burden: It was *Harvey*'s obligation to introduce competent admissible evidence to establish actual malice, not *Netflix's* to disprove it. Netflix Br. 44-46. She cannot meet that burden by introducing *incompetent* evidence and then arguing that this evidence is somehow sufficient because Netflix did not specifically deny it. In any event, Harvey is mistaken that Netflix did not dispute the Sunday Times article. Netflix explicitly objected to the article, explaining that it was "inadmissible" because it contained "irrelevant, speculative, and inadmissible hearsay." 2-ER-37. It is Harvey who has the problem; she did not even respond to Netflix's evidentiary objections, including as to the article. Netflix Br. 21.

*Second*, Harvey cites (at 47) *Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003), for the proposition that hearsay can be considered at summary judgment so long as its content will be admissible at trial. But *Fraser* did not involve the anti-SLAPP law, and the Court relied on the hearsay evidence—a plaintiff's diary—at summary

judgment only because the plaintiff herself could testify to its contents at trial—thus curing any hearsay problem. 342 F.3d at 1036-37. Here, Harvey cannot testify to the contents of the Sunday Times article.

Indeed, the article's key statement comes from unnamed "[s]ources in the TV industry." 1-ER-5 (citation omitted). Harvey has not attempted to identify these anonymous sources, much less explained how she would summon them to testify. And, of course, the mere "possibility" that at some point in the future one of the unidentified sources might become known to Harvey and "emerge to provide testimony" is "insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012); *see Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996) ("[H]earsay statement by [an] unknown individual is not 'capable of being admissible at trial.'" (citation omitted)).

Harvey suggests (at 47) that the Sunday Times article can be presented at trial "through Gadd and Netflix[]" because both have "agreed to testify." But nothing in Gadd or Netflix's declarations suggests any knowledge of the hearsay statement—that unnamed sources believed Gadd expressed "concerns" about the "true story" line—or shows that they would verify the accuracy of the Sunday Times' reporting on these alleged "concerns." On the contrary, both of their declarations state that the Series *is* Gadd's true story. *See* 2-ER-136–37; 3-ER-303–04. And their

declarations further underscore that the Series was crafted and intended to be viewed as a dramatic and fictionalized work, not a documentary. *Id.*

At this stage of the proceedings, Harvey must prove actual malice "*by clear and convincing evidence*." *Christian*, 148 Cal. App. 4th at 84 (emphasis added). Harvey has not come close to meeting that burden. And, as amicus Foundation for Individual Rights and Expression (FIRE) has explained, the district court's watering down of actual malice's high evidentiary burden through its reliance on inadmissible hearsay undermines the protections of the First Amendment and California's anti-SLAPP statute. *See* FIRE Br. 10-13. If allowed to stand, the district court's actual malice ruling will imperil protected expression and countless artistic works by permitting public-figure plaintiffs to "drag speakers into court on obscure and flimsy allegations." *Id.* at 3.

### B. Harvey's Attempts To Salvage The District Court's Actual Malice Ruling On Other Grounds Should Be Rejected

Unable to defend the district court's decision on its own terms, Harvey floats new and alternative arguments. To the extent they are even properly presented, Harvey's new theories are unavailing.

*First*, Harvey argues (at 42 & n.3) that Netflix "unequivocally admitted to the mental state required to establish actual malice" by declaring that it "believed that *Baby Reindeer* was a fictionalized drama." This argument is forfeited, because Harvey failed to present it below. *See* 2-ER-80–81; *Momox-Caselis v. Donohue*,

987 F.3d 835, 841 (9th Cir. 2021) ("[W]e do not consider arguments raised for the first time on appeal."). But the argument is misguided in any event, because it misunderstands the relevant standard and assumes the conclusion.

To establish actual malice, Harvey must submit competent admissible evidence establishing not just that a viewer might understand the statements at issue to be true, but that *Netflix knew* reasonable viewers would understand the statements at issue as true statements of fact about Harvey, or in fact entertained serious doubts on that matter. *See* Netflix Br. 44-45. Harvey does not even attempt to engage with that standard; instead, she simply assumes that the Series' "true story" line—stripped of any context—is dispositive as to how Netflix would believe reasonable viewers would understand the show. As Netflix has explained and details below, the "true story" line would not lead reasonable viewers to interpret the Series as a documentary, especially when viewed in its broader context, as it must be. *See id.* at 40-43; *infra* at 10, 19-20.

At the very least, Netflix's argument that the Series would not be reasonably interpreted that way "is not so implausible as to support an inference of actual malice." *Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1169 (2004). And the only evidence in this record regarding Netflix's subjective state of mind confirms that "Netflix would have never released the Series had it believed the Series would

be understood as stating actual facts about anyone, including Fiona Harvey." 2-ER-137 (¶9). Harvey has provided no competent evidence to the contrary—none.

In passing, Harvey also suggests (at 44) that Netflix's purported "failure to retract" the Series after she identified herself as the supposed inspiration for the Martha character establishes actual malice. That suggestion fails for the same reasons. Harvey has produced nothing to suggest that Netflix actually knew or in fact entertained doubts that reasonable viewers would view the Series—which never mentions Harvey, is replete with dramatic devices and fictionalized characters and events, and expressly states at the end of every episode that it is fictionalized—as a documentary that states actual facts about Harvey. *See infra* at 18-19.

Moreover, courts have repeatedly recognized that there is "no authority" for the notion that "a publisher may be liable for defamation because it fails to retract a statement." *D.A.R.E. Am. v. Rolling Stone Mag.*, 101 F. Supp. 2d 1270, 1287 (C.D. Cal. 2000), *aff'd*, 270 F.3d 793 (9th Cir. 2001); *see McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) (noting lack of authority supporting liability for failure to retract). *Dickinson v. Cosby*, 37 Cal. App. 5th 1138 (2019), does not contradict this. Although the defendant's failure to retract in that case was

relevant to whether he was responsible for the publication of his agent's statements, it was *irrelevant* to actual malice. *Id.* at 1159.[1]

*Second*, Harvey argues (at 44-48) that Netflix "recklessly disregarded obvious reasons to doubt that the Series was a true story"—namely, that Gadd's one-man play stated that it was "*based* on a true story," while the first episode of the Series states that "this *is* a true story." Yet again, Harvey simply presumes that the Series' "true story" line is decisive as to how Netflix and reasonable viewers would interpret the show. But as Netflix has explained, describing something as a "true story" is not the same as saying that *every* detail that follows actually happened, and the Series' "true story" line must be understood in context. Harvey does not deny that—as Netflix has explained—the Series deployed numerous dramatic devices and included a disclaimer after each episode. She just ignores them.

Moreover, Gadd—who wrote and created the Series—himself affirmed that the story behind the Series *is* true. 3-ER-304 (¶10). Gadd *was* stalked and harassed

---

[1] Harvey's remaining cases likewise lend her no support. In *Nevada State Journal Publishing Co. v. Henderson*, this Court observed more than a century ago that the totality of the circumstances, including "the refusal to retract after publication," could be relevant in assessing punitive damages. 294 F. 60, 62 (9th Cir. 1923). And in *Zerangue v. TSP Newspapers, Inc.*, the Fifth Circuit acknowledged that a publisher's "readiness to print a retraction" could "weigh[] against 'malice.'" 814 F.2d 1066, 1071 (5th Cir. 1987) (citation omitted). But neither case establishes that a failure to retract, in isolation, could establish actual malice.

over a three-year period during which he was undergoing various personal crises. *See* Netflix Br. 8-14; 3-ER-304–18 (¶¶14-56). Stories are told for entertainment and to make broader points; they often include fictionalized elements, including to communicate the emotional drama and feelings experienced by the storyteller. The dramatic elements throughout the Series, use of different names, and the disclaimer would communicate to any reasonable viewer that Gadd was telling his *story*, not trying to make a documentary. Especially when the statement is viewed in context, the difference between "based on" and "is" cannot demonstrate actual malice.[2]

*Finally*, Harvey references (at 1, 3, 5, 23) promotional materials that also label the Series a "true story." The district court did not rely on these materials when deciding Netflix's motion, nor did it adjudicate Netflix's evidentiary objections to them. 1-ER-4. These materials do nothing to move the ball. Indeed, the promotional materials merely reinforce the point that the Series is *not* a documentary, advertising the Series as a "dramatic" and "fictionalized" rendition of what happened to Gadd in "real life." 1-SER-83, 1-SER-85–86 (Levenson Ex. 2). Like the Series itself,

[2] Harvey also contends (at 45-46) that Netflix was misguided in relying on Gadd to tell his own story, citing Gadd's past struggles with drug use and sexual abuse as reasons to deem him an "unreliable" narrator. This suggestion is not only malicious but entirely baseless. There is zero evidence that Gadd was an "unreliable" narrator of the story he wrote and created. And this argument also fails to account for the fact that Netflix indisputably regarded Gadd's creation as a fictionalized drama intended to depict his emotional truth, not as a documentary. 2-ER-136–37 (¶¶6-10).

these materials do not mention Harvey and do not depict *Baby Reindeer* as a documentary. 1-SER-83–88 (Levenson Ex. 2). And they must be understood in the context of the Series, with its use of different names, a disclaimer, and many different dramatic elements that Harvey does not deny.[3]

### C. Harvey's Attempts To Evade The Actual Malice Inquiry By Denying Her Public Figure Status Should Be Rejected

Unable to prove actual malice, Harvey tries to side-step the inquiry altogether, contending (at 48-60) that she is not a public figure. Here, she is at odds with the district court decision she purports to defend. The district court found that because of "her run for office" and "her publicly reported stalking" of certain individuals, Harvey "may qualify as a public figure"—and, importantly, that Harvey, who bore the burden of proof on this issue, "offer[ed] no authority" to the contrary. 1-ER-14. Harvey's arguments on appeal to refute this are not only forfeited but meritless.

1. The First Amendment requires public figures to demonstrate that a statement was made with actual malice to establish a defamation claim. *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 856 (2018). There are two types of public figures: "all purpose" and "limited purpose" public figures. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265 (9th Cir. 2013). All purpose public figures

[3] Though Harvey harps (at 18-19) on correspondence a Netflix employee had with a Member of Parliament, this correspondence sheds no light on how reasonable viewers would understand the Series or what Netflix knew about that matter.

"occupy 'positions of such persuasive power and influence that they are deemed public figures for all purposes.'" *Id.* (citation omitted). Meanwhile, limited purpose public figures "achieve their status by 'thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Id.* (alteration in original) (citation omitted).

Harvey fits the bill for both types of public figures. "[G]overnment officials and candidates for such office" are "the paradigm case" of all purpose public figures. *Kapellas v. Kofman*, 1 Cal. 3d 20, 36 (1969). Harvey admits that she not only sought a nomination for Parliament—the highest legislative body in the United Kingdom—on behalf of the Labour Party in 2000, but was "on 'four shortlists' for seats in Parliament." 1-SER-25 (¶6); 3-ER-310 (¶31). The district court rightly recognized that this "run for office" qualified Harvey as an all purpose public figure, pointing out that she "offer[ed] no authority" to the contrary. 1-ER-14.

At a minimum, Harvey qualifies as a limited purpose public figure. Three factors determine whether an individual is a limited purpose public figure: whether (i) a public controversy existed, (ii) the plaintiff voluntarily injected herself into that controversy to influence its resolution, and (iii) the alleged defamation is related to the plaintiff's participation in the controversy. *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 925 (9th Cir. 2022). Here, a public controversy surrounded Harvey's stalking of Donald Dewar—the First Minister of Scotland—and Laura Wray—the wife of a

Member of Parliament. *See, e.g.*, 2-ER-217–19 (Putnam Ex. M) (news article describing the stalking). Harvey voluntarily injected herself into that controversy by "den[ying] she was a stalker," providing a different version of the events to the press, and then threatening legal action. 2-ER-219 (Putnam Ex. M). And the alleged defamatory statements are directly related to that controversy because they contradict her public denial of being "a stalker."

Thus, as the district court recognized, Harvey qualifies as a limited purpose public figure on the issues of "stalking, harassment, and assault"—and she "offer[ed] no binding authority" to the contrary. 1-ER-14.

2. Harvey suggests (at 48-49) that "the district court reserved its decision on the issue of whether Netflix met its burden to establish that Harvey is a public figure until a later stage in the case." That argument cannot be squared with the district court's express conclusion that it "agree[d] with Defendants[']" arguments regarding Harvey's public figure status, which Harvey "offer[ed] no authority" to refute. 1-ER-14. In any event, Harvey is plainly a public figure.

Harvey argues (at 50-55) that she is not an all purpose public figure "in this litigation" because the alleged defamatory statements do not relate to her candidacy for Parliament. This argument is new and thus forfeited. *See* 2-ER-78–79. Below, Harvey argued that she could not be an all purpose public figure because she was "never selected to be a candidate" for Parliament and "a candidate for office is not a

general public figure *after* the election." 2-ER-78 (emphasis added). The district court rightly rejected that argument, explaining that Harvey "offer[ed] no authority suggesting that the functional aspects of her political candidacy would disqualify her from being an all-purpose public figure." 1-ER-14.

Moreover, this Court has already held that "[a]ll-purpose public figures must prove actual malice for virtually any subject of defamation," not just those touching upon "a limited range of issues." *Planet Aid*, 44 F.4th at 924. That is what distinguishes an "*all purpose*" public figure from a "*limited purpose*" one. *Stolz v. KSFM 102 FM*, 30 Cal. App. 4th 195, 203 (1994) (emphasis added).

Harvey's lead authority—*Crane v. Arizona Republic*, 972 F.2d 1511 (9th Cir. 1992)—only undermines her position. Indeed, in *Crane* this Court explicitly contrasted the private attorney in that case with "[a]n individual who decides to seek governmental office," indicating that the latter is an all purpose public figure even if the former is not. *Id.* at 1525. *Crane* nowhere holds that a public figure plaintiff must prove actual malice only when the defamatory statement pertains to the conduct that establishes his status as an all purpose public figure.

Harvey next contends (at 55-60) that she is not a limited purpose public figure on the issues of stalking, harassment, and assault. She argues (at 57-58) that her publicly reported stalking of Wray and Dewar does not qualify as a "public controversy" because her actions had no "foreseeable and substantial ramifications

for nonparticipants." But these matters plainly concerned more than Harvey and her victims, as evidenced by the media coverage of Harvey's actions. *See, e.g.*, 2-ER-217–23 (Putnam Exs. M, N). That media attention was driven by the fact that her chosen victims were high-profile individuals—the wife of a Member of Parliament and the First Minister of Scotland. Harvey's harassment of these individuals accordingly affected the citizenry and the political process. *See Planet Aid*, 44 F.4th at 925 (a public controversy "affects the general public or some segment of it" (citation omitted)). Harvey offers no persuasive authority to refute this.

Harvey then argues (at 58-59) that she did not voluntarily inject herself into this public controversy because her "involvement" was limited to stating that she would contact her lawyer. But the public reporting of this incident described her involvement as far more extensive, noting that she denied being a stalker and provided an alternative version of events. 2-ER-219 (Putnam Ex. M). Moreover, Harvey ignores the district court's conclusion that even if "her stalking was not made public through any voluntary act, the case law makes clear that a person can become a limited public figure if he 'voluntarily injects himself *or* is drawn into a particular public controversy,'" and Harvey "was undoubtedly drawn into" this public controversy. 1-ER-14 (citation omitted). As this Court has held, the "voluntariness requirement" must be "interpreted broadly" and is met whenever a plaintiff "engaged in a course of conduct that foreseeably put themselves at risk of public

scrutiny with respect to" the relevant issues. *Planet Aid*, 44 F.4th at 926. That perfectly describes Harvey.

Finally, Harvey contends (at 59-60) that *Baby Reindeer* is unrelated to her publicly reported stalking of Wray and Dewar. This argument fares no better. The allegedly defamatory statements in this case contradict her public denial that she was a stalker, *see supra* at 13, making them germane to the controversy, *see Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1578 (2005).

* * *

In short, Harvey cannot get around the actual malice requirement, much less the fact that the district court obviously erred in relying on the flimsiest of sources to find that crucial requirement met. The district court's decision cannot stand.

## II. HARVEY CANNOT SHOW THAT REASONABLE VIEWERS UNDERSTOOD *BABY REINDEER* TO STATE ACTUAL FACTS ABOUT HER, SEPARATELY REQUIRING REVERSAL

Harvey's defamation claim fails for an even more fundamental reason: She cannot establish that *Baby Reindeer* would be understood by a reasonable viewer as stating actual facts "of and concerning" her, as if *Baby Reindeer* were a documentary like *Making a Murderer* using actual images, video, and audio to convey real-life events, rather than a drama series deploying dramatic devices to tell a story.

Harvey does not contest that the defamation standard is whether "a reasonable person, viewing the Series as a whole, 'would understand the character [Martha] was,

in actual fact, [Harvey] conducting herself as described.'" Netflix Br. 29 (alterations in original) (citation omitted); *see* Harvey Br. 29-30 (quoting this standard). Yet she conspicuously fails to engage with this standard and this Court's case law on considering allegedly defamatory statements in their full context.

The district court's conclusion that the Series would reasonably be interpreted as making statements of fact about Harvey is itself grounds for reversal.

### A. Harvey Ignores The Broader Context Of The Dramatic Series In Which The Allegedly False "Statements" Appeared

On the "of and concerning" element, this case boils down to one central question: whether using the phrase "this is a true story" once—about two minutes into the first episode of the Series and in the same font as the main character's texts and emails—necessarily conveyed to reasonable viewers that every detail about the Martha character that followed over the course of the seven episodes of the Series was an assertion of *fact* about Harvey, notwithstanding the use of different names, the many dramatic devices deployed throughout the Series, and the disclaimer following each episode stating that events and characters were fictionalized. Harvey's position that this question should be answered in the affirmative is untenable and must be rejected, for two primary reasons.

*First*, Harvey's approach ignores settled precedent from this Court and the Supreme Court mandating that an allegedly defamatory statement be "analyze[d] . . . in its broad context." *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995);

*see, e.g.*, *Masson v. New Yorker Mag.*, 501 U.S. 496, 520 (1991). Notably, Harvey does not dispute that defamatory statements must be considered in their full context. *See* Netflix Br. 29, 33-35. Nor does she dispute that this includes "not only the immediate context of the disputed statements," but also the creative work's "general tenor," genre, setting, and format. *Farah v. Esquire Mag.*, 736 F.3d 528, 535 (D.C. Cir. 2013); *see also Brodeur v. Atlas Ent., Inc.*, 248 Cal. App. 4th 665, 681 (2016) (similar). But that test is the death knell for her claim.

The "broad context" here is that *Baby Reindeer* is a fictionalized drama series—using actors, made-up names (including for the character Gadd plays), and a range of dramatic devices like flashbacks, edgy camera angles, offbeat music, and narrative voiceovers. Netflix Br. 33-35. Harvey does not dispute that the Series uses numerous dramatic devices described in Netflix's brief. *See, e.g.*, *id.* at 15-17, 34. Moreover, shortly after the "this is a true story" screen appears during the first episode, the Series states that it was "written *& created*" by Gadd. *Id.* at 35 (emphasis added). That context would "negate the impression" Harvey claims might otherwise have arisen from the "this is a true story" line—"that the statements involved represented a false assertion of objective fact." *Partington*, 56 F.3d at 1153-55. Indeed, the "this is a true story" line is itself used by creators as a dramatic device in other fictionalized series. Netflix Br. 42 n.6.

*Second*, Harvey also reads far too much into the "this is a true story" line. The Series did not say, "this is a documentary," or "everything that follows actually happened." It said this is a "true *story*." As Netflix has explained, the word "story" has a well-understood meaning that conveys that the essence and emotional core of the narrative was true and something Gadd experienced. Netflix Br. 40-41. This phrase would not reasonably be interpreted to mean that *every* scene, setting, piece of dialogue, or event actually happened—something Netflix never claimed, and that would conflict with the statement that the Series was "'written & created' by Gadd," the use of fictitious names for characters, and the disclaimer that "'incidents'" and "'characters'" in each episode were "'fictionalized.'" *Id.* at 34-35 (citation omitted). Harvey just ignores such elements of the Series' broader context.

The broader context is critical. Just as a ruling that automatically deems any fictionalized statement defamatory due to the use of the line "this is a true story" would be both unprecedented and problematic, a ruling that requires this line to be considered in the broader context of a series would not sanction its use in *any* circumstance. Context is critical—and the broader context here would establish to a reasonable viewer that the Series is not a true-to-life documentary.

Ultimately, Harvey's argument that the reasonable viewer would understand *Baby Reindeer* to be a *documentary* greatly underestimates the artistic sensibility of the average viewer. There is a reason *Baby Reindeer* won a Peabody for

"Entertainment," and not "Documentary"—two separate awards categories.[4] There is a clear and obvious difference between a documentary like *Making a Murderer* that recounts real-life events, and a *fictionalized story* that—while at its core centers around an emotional journey its creator experienced in real life—includes dramatized and fictionalized scenes to convey a broader message and enhance the entertainment value of a show and its message about issues of public concern. A reasonable viewer who went to Netflix to stream *Baby Reindeer* also would know that Netflix has its own category for "Documentaries" on its list of options.

Accepting that a reasonable viewer would understand that *Baby Reindeer* contains fictionalized and dramatized elements—as the disclaimer following each episode states—alone defeats Harvey's claim and requires reversal.

### B. Harvey's Remaining Arguments Miss The Point

Harvey's remaining scattershot arguments are unpersuasive.

*First*, Harvey spends pages (at 22, 25-29) arguing that the Martha character is "based on" Harvey. But this misses the point. The question is not whether a viewer would think Martha was "based on" a real person—something true of a vast array of fictional dramas. Rather, it is whether a reasonable viewer would believe that the

---

[4] *See* Michael Schneider, *Baby Reindeer, Ripley, Shogun, We Are Lady Parts Among This Year's Peabody Award Winners*, Variety (May 1, 2025), https://variety.com/2025/tv/awards/peabody-awards-2025-winners-baby-reindeer-shogun-ripley-1236383333/.

Series purported to state *actual facts* about Harvey, including that she had stalked a police officer. Netflix Br. 36. In other words, it is not enough for Harvey to show that Martha was *inspired by* Harvey; she must show that reasonable viewers believed that the Series they watched on Netflix was actually documenting Harvey's life in all respects. She has not come close to establishing this.

The declarations Harvey cites (at 28-29) suggest only that some viewers thought the Martha character was *inspired by* Harvey. But none of these declarations suggests, let alone proves, that any viewer also believed the Series was attempting to convey factual information about Harvey's actions—for instance, that Harvey had committed a crime or stalked a police officer. And that is not surprising. These individuals likely grasped the obvious reality that *Baby Reindeer* is a work of fiction, with events intentionally exaggerated and dramatized to entertain and convey an emotional message in a compressed timeframe.

Moreover, this understanding of the Series aligns perfectly with Harvey's own prior descriptions of *Baby Reindeer* as a "work of fiction" and "hyperbole," featuring a "fabricated" and "fictional" character—Martha. Netflix Br. 33 (quoting 2-ER-182 (¶17); Piers Morgan Interview at 17:24). Harvey just ignores these statements.

Harvey points (at 31) to foul online messages she received from a few cyberbullies. But "[a] cause of action for defamation is not established merely because someone believes" details about a character applied to a real person; that

belief must be "reasonable." *Aguilar v. Universal City Studios, Inc.*, 174 Cal. App. 3d 384, 391 (1985); *see Farah*, 736 F.3d at 537 ("The test, however, is not whether some actual readers were misled, but whether the hypothetical *reasonable* reader could be (after time for reflection)." (emphasis added)). Cyberbullies—acting irrationally and driven by some desire to incite fear—are far from the "reasonable" viewer. Netflix Br. 37-38. And the fact that a cyberbully lashed out against someone is not evidence that he actually believed a statement to be true, but rather evidence that he was simply seeking an opportunity to create unrest or spew threats.

*Second*, Harvey argues (at 29) that fictional works can sometimes be defamatory. That is a strawman. Of course, works styled as fictional can in fact depict real people in a manner that gives rise to a defamation claim. But in knocking down the strawman, Harvey wrongly downplays precedent from both this Court and the Supreme Court explaining that the fictional tenor of a statement must receive considerable weight in the defamation analysis, as that general tenor "tends to negate the impression that the statements involved represent[] a false assertion of objective fact." *Partington*, 56 F.3d at 1154-55; *see also Masson*, 501 U.S. at 512-13 (statements made in "a so-called docudrama or historical fiction" should not be accepted unquestioningly); *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 326 (1997) (same for statements in fictional films). "It is absolutely crucial that, for the purposes of evaluating [defamation claims], courts distinguish

analytically between intentionally false statements of facts on the one hand and narrative fiction on the other." *Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d 294, 306 (D.C. Cir. 1987).

This Court's decision in *Partington*—which Harvey just ignores—is directly on point. There, this Court explained that "[d]ocudramas, as their names suggests, often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes in order to capture and maintain the interest of their audience." 56 F.3d at 1155. Thus, viewers can be presumed to be "sufficiently familiar with th[e] genre to avoid assuming that all statements within them represent assertions of verifiable facts." *Id.*; *see also id.* at 1157 (movie character's "use of hyperbolic language" supported conclusion that dialogue was "designed to maintain the viewer's attention—rather than [be] an objective statement of fact").

The fictional tenor of a series is *critical* for the defamation analysis and cannot be ignored. *See, e.g.*, *Brodeur*, 248 Cal. App. 4th at 681 ("[T]he general tenor of *American Hustle*, the entirely farcical nature of the [scene at issue], and the ditzy nature of the character uttering the allegedly defamatory statement, all indicate that" the statement was not intended to be factual.); *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1081 (C.D. Cal. 1998) ("the general tenor of" a fictional film and "the context in which the alleged Defamatory Material arises"

would show it was not asserting factual statements). Yet Harvey continues to ignore the dramatized nature of *Baby Reindeer* on appeal.

Harvey instead cites two nonbinding cases with very different facts. *Gaprindashvili v. Netflix, Inc.* involved a line in the historical drama *The Queen's Gambit* stating that "Nona Gaprindashvili . . . [was] the female world [chess] champion and has never faced men." No. 21-cv-07408, 2022 WL 363537, at *1 (C.D. Cal. Jan. 27, 2022) (emphasis omitted) (citation omitted). The district court concluded that reasonable viewers could have understood this line as conveying a statement of fact about Gaprindashvili because the Series specifically "reference[d] real people and events and most importantly, the Line identifies a real person"— Gaprindashvili, a real chess player from the same historical period depicted in *The Queen's Gambit*. *Id.* at *5.

In stark contrast, *Baby Reindeer* does not reference real-life individuals, does not depict historical events, and never uses Harvey's name. If anything, *Gaprindashvili* bolsters *Netflix's* argument that the fact that the Series did *not* use Harvey's name—and used a different name for the character Gadd plays—renders unreasonable any belief that the Series intended to convey that everything that happened to Martha actually happened to Harvey in real life. *See infra* at 27.

*Bindrim v. Mitchell*, 92 Cal. App. 3d 71 (1979), a nearly 50-year-old decision, involved highly unusual circumstances not present here. In *Bindrim*, a character in

the defendant's novel and the plaintiff doctor both used a distinctive method of group therapy—the "Nude Marathon" practice—where participants removed their clothes to shed psychological inhibitions. 92 Cal. App. 3d at 69-70. The defendant attended the plaintiff's sessions and then secretly recorded and incorporated those experiences into a novel, changing only a few details about the plaintiff's physical appearance and level of education. *Id.* at 75. In stark contrast to the novel in *Bindrim*, the Series openly informs viewers that it was "written *& created*" by Gadd, with "incidents" and "characters" explicitly "fictionalized for dramatic purposes"—thereby telling viewers expressly it diverges from real life. Netflix Br. 34-35 (emphasis added) (citation omitted). The Series also uses a variety of storytelling devices that clearly communicate to any reasonable viewer that it is not presenting *factual allegations* about any real-life person. *Id.* at 33-37, 39-43.

Ultimately, Harvey's position is that creators of a show would be prone to liability for defamation if a single person could prove that any aspect of an identifying character did not actually apply to that person. That cannot be the law. If it were, it would shut down artistic expression through drama series in Hollywood.

*Third*, Harvey constructs yet another strawman—arguing that Netflix's disclaimer cannot "[i]mmunize" it from liability because it "conflict[s]" with the "'this is a true story' line" in the first episode. Harvey Br. 31-33 (citation omitted). But she has it backwards. The "this is a true story line" has to be read *in light of the*

*disclaimer*. In any event, Netflix's argument does not rest solely on the disclaimer, but on the entire contextual framework of the Series. Even the cases Harvey cites emphasize that a disclaimer—including a disclaimer appearing at the end of the credits in a Netflix show—is critical context that must be "considered." *Gaprindashvili*, 2022 WL 363537, at *6; *see also Mossack Fonseca & Co. v. Netflix Inc.*, No. 19-cv-9330, 2020 WL 8510342, at *4 (C.D. Cal. Dec. 23, 2020) (film's dramatization and disclaimer reduced likelihood that viewers would perceive it as making factual assertions). There is no basis to ignore it, as Harvey suggests.

*Finally*, Harvey criticizes (at 34-41) Netflix's discussion of the relevant case law in its opening brief—disputing the applicability of cases like *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1044 n.1 (1986), *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1405 (1999), *Greene v. Paramount Pictures Corp.*, 813 F. App'x 728, 732 (2d Cir. 2020), and *Tamkin v. CBS Broadcasting, Inc.*, 193 Cal. App. 4th 133, 146-47 (2011), and challenging Netflix's framing of the relevant standards. But it is Harvey who refuses to engage with the key standard, as set forth in this Court's decision in *Partington*—that a reasonable viewer would understand the Series *as a whole* to be stating actual facts about Harvey. *See supra* at 22-24.

Consistent with that rule, cases like *Tamkin* rightly impose a meaningful bar to show that a statement is "of and concerning" the plaintiff. Netflix Br. 31-32. Given that the "mere similarity or even identity of names is insufficient" to clear that

bar, *Tamkin*, 193 Cal. App. 4th at 146-47, it follows that the use of *different* names is a strong indication that a series is not "of and concerning" the plaintiff.

That conclusion is reinforced by cases holding that the use of a different name in a creative work is strong evidence that the work does not make factual assertions about a plaintiff. *See, e.g.*, *Sarver v. Hurt Locker LLC*, No. 10-cv-09034, 2011 WL 11574477, at *8 (C.D. Cal. Oct. 13, 2011), *aff'd sub nom.*, *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016) (fictional movie did not convey facts about the plaintiff because it did not use the plaintiff's name); *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 903 (7th Cir. 2007) (emphasizing the "importan[ce]" of the film "Hardball" using a different name to refer to the plaintiff); *Greene*, 813 F. App'x at 731 (the "most obvious" reason why no reasonable viewer would understand the film to be stating facts about the plaintiff was that it did not use his name). The result should have been the same here.

By focusing on irrelevant details in the cases Netflix cited and overlooking those cases' actual substantive import, Harvey neglects her essential burden to establish by "clear implication" that the Series is stating *facts* about her. Netflix Br. 31-32. Harvey's failure to meet that burden is an independent ground for reversal.

## III. HARVEY'S TELLING REQUEST FOR LEAVE TO AMEND HER COMPLAINT SHOULD BE REJECTED

Harvey ends by raising—for the first time in this case—a request for leave to amend her complaint. That eleventh-hour request should be denied.

Harvey never sought leave to amend her complaint in the district court in the event that her complaint was struck, and therefore has abandoned this request. *See, e.g.*, *Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110, 1114 (9th Cir. 2025) ("Osheske did not request leave to amend from the district court, so we need not consider that argument on appeal."); *Alaska v. United States*, 201 F.3d 1154, 1163-64 (9th Cir. 2000) ("Where a party does not ask the district court for leave to amend, 'the request [on appeal] to remand with instructions to permit amendment comes too late.'" (alteration in original) (citation omitted)). Regardless, the fundamental legal flaws in Harvey's theory of liability against Netflix make it "clear . . . that [Harvey's] complaint could not be saved by any amendment." *Osheske*, 132 F.4th at 1114 (citation omitted). And Harvey has not come close to showing otherwise. Thus, her belated request should be denied. *Id.*[5]

---

[5] Harvey's suggestion (at 60-61) that her claim for intentional infliction of emotional distress "was not argued in Netflix's motion to strike" and therefore "is not at issue on appeal" is baffling. Netflix moved to "strike Harvey's complaint in its entirety." 2-ER-118; *see also* 2-ER-132 (specifically seeking to strike Harvey's "claim[] for intentional infliction of emotional distress"); 1-ER-15 (district court noting that Defendants sought to strike this claim). In response, Harvey did not argue that her intentional infliction claim could survive on any basis independent of the defamation claim. Her new arguments about that claim are therefore forfeited.

## CONCLUSION

The judgment of the district court should be reversed.

Dated: July 18, 2025

Respectfully submitted,

*s/ Gregory G. Garre*
Gregory G. Garre
*Counsel of Record*
Christina R. Gay
Sakina J. Haji
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

Marvin S. Putnam
Laura R. Washington
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
(424) 653-5500

*Counsel for Defendants-Appellants*
*Netflix, Inc. and Netflix Worldwide Entertainment, LLC*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 24-6151

I am an attorney for Defendants-Appellants Netflix, Inc. and Netflix Worldwide Entertainment, LLC.

This brief contains 6,969 words, including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Gregory G. Garre* **Date:** July 18, 2025